**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| MARC B. GOODMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   **Case No.: MJG-04-391** |
| | ) |
| PRAXAIR SERVICES, INC. | ) |
| | ) |
| Defendant | ) |

**MEMORANDUM IN SUPPORT OF PLAINTIFF MARC GOODMAN'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

Marc B. Goodman
P.O. Box 727
North Beach, Md.  20714
(301) 855-7655
marcbgoodman@msn.com

*Pro se*

September 29, 2008

# TABLE OF CONTENTS

I.      Goodman is Entitled to Judgment or Favorable
        Inferences Due to PSI's Spoliation of Evidence ............................ p. 1.

II.     Tracer Is Liable to Goodman for Breach of Contract ...................... p. 2

        A. Goodman met the terms of his contract with Tracer
        Research for the success fees ................................................... p. 2

                1.  PSI's Contract Interpretation .......................................... p.2

                2.  Valid Contract Interpretation ....................................... p. 5

        B. If the terms of the original letter proposal had not been met,
        those terms would have to be seen as subsequently modified,
        a new contract substituted and/or the condition precedent waived .............. p. 15

        C. Tracer prevented Goodman from performing, breaching
        the contract and excusing his performance as well as waiving
        any condition precedent to the success fee ......................................... p. 17

III.    The Success Fees PSI Owes Goodman Are Based on the Cumulative
        Number of Tracers Available for Use with Gasoline Tanks and Those
        Available for Use in Diesel Tanks, (and Which Were Excluded
        From the EPA Fuel Additive Registration Testing) .......................... p. 19

IV.     Goodman was Tracer's Agent ("Employee" Under Md.'s Wage
        Payment Collection Act) and the Monies Owed Goodman
        are Wages Under the Act ........................................................... p. 26

        Factor 1, Control and dependence .................................................... p. 31

        Factor 2, Whether the services provided were within the
            usual course of business of the enterprise ..................................... p. 35

        Factor 3, Whether the individual is customarily
            engaged in an independently established trade, occupation,
            profession or business ............................................................ p. 36

        Factor 4, whether it is the employer or the employee who supplies the
        instrumentalities, tools, and location of the work performed .................... p. 37

        Factor 5, whether the individual receives wages directly from the employer
            or from a third party for work performed on the employer's behalf .......... p. 38

       Factor 6, whether the individual had an ownership interest in the
business such that he had the ability and discretion to
affect the general policies and procedures of the business ................... p. 38

V.    PSI's Counterclaims For Breach of Contract and
Misrepresentation Should Be Denied .............................…..... p. 39

    *Breach of Contract by Goodman* .............................................. p. 39

    *Fraud and Negligent Misrepresentation* ..................................... p. 40

VI.   Goodman is Entitled to Restitution in *Quantum Meruit*
and/or Unjust Enrichment as Alternative Means of
Recovery on the Breach of Contract ...................................... p. 46

VII.  Tracer's Refusal to Pay Goodman Was Not for a Bona Fide Reason ........... p. 49

**I. Goodman is Entitled to Judgment or Favorable Inferences Due to PSI's Spoliation of Evidence**

1.    Goodman will shortly be filing a motion regarding spoliation, which will identify how Tracer should have known of a likelihood of litigation by 1999.  PSI admits that no litigation hold was ever issued regarding this matter until March 11, 2008 (Exh. 1, Answer 9).  Potential litigation had been mentioned immediately upon the EPA letter in December 2000 (MtyDpTr 358:6-12), confirmed in a letter of Jan. 5, 2001 (Exh  2, p. 9, 10).  No instruction to preserve evidence was ever given to Richard Wilson of National Environmental Strategies (NES) (Wilson Dp.Tr. p. 94), despite PSI's defense centering on its assertion that relief was by Wilson separately from and with no contribution by Goodman.  Failure to issue litigation hold constitutes spoliation.  *Broccoli v. Echostar*, 229 FRD @ 510.

2.    Among the most important of Wilson's statements of inability to answer are that, without his file, he could not say:  *(1)* how "useful" or "critical" Goodman's ideas, material, and facts had been or whether or not he had relied on them (WilDpTr pp. 116-117); *(2)* how much of the strategy followed by NES had been provided by Goodman (p. 116); *(3)* although sure that material was provided to him (p. 106-107) and that he would have drawn on whatever was provided (p. 82, 17, 18), he could not remember which materials were provided (p. 105-106).  The evidence and testimony unavailable from Wilson clearly strike at the heart of PSI's case, as shown in its Memorandum in Support of its MSJ. Therefore, the extreme prejudice to Goodman might well be shown adequate to justify disposition in his favor, *Silvestri v. General Motors Corp*, 271 F. 3d 583, 591 (4th Cir. 2001), by default judgment. Certainly inferences will be warranted.  These issues will be further delineated in Goodman's coming spoliation motion and as they come up in pleadings and proceedings.  Goodman asks the Court to be mindful of this in considering the pending dispositive motions, as such inferences could remove any doubt as to whether summary judgment is warranted on some issues.

## II. Tracer Is Liable to Goodman for Breach of Contract

### A.    Goodman met the terms of his contract with Tracer Research for the success fees

#### 1. *PSI's Contract Interpretation*

3.      PSI is essentially correct in stating that the success fees in the April 14 agreement (PSI Exh 7) were due Goodman "if he was successful in obtaining exemptions[1]" for the tracers. PSI MSJ Mem., p. 11. PSI's memorandum also correctly points out that the $10,000 consolation fee was to become the total amount payable only if the ***overall efforts*** to have the tracers excluded proved unsuccessful (*Ibid.*). The agreement indeed provided for payment of the success fees to Goodman if the project were successful and it unquestionably was successful. EPA issued a letter finding the tracers not to be fuel additives, hence not requiring registration, on December 19, 2000, precisely the avenue of relief that Goodman had most pushed for throughout the project. In its forlorn attempt to avoid payment, PSI now takes an interpretation of the agreement with absurd result, which it purports to be literal. Along with PSI's illogical interpretation, PSI seeks to avoid liability by also inventing the fiction (refuted below) that there was not one project to obtain relief but two separate projects, one of which failed and other of which succeeded without Goodman's involvement.

4.      PSI argues that the intent of the parties was to allow Tracer to use Goodman to perform hundreds of hours of work so as to earn the success fee, use him to perform seven of the nine steps shown in the agreement as anticipated to be used for the success fee, then, before Goodman could conclude the project, the agreement allowed Tracer to suspend his communication with EPA, keep him working by promising him that he would still get the success fee with other individuals doing the communicating

---

[1] The term "exemptions" is a misnomer. The success fees were payable if Goodman found a way to have the tracers excluded from the EPA testing whether by "exemption" or otherwise.

with EPA, and then, after success, deny him the success fee by claiming that others, not he, had been the "proximate cause" of the success (PSI Mem., p. 15). That is precisely what Tracer/PSI has done and how it hopes to avoid payment. Tracer CEO Shannon Marty testified that she suspended Goodman's contacts with EPA (Mty DpTr 124:19, 128:4, 214:11-14, 215:6-9, 353:12-14, 356-357, Answer/Counterclaim, p. 3, #12, Exh 1 - Answer #19), after which she "kept him working" "diligently" (MtyDpTr.119:2-5, 132, 186:14-18, 202-203, 249:1-250:7, 252-256, 292:5-7, 364:4-7, 376:11-13, 396:13-397:16) and doing so for the sole compensation of the success fee (256:4-6, 377:3-6). But, Marty also testified that her (secret, 379:6-13, 272:4-15, 125:3-9) interpretation of her commitment was to only pay Goodman the success fee if he participated in the ultimate discussions with EPA (256:11-21, 376-381), and that such participation by Goodman was at her sole discretion (272:8, 320:18-321:12, 371-372, 378:8-379:13).[2]

5.      That interpretation is completely unfounded in logic, in the evidence, and in basic principals of contract interpretation. The cardinal rule of contract interpretation is to give effect to the intent of the parties. *Catalina Ent. v. Hartford Ins.*, 67 F.3d 63, 65 (4th Cir. 1995 – Md.). "An interpretation that makes a contract fair and reasonable will always be preferred to one which leads to either a harsh or unreasonable result." *Canaras v. Lift Truck Services*, 322 A.2d 866, 877, 874 (Md. App. 1974) citing cases. *P.V. Properties v. Rock Creek Village Associates Ltd.*, 549 A.2d 403, 406. *Catalina, supra* @66. This applies even when the harsh interpretation is "strict and literal." *Catalina* @ 65. Moreover, Maryland law strongly imputes all contracts to imply a warranty of fair dealing and cooperation, making it breach of contract to prevent or even hinder performance by another party (discussed *infra*, Sec. II.C.).

---

[2] Shannan Marty and Glenn Thompson are parties in interest in the case, having indemnified Praxair when they sold Tracer to Praxair (Answer # 18 , Exh 1). Their statements should be treated as admissions or declarations against interest.

*Parker v. Columbia Bank*, 604 A.2d 521, 531 (Md. App. 1992) citing many cases, *P.V. Properties*,

*supra* @ 408. The Marty/PSI interpretation obviously conflicts with this implied contract warranty.

6.      While PSI does not now explicitly adopt Marty's disingenuous interpretation, PSI's position

implicitly relies on it since it precisely describes the facts of the case. PSI tries to avert attention from

this by inventing a fiction that there were "two projects," one Goodman's and one without his

participation. PSI and Marty have declined to identify any date or event marking the unsuccessful

conclusion of the first project and the onset of the second (MtyDpTr 132-133, 202) and do not claim that

the parties communicated any such boundary (p. 125, 315-316). Rather, because Tracer had gradually

changed the roles of various consultants, excluding Goodman from the final stages of the project after he

had already succeeded in the tasks assigned to him, while keeping him on-call if needed, PSI now

apparently draws a fictional dividing line retrospectively to the point where Goodman's active role was

completed and he was put on stand-by. This fiction is shown by Marty's email to Goodman of June 13,

2000, (Exh. 3).

> "I was going to get ahold of you [Goodman] as soon was we got a little further with EPA, but I'll
> give you an update. …
>
> *I will only count this project under control when we actually have something in writing from*
> *EPA.*
>
> *I will get you* [Goodman] *involved in this process if we need your expertise.* ***At Friday's meeting***
> ***everyone seemed to indicate they had what they needed. However, if anyone hits a bump we***
> ***may need to get you involved***. I am the point of contact with EPA on this so I'll let you know."

***This was over six months after the meeting in which NES was brought on board and eight months***

***after Mary Gade had been engaged.*** Marty confirmed in her deposition that the reason Goodman was

not included in strategy sessions and meetings with EPA after Feb.-March 2000, was simply that he was

"no longer needed," (PSI MSJ Mem. p. 25, MtyDpTr, p. 125, p. 295-297, p. 322)  since the other

consultants were skilled at approaching EPA.  Marty confirms in this email above that Goodman had already successfully accomplished his main role because "*everyone seemed to indicate they had what they needed* [from him]."  Even at this point, however, Marty emphasizes that Goodman must maintain availability, because Marty "*will only count this project under control when we actually have something in writing from EPA.*"  *Ibid*.  This testimony highlights the obvious fiction of the "two projects" argument.  A party may not avoid payment on a contract by injecting a division into a "unified project".  *Franklin Co. v. U.S.*, 381 F.2d 416, 418 (Ct.Cl. 1967).  Nor can a party avoid payment on a contract because it decides that services are not needed and declines to accept them, *City of Memphis v. Ford Motor Co.*, 304 F.2d 845, 849 (6th Cir, 1962), which is the core of PSI's position, though in this case Tracer continued to demand Goodman's services/availability.

### 2.  *Valid Contract Interpretation*

7.     The summary judgment evidence allows only one conclusion:  that the April 14 agreement, to say nothing of the contract between Goodman and Tracer in totality, embodying subsequent communications and inferences from the conduct of the parties, compels a different interpretation than the absurd and unconscionable one urged by PSI.  PSI's memorandum correctly points out that the $10,000 consolation fee was to become the total amount payable only if the overall efforts to have the tracers excluded proved unsuccessful (PSI Mem. p. 11).  While the language of this informal letter, which Tracer declined to augment with a formal contract (MG Dec par. 14 and MtyDpTr 64:1-65:5), describing the three success fees, is slightly different for each, the agreement must be read as a whole (*Catalina Ent. v. Hartford Ins.* 67 F.3d 63, 65 (4th Cir. 1995 – Md.) ), particularly with this language describing the alternative fee if the overall project were unsuccessful.  Marty confirmed that the agreement referred to a "very broad" concept (MtyDpTr 83:16), to bring about the result of persuading

EPA through any of a wide array of methods (MtyDpTr 82:18-85:3), which could include use of other interlocutors (chosen by or with Tracer). As Marty testified, if Goodman had drafted a letter for Marty's signature, submitted to EPA, which elicited a favorable response without any oral communication, or if he had just found a regulatory provision that excluded Tracer, those would have qualified (68:19-70:1). Marty's interpretation taken after the project was concluded, that Goodman's direct participation in final talks with EPA was required (256:11-21, 376-381), which she never communicated to him (379:6-13), despite her having suspended Goodman's authority to speak with EPA (*supra*), has no basis in law nor in the intent of the parties. The April 14 document does not in any way limit entitlement to the success fees based on what specific methods would ultimately be adopted by Tracer. Thus, alternative and reasonable interpretations to PSI's are available and must be adopted.

8.      The April 14 agreement clearly did not explicitly provide for the situation that Tracer created, with Goodman providing strategy and arguments for others to communicate to EPA.[3] Rather, the agreement plainly envisaged that Goodman would play a lead role in communicating with EPA, without specifying how he would do so. As Marty stated, the agreement authorized Goodman to represent Tracer before EPA (MtyDpTr 119:6-10). But Tracer suspended Goodman's authority to communicate on its behalf with EPA in April 1999 (*supra*), having previously instructed him to hold-off on setting up a meeting with the EPA official who the decision on relief to Tracer had been referred to (MtyDpTr 357:9-18) and never subsequently reauthorized him to contact EPA (MtyDpTr 215:6-9, Answer and Counterclaim, Dckt paper 55, p.4 #18). Thus, by revoking the authority provided by the agreement and preventing Goodman from performing as he wanted and needed to do to meet the condition precedent -

---

[3] This does not mean that the original document was ambiguous. "That a term cannot be precisely defined so as to make clear its application in all varying factual situations does not mean that it is ambiguous." *Allstate Insurance v. Humphrey*, 229 A.2d 70, 72 (Md. Appeals, 1967); *Lynard Tucker v. Fireman's Fund Ins. Co.*, 517 A.2d, 722, 732; *Bentz v. Mutual Fire*, 575 A.2d 795, 801.

persuading EPA on his own (MtyDpTr 119:14-16), Tracer unmistakably breached the agreement.[4]

Tracer kept Goodman working diligently on the project for another 10 months after suspending his

communication with EPA (*supra*) and kept him on stand-by for another 10 months after that (MtyDpTr

296-297, 311:13-21), thus continuing to demand his services for 20 months while preventing him from

contacting EPA.  Apart from such breach on its own making Tracer liable, excusing Goodman's

performance, and waiving his condition precedent, discussed *infra*, it was this breach by Tracer that

created any ambiguity in contract terms as they applied to the subsequent situation.  *"That a term may be*

*free from ambiguity when used in one context but of doubtful application in another context is well*

*settled."  Bentz, supra.*

9.       The agreement between Goodman and Tracer consists not merely of the April 14 letter-proposal

but of all evidence of the intention of the parties, with subsequent agreement superseding prior.  As the

original document did not provide clearly for the situation that developed, the interpretation of the

contract and its application to that situation must be determined from additional communications

between Tracer and Goodman and inferred from the conduct of the parties.  Such undisputed conduct

and communications make perfectly clear that the parties intended that Goodman would be paid the

success fees in those circumstances.  Firstly, Tracer kept Goodman working "diligently" for an

additional ten months and on stand-by for another ten[5] after it had suspended his contact with EPA,

---

[4] While Tracer presumably had a right to stop Goodman from representing it before EPA, as Marty testified (122:20-123:14), its doing so nonetheless breached its agreement with him. *Black v. Woodrow*, 39 Md.194, 1874 WL 4715, *13 (Md. Appeals, 1874).  The same is true for terminating employees under employment contracts; the employer retains the right to terminate but breaches contract in doing so.

[5] We also serve, who only sit and wait.  Goodman was precluded from seeking or accepting other full-time employment during the last 10 months.  Such stand-by status is considered as service and employment in a wide variety of contexts, including medical care, emergency response, professional sports, types of facility maintenance, presumably Mafia hit men, etc. and must be here also.  The very concept of the "retainer agreement" presumes service by maintaining availability.  See *Battaglia v. Clinical Perfusionists*,  658, A.2d 680, 681, describing Battaglia as an "**on-call clinical perfusionist**;" *Marroquin v. Canales* 505 F.Supp 283, 294-295 (D.MD. 2007); also, generally, *Skidmore v. Swift* 323 U.S. 134, 135-137 (1944); Armour v. Wantock, 323 U.S. 126, 132 (1944).  Goodman was engaged to wait, not waiting to be engaged.

without any other basis or reason for him to do so other than the success fee (256:4-6, 377:3-6). Secondly, Tracer used Goodman to educate the additional consultants as to the history of the project, strategy, avenues for relief, arguments supporting those avenues and impediments to the relief – to facilitate those persons taking over the role PSI now claims that Goodman's success fee was predicated upon (MtyDpTr 284:19-286). Thirdly, a host of communications, summarized below, show that this was their understanding.

10.      Tracer CEO Marty testified that when she suspended Goodman's contacts with EPA, she believed that she would probably reauthorize him to approach EPA for Tracer but was considering whether or not to do so (379:9-13). She never communicated to him that she was so considering not reauthorizing him, however (272:4-15, 379:6-13). She testified that she wanted him to continue working on the project and that he did so diligently (*supra*). And that he was doing so solely for the success fees (256:4-6, 377:3-6). And that she had told him that holding-off on contacting EPA was only until the legal analysis was complete and a strategy confirmed (MtyDpTr 357:9-18, 376:5-381:17). Tracer obviously knew that Goodman's understanding was that he would earn the success fees if the project were successful and that he would be given a chance to make it succeed. The contractee is obliged to assign to the service provider those aspects of the project intended to it and tied to its compensation. *Franklin Co. v. U.S.*, *supra* @ 420. If one party to a contract knows or even ***has reason to know*** the meaning that the other party attaches to a contract, the first party is bound to that meaning. *City of Memphis v. Ford*, 304 *supra* @ 849 (C.A. 6, 1962), citing *Bowers v. U.S.* 221 U.S. 176, 188, 29 S.Ct. 77; *Creswell v. U.S.* 173 F. Supp. 805, 811 (Ct. Cl.1959), citing *Corbin Contracts*, §538 pp. 41-42 and cases. This is an "***unassailable rule of contract law***." *HPI/GSA v. Perry*, 364 F.3d 1327, 1335, 1336 (C.A. Fed. 2004). *Perry and Wallis v. U.S.* 427, F.2d 722, 725 (Ct.Cl. 1970): *"The knowledge that*

8

*each of the parties had as to the intended meaning of the other party to the contract must be considered*

*along with the acts and conduct of each party in executing the contract in light of such knowledge.*"

*Ibid*, @ 726. *Franklin v. U.S.* @ 416, 418, 420. This rule applies also to contract modifications. *Sun*

*Shipbuilding v. U.S.,* 393 F.2d 807, 817 (Ct.Cl. 1968). Marty testified that she did not know what

Goodman's interpretation was (297:6-9, 302:17-303:5, 266:12-15), though it should have been obvious,

since she knew that he was working so for no other compensation. If a party is uncertain as to the

meaning attached by the other party, i.e., "put on inquiry," it is bound to investigate the other's meaning

or to accept it. *Ibid.* @ 818; *Perry and Wallis*, *supra.* @ 725. *HPI/GSA* @1336. It has an affirmative

obligation to resolve any difference in understanding. *Ibid*; *Beacon Construction v. U.S.* 314 F.2d 501,

504. Tracer knew the terms on which Goodman was offering his services; thus, receiving them in

silence operates as acceptance of the terms. *Edell and Associates v. Law Firm of Peter G. Angelos*, 264

F.3d 424, 439, (4th Cir. 2001). But Tracer went beyond silence in affirming the terms, as shown below.

11.      In Nov. 1999, when Marty had decided to engage Gade, she proposed to Goodman that they

"rework the agreement," (Marty email, Nov. 19, 1999, Exh. 4, p. 3) meaning, as Marty testified, to

reduce the success fee or eliminate it (267:10-16, 270:8-12). Marty clearly was already contriving to

deprive Goodman of his fee ("make it go away" 270:12). But, still desiring Goodman's services, in the

next sentences of the same Nov. 19 email, however, Marty assured him:

> "*You have done a tremendous amount of work and **I do not want to discount that in any way**. Give me your thoughts on what you think we should do. Also, what happens if this latest effort also fails to produce results?*"

Thus, Marty clearly communicated that the success fee would be applicable except by mutual agreement

to restructure it, presumably with a greater non-contingent fee, as suggested in Marty's question. Still

confident of success, Goodman argued against reducing the success fee for a larger non-contingent fee

in his reply email (MtyDpTr 271:21-272-3; Exh 4, pp. 1-3).[6]  In a (second) conference call (Nov. 24) between Goodman, Marty, Gade and Gade's assistant, Gade (having now read Goodman's materials) abandoned her own previous ideas and pronounced Goodman's to be "excellent," saying they would be the strategy going forward and that no further research would be required (MG Dec par. 29; MtyDpTr 261:11-19 - neither recalls nor denies).  Marty confirmed this in an email to Goodman later that day:

> "*I feel much better after this morning's conference call.  **If I don't have to pay for a lot more research and strategy, I can more comfortably live with our original agreement*.** ... *I feel much better with Mary and the fact I believe we can effectively operate as a team.*"  (Exh  4, p.1)

Goodman interpreted that the only way he could – that the success fee would **_not_** be reduced but would be paid by Tracer notwithstanding the new consultants playing the lead role in communicating with EPA. (Gade was already engaged and the decision had been made in that conference call to seek Wilson's help.)  Marty confirmed that this is what she meant but with her secret twist or subsequent reneging (272:4-15).  Goodman relied on the assurance from Tracer that he would still get the success fee and continued to work on the project (MG Dec. par 31),  There is no question but that Tracer knew Goodman was working with the understanding that he would be paid the success fees if the project were successful with the participation of the new consultants.

12.     Not only did Goodman dedicate 20 months of his life (MtyDpTr 258:12-13) and hundreds of hours of direct labor to Tracer's relief ***after his contact with EPA was suspended*** (April 1999-Dec. 2000, *supra*), but he was directly used to put the new consultants into place to pick up the contact with EPA by Tracer telling Goodman not only that he would still earn the success fee (*supra*).  Beyond the great volume of work Goodman had done between February/April 1999 (when his setting up the

---

[6] His email is misdated as January 8, 2000 due to a "Y2K" test he was doing on his computer, but it can be seen as the reply to Marty's of Nov. 19 in this "email history" not only physically and in the substance described above, but in his reply regarding the next conference call schedule, which Marty proposed for "9:30 EST Wednesday" and Goodman opens by confirming for that.

meeting with Oge was put on hold [Feb.] and then all his contact with EPA was put on hold [April] ) and

Nov. 1999, when Gade was engaged, Goodman did substantial work *even after* the new consultants

were recruited.  Between April and November 1999, all the work with Scroggin, NLRG, and Sapphire

Group was done and numerous other documents were drafted by Goodman.  After Gade was engaged in

Nov., Goodman, under instruction from Tracer, participated in two conference calls with Gade, provided

her written material and emails sent to EPA (MtyDpTr 249:1-250:7), drafted a complete chronology of

his communications with EPA (most of which had been oral) running to 10 single spaced pages (PSI

Exh 18, MtyDpTr 252:6-254:4), and completed drafting a 20 page single spaced argumentative memo

incorporating the legal authorities found by NLRG (PSI Exh. 27, MtyDpTr  252:15-253:15, 255:2-16).

He participated in a meeting at NES where he briefed the new consultants on strategy, impediments,

history of communication with EPA, avenues for relief, and arguments in support of the avenues

(MtyDpTr 284:19-286:17; Wilson DpTr pp.13-15).  He prepared an additional memo on the

environmental role of Tracer, as tasked at the January 7, 2000 meeting with NES, which went through

two rounds of comments by various Tracer staff before Tracer instructed him to forward it to NES a

month after the NES meeting (Exh 5; WilDpTr 20:1-21:5).  Moreover, it was Goodman who first

proposed engaging Wilson (Exh 6, top) so Wilson's work can be seen as an extension of his.

13.     When Goodman was not included in additional meetings with EPA he protested but Marty

instructed him to merely remain on stand-by for additional strategy and analysis (breaching contract -

*Vesprini v. Shaw*, 221 F.Supp.2d @ 64-65 (D.Mass.)).  In  March 6, 2000 email, (Exh.7,), Marty replied:

> "*At this point I am comfortable with the direction we are going and how it is being pursued.  **I
> believe your knowledge and background will be critical when it comes to figuring out how to
> get us out of the regulatory web.**  At this time, I believe we are merely sowing the seed to create
> the desire within the upper levels of EPA to do so.*

14.     Although Gade had originally suggested focusing only on the small business exemption and going over Oge's head to Asst. Administrator Persciacepe, Wilson followed the same path started and advocated by Goodman.  PSI's SOF, p. 1,2; WilDpTr, pp. 24-25; especially ***Exh. 4, p. 2, 1st full para.***:

*"I think we need to get Oge or Persciape to indicate an interest in finding a solution and make her or him aware that there are various options.  This will give the staff more incentive to work out one or more favorable recommendations*."  Goodman email to Marty, 11-19-99 (misdated due to Y2K test).

Wilson immediately found that the officials Goodman had previously communicated with (Kortum, Caldwell, Mathews) were already largely accepting of the idea of tracers not being fuel additives, obviously due to Goodman's prior work (Exh 7, p. 2).  Then, when the first meeting with Margo Oge was held and she heard of this avenue for the first time, she readily accepted it, based on the advice of Kortum/Caldwell/Mathews.  Marty reported this to be due to the work Goodman had done with NLRG:

*"OGC has been given the results of the legal research and Keith Mathews apparently did make Margo feel like there were a number of options not to cover us*."

Marty email to Goodman May 5, 2000 (Exh 8).  Marty explained that this referred to Goodman's work product with the authorities he developed with NLRG (MtyDpTr 308:3-309:13).  Although Wilson proposed four reasons for tracers not being fuel additives (PSI Exh 31 - NES006, WilDpTr 88:5-89:2), all of which were drawn from Goodman's work (WilDpTr pp. 64-80 combined with MtyDpTr 287:10-18, 155:9-156:4, 327:18-328:7, 332:7-334:17, 336:2-16), EPA only adopted one of these – that the tracers don't add value to fuel (PSI Exh 34, 2nd para.) - along with two other reasons (that the concentrations are lower than for fuel additives; and that the tracers migrate apart from the fuel - *Ibid*) that had been made by Goodman but not Wilson (e.g., Exh. 9, 3rd and 7th bullets, WilDpTr 89:3-17).

15.     Wilson's ***not remembering (without his file)*** having needed to focus on obtaining legal analysis or specific avenues of relief, which was what he actually testified (18:1-11, 27:17-32:2, 102:6-15, 105:1-20, 113:19-117:6), largely reflects that that was already done.  Goodman had already persuaded EPA of

this avenue of relief and reasons justifying it (Exh 3, WilDpTr 33:4-34:15), subject only to verification

by tank regulators that the process was needed (Exh 3), the aspect which had delayed the project all

along because Tracer had reserved that role to itself (PSI Admission # 7-Exh 14, MtyDpTr 406:1-3).

This is largely what Marty had reported in her emails of May 5, 2000 (Exh 8) except that she attributed

that success specifically to the legal analysis Goodman had subsequently carried out, which was one of

the resources provided to Wilson, which he would have drawn on (WilDpTr 17:3-13, 82:9-12),

presumably in addition to Goodman's prior communications with EPA.

16.     Based on the changes in the role assignments that Marty had instituted starting in Nov. 1999,

with Goodman providing strategy, analysis, etc. and Wilson/Gade communicating to EPA, Marty

reported that Goodman's role had already been largely accomplished by  June 13, 2000, stating:

> "I was going to get ahold of you as soon was we got a little further with EPA, but I'll give you an
> update. … *I will only count this project under control when we actually have something in
> writing from EPA.  I will get you involved in this process if we need your expertise.  **At Friday's
> meeting everyone seemed to indicate they had what they needed.**  However, if anyone hits a
> bump we may need to get you involved.*  I am the point of contact with EPA on this so I'll let you
> know."

Marty confirmed in deposition that the reason Goodman was not included in meetings or conference

calls after March 2000 was that he was no longer needed (MtyDpTr p.125, pp. 295-297, p. 322), just as

she had stated in the June 13 email that his role had been accomplished.  But Marty did not release

Goodman from commitment even after believing he had successfully completed his tasks.  Rather, she

kept him on notice that he should be available for further work if needed, saying "*I will count this

project under control only when we actually have something in writing from EPA … if anyone hits a

bump, we may need to get you involved.*"[7]  Moreover, Goodman continued to offer his advice to Tracer,

---

[7] Marty indicated that from this point on, the last remaining step, which she saw as a formality, was for EPA's Office of
Research and Development to report on the toxicities and sub-soil behavior of the tracer chemicals, working directly with

specifically advising Tracer of possible glitches in a potential letter granting relief drafted by EPA on its own, based on Goodman's experience.  (Goodman/Marty email exchange, 6-14, 7-7, 8-17; Exh. 10). Tracer took advantage of this advice by requesting to Dick Wilson that he try to obtain a draft of the EPA letter for review prior to its signing, which Wilson did (Exh. 11; WilDpTr pp. 89-90).  Of course, there was no basis for Goodman to be doing any of the work after new consultants were brought in, let alone to be facilitating their partially replacing him, other than the success fees agreed upon.

17.     Goodman communicated unambiguously his understanding of the agreement – that he would be entitled to the success fees notwithstanding the involvement of additional consultants.  Marty communicated back by suggesting that Goodman might want to change the agreement to avoid risk of not meeting the condition precedent, repeating her ostensible concern for Goodman losing out if the project were *unsuccessful* - "what if get zero?" (Exh  4, p. 1 top, p.3 bottom).  In contrast, at no point does Marty suggest that Goodman would himself get paid zero if the project were *successful*, showing that she not only was aware of Goodman's interpretation but shared or acquiesced in it.  When Goodman was not included in subsequent meetings, he protested and pointed out that this put Marty's question – "what if we get zero?" in a different light – that Goodman should not be deprived of the success fees if the other consultants failed without Goodman's ongoing participation (email March 6, 2000, Exh.7, p.1 top).  This email clearly noted, "*I assume that we wouldn't have any problem regarding the contract if it does succeed, even with me on the sidelines. But if it's out of my hands and fails, that would create some real questions for us to resolve.*"  Marty never responded to this email, again indicating acquiescence (MG Dec 33; MtyDpTr 302:12-303:12).  Silence shows assent.  "*He who is silent when he*

---

Tracer's technicians.  This took longer than anticipated and, absent involvement by Goodman or Wilson, this process also was handled incompetently by Tracer, thus delaying the relief further and requiring Tracer to submit an additional letter to EPA limiting its regular use to one group of tracers but remaining flexible for special or emergency use (Exh 11).

*ought to have spoken will not be heard when he ought to be silent.*"[8]  Moreover, as PSI points out in its

Memorandum p. 13, Tracer made interim payments to Goodman as "draw" on the success fees paid on

invoices that clearly indicated that Goodman was still entitled to earn thesuccess fees (Exh 13).  Such

payments made Tracer's acquiescence "manifest."  *Cole v. Wilbank*, 171 A.2d 711, 713 (Md. App.

1961).  When Tracer emailed optimistic updates, Goodman responded that he "*can't wait*" (6-13-00,

Exh. 13) and "*can hardly wait*" (10-12-00, Exh 12, p. 2 bottom).  Tracer again did nothing to dispute or

inquire. (See various replies within Exh 12.)  There is no doubt that Tracer knew he expected to be paid.

18.    For all of these reasons, it must be seen that PSI's "two projects" is a fiction.  The single project,

Goodman's, was successful overall and specifically as the roles were redefined by Tracer.  The contract

provided the success fees based on ultimate success, not specific methods or task roles.  Tracer

reassigned the roles, breached the agreement by preventing Goodman from performing on his own, but

clarified that he would receive the success fee for the more limited roles it assigned him.  It knew that

Goodman was providing services understanding that success fees would be paid upon success

notwithstanding his following instructions to stay sidelined.  Tracer is liable for payment.[9]

   B.    **If the terms of the original letter proposal had not been met, those terms would have to
         be seen as subsequently modified, a new contract substituted and/or the condition
         precedent waived.**

19.    Even if the language of the original letter proposal did not allow for an interpretation that treated

the condition precedent, Goodman's success in persuading EPA to exclude tracers from testing, being

---

[8] *Bargale Industries v. Robert Realty Co. Inc.*, 343 A.2d 529, 534 (Md. App., 1975); *Pumphrey v. Pelton*, 245 A.2d 301, 304 (Md. App., 1968), citing cases.  *Edell, supra*, @ 439, citing *Porter v. General Boiler Casing*, 396 A.2d 1090, 1095 (Md. App. 1979);  *HPI/GSA v. Perry, supra.*, @ 1336; *Beacon Constr. v. U.S.*, *supra* @ 504.

[9] The only three cases cited by PSI in support of its position actually support Goodman, though they explicitly apply only to real estate commissions under the standard broker agency, **_only_** absent any contract between the principal and broker. *Anderson-Stokes v. Muslimni*, 574 A.2d 320, 323.  This case is the most recent and authoritative of the three and has facts most resembling those of the instant case, holding the commission *was owed*.  All three cases hold that use of another broker does *not* deprive the original one of his commission and that commission is due to broker whose work laid the "foundation" of sale.  *Ibid*.  Broker commission cases more on point are *Bargale, supra* 343 A.2d 529, 534; *Fuller v. Brown* 15 F.2d 672, 678; *Alois v. Waldman* 149 A.2d, 406, 409-410; and *Admiral Mortgage v. Cooper*, 745 A.2d 1026, 1028.

met, Goodman would still be entitled to the success fee because that language, so interpreted, would be inconsistent with the clearly expressed subsequent agreement of the parties (***written*** - in emails). Subsequent agreement, whether written, oral, or inferred from conduct, always supersedes prior agreement. As the Md. Court of Appeals held in *Charles Burton Builders Inc. v. L&S Const. Co.*, 271 A.2d 534, 545, quoting Justice Holmes from *Bartlett v. Stanchfield*, 19 N.E. 549, 550:

  "*A subsequent oral modification of a contract may be established by a preponderance of evidence. … Attempts of parties to tie up by contract their freedom of dealing with each other are futile … They could substitute a new oral contract by conduct and intimation, as well as by express words. … In deciding whether they had waived the terms of the written contract, the jury had a right to assume that both parties remembered it, and knew its legal meaning. On that assumption, the question of waiver was a question as to what the plaintiff might have understood to be **the meaning of the defendant's conduct**. If the plaintiff had a right to understand that the defendant expressed a consent to be liable, irrespective of the written contract, and furnished the work and materials on that understanding, the defendant is bound.*"

For all the same reasons shown above as clarifying interpretation of the contract through subsequent communications and conduct, the contract would have to be seen as modified, substituted and/or the condition precedent waived, making Tracer liable. These three concepts are close enough that many cases deal with them interchangeably and that is clearly appropriate in the instant case. *Ibid*; *Hudson v. Maryland State Housing Co.*, 114 A.2d 421, 425. It matters not how the subsequent communication and conduct are characterized, whether as clarification, modification, or waiver, since the result is the same.

20.     Addressing modification/substitution/novation, see, in addition to *Burton Builders, supra* and *Hudson, supra*, *Swift v. Allan*, 128 A.2d 260, 263; *Edell, supra*, @ 440; *Cole v. Wilbanks, supra*, @ 712-713, citing cases. While determination of contract modification by conduct is normally left to the jury where facts are in dispute, *Ibid.*, where facts are clear, as here (***written***), it is for the court. *Swift* @ 264.

21.     Addressing waiver of condition, *Bargale Indust. v. Robert Realty*, 343 A.2d 529 is directly on point factually, holding that there was such waiver at 534 (describing additional on-point cases) and with

key holdings at 533-534. "A waiver is the intentional relinquishment of a known right, or such conduct as warrants an inference of such right, and may result from an express agreement or be inferred from circumstances. ... and it is not necessary that the waiver should be direct and positive." *Ibid*, citing *Canaras*, *supra*, and other cases; *Burton Builders*, *supra* @ 545; *Pumphrey*, *supra* @ 304; Tracer knew it had a right to have Goodman communicate to EPA on its behalf and it had a right to deny payment unless those communications were successful as condition precedent. Its actions and statements to Goodman clearly relinquished that right, not the least of which was its suspending his authority to communicate with EPA on its behalf. Classic forms of waiver include: continuing to receive services after it is known that a condition will not be met (*Corbin Contracts* § 755) and prevention of performance of a condition precedent (Corbin, *Contracts* § 767 – 769; *Singer Const. v. Goldsborough*, 128 A.2d 754, 757-758 (Md. App. 1925) ), as discussed in the next section. See also, *Restatement of Contracts 2d*, § 247, "Effect of Acceptance of Part Performance as Excusing the Subsequent Non-Occurrence of a Condition." Thus, if Goodman's communicating directly with EPA proximate to relief were the condition precedent for the success fee, as PSI argues, that condition was clearly waived.

> **C. Tracer prevented Goodman from performing, breaching the contract and excusing his performance as well as waiving any condition precedent to the success fee**

22.     As described above, in February 1999 Marty instructed Goodman to hold off on setting up the meeting with Margo Oge, as EPA had offered to set up, in order to give the attorney who had just been engaged a chance to find support for Goodman's arguments prior to such meeting (MtyDpTr 357:9-18, 356:16-17). Then, in April 1999 Tracer unilaterally suspended Goodman's authority to communicate with EPA at all on Tracer's behalf and never reauthorized him to do so, despite his objections (Mty DpTr 124:19, 128:4, 214:11-14, 215:6-9, 353:12-14, 356-357; Answer/Counterclaim-Docket #55, p. 3, #12; Exh 1- Answer #19). Thus, Tracer clearly prevented Goodman's performance of the condition

precedent for the success fee, persuading EPA to exclude Tracer from fuel additive testing, for at least 20 months while he remained engaged.  Tracer continued to demand, receive, and accept Goodman's services during this period.  (This triggers unjust enrichment option as well as making PSI liable.)

23.     Maryland law applies a strong implied warranty of fair dealing and cooperation to all Maryland contracts; preventing or even hindering the other party's performance constitutes breach, waives any condition precedent that has been hindered, and generally excuses performance by the other party.[10]  All of these authorities (in fn.) are directly on point, though the violation of fair dealing and cooperation in none of these cases is anywhere near as egregious as in the instant case, where Tracer kept Goodman working and sacrificing for 20 months while secretly planning to avoid paying him.  *Automatic Laundry Service* deals with impeding performance by commissioning a competitor (analogous to new consultants excluding Goodman).  *Singer Construction* also shows that use of another agent to perform the service independently of the first promissee does not excuse payment and it deals directly with waiver of condition.  *Moore Bros. v. Brown & Root* 207 F.3d 717, 725, 726 (4th Cir. 2000) holds that the prevention doctrine does not require a showing that the condition would have occurred "but for" the conduct but only that the conduct hindered or "contributed materially" to the non-performance.  Tracer's wrongful conduct obviously goes far beyond these.

---

[10] *Black v. Woodrow*, 39 Md. 194, WL 4715, *12-13 (1874); *Funger v. Somerset* 239 A.2d 748, 759 (Md App. 1968), citing many cases and Williston, *Contracts*, §§ 1293, 1293A; *Edell, supra* @ 444 (4th Cir. 2001), citing *Eastern Shore Markets*, 213 F.3d 175, 182-183 (4th Cir. 2000);  *Alois v. Waldman*, 149 A.2d 406, 409-410 (Md. App. 1959);  *Dexter v. Dexter* 661 A.2d 171, 174 (Md. App. 1995); *Seldeen v. Canby* 270 A.2d 485, 488 (Md. App. 1970); *Whitney v. Halibut* 202 A.2d 629, 635 (Md. App. 1964); *Automatic Laundry Service v. Demas* 141 A.2d 497, 501, (Md. App. 1958); *Singer Const. v. Goldsborough*, 128 A.2d 754, 757-758 (Md. App. 1925); *P.V. Properties, supra*, 549 A.2d @ 408; *Fuller v. Brown* 15 F.2d 672, 678, (4th Cir. 1926) citing authorities; *Sanders v. Mueller*, 2005 WL 517975, pp. 7-8 (4th Cir. 2005), reversing J. Garbis; Corbin, *Contracts*, § 767-769; *Restatement Contracts 2d* §205; Farnsworth, *Contracts,* § 7.17 at 529.

**III. The Success Fees PSI Owes Goodman Are Based on the Cumulative Number of Tracers Available for Use with Gasoline Tanks and Those Available for Use in Diesel Tanks, (and Which Were Excluded From the EPA Fuel Additive Registration Testing).**

24.     Rarely, in the annals of contract litigation, is a court called upon to rule on an issue exhibiting such a nearly perfect meeting of the minds as on this point.  Shannan Marty, Tracer's CEO, who handled all of the contract negotiations, executed the contract on behalf of Tracer, and managed the project, stated the understanding of the parties in her deposition:

> Q:  The agreement that we eventually entered into in which you initially considered the terms of in the March 16 proposal, did you consider that any tracers were outside the scope of that agreement?
> A:  (Marty)  "Yeah.  I mean we had other tracers that were never used on underground storage tanks.  *So, it certainly would have been limited only to things that we used for leak detection on motor fuel products*."  MtyDpTr 78:21 – 79:4.
> Q:  "But any that were usable for motor fuel products, were any of those excluded?  Were they outside the scope of the agreement?"
> A:  (Marty) "*The tracers that we had in our stable of tracers that were used on motor fuels is what this agreement applied to*."  MtyDpTr 79:8-10.

That is almost precisely the position take by Plaintiff Goodman as shown in his Complaint(s):

a.  "That for each of the tracers for which the EPA agreed not to require completion of Tier 2 testing *for use with gasoline/diesel fuel*, Tracer would pay Plaintiff a fee of $25,000."
b.  "If the plaintiff was also successful in removing leak tracers from Tier 1 testing, an additional $5,000 per tracer would be paid …"  First Amended Complaint-Dckt #14, p. 4, Fact #10.

That the parties entering into the contract gave such similar meanings to the words precludes the defendant from escaping liability based on a different reading of the words.[11]  Corbin, *Contracts*, § 538.

25.     The shared understanding of the agreement term is also indelibly etched in the language of the agreement itself.  The agreement states that the $25,000 fee was payable for "*each of the* six *tracers* for which I successfully negotiate with EPA not to have to perform Tier 2 testing *with gasoline and/or*

---

[11] These Marty statements, in conjunction with the questions, are slightly ambiguous as to whether the agreement covered only tracers actually used or those available for use.  Marty later confirmed that the agreement covered tracers that might not be used (MtyDpTr 80:12-81:8).  PSI has also taken the position in discovery that actual use of the tracers is irrelevant to coverage under the agreement.  The only available tracer that may not have been so used was Tracer O, which Tracer had Goodman explicitly add to his petition, noting that it was unlikely to be used, discussed *infra*.

_diesel fuel_ …" (emphasis added) and that if Goodman's efforts were also "successful in removing the

tracers from Tier 1 coverage, another $5,000 per tracer would be paid." The structure of the phrase

"each of the" tracers clearly shows the meaning to be that the fees would be paid for each and every

tracer so excluded, while also indicating a belief, mistaken, that the total number of tracers was six and

was fixed. As we shall see below, the number six was clearly a unilateral mistake at that time. Tracer

clearly knew that it was a mistake, yet failed to disclose it to Goodman. Tracer's intentional silence,

which adversely affected Goodman, by law precludes Tracer from benefiting from its own wrongdoing

and binds Tracer to the opposing interpretation. PSI now urges the Court to rewrite the contract,

keeping the false number six, while striking out the sentence around it, putting into its place something

that means "for each tracer up to but not exceeding six." If that had been what the agreement meant,

that is what it would have said. If the agreement had intended to cover some tracers while not covering

others, it obviously would have distinguished between the two sets, at least by identifying which tracers

it applied to. That is not what the agreement says and not what the understanding of either party was.

The fee was clearly payable for each of the tracers excluded for use in gasoline and each excluded for

use in diesel. _**The only question then to be determined is how many tracers have been cumulatively**_

_**available for use in gasoline and diesel fuel. That could be determined either upon this motion or in**_

_**a subsequent proceeding, including at trial.**_

26.     PSI produced, under threat from Magistrate Grimm, a document entitled "History of Use of

Tracers" (Exh 16-under seal). PSI had balked at producing various R&D documents and Magistrate

Grimm brokered an agreement that PSI would answer an interrogatory or produce any document

showing the cumulative number of tracer used and the dates of first use. This document produced is

therefore PSI's official answer to that question, showing _**11**_ tracers available for use as of the agreement

date in April 1998, along with three tracers shown as becoming available after 1998 (2004). The list,

however, shows an additional tracer, Tracer F, as having been available up until 1996. But Randy

Golding, the PSI employee who had earlier certified an answer to Goodman's interrogatory regarding

the total available tracers, confirmed in deposition, after examining other documents, that Tracer F was

still used in 1997 (Golding DpTR. p. 52-53). Moreover, Tracer F was one of the tracers that Tracer had

specifically identified to EA Engineering in mid-1997 as among those it wanted to retain the registration

of (Exh.17 – under seal), was identified in a generic letter to Tracer clients dated April 20, 1998 (four

days after Tracer executed the April 14 agreement) as being registered with EPA and used (Exh 18), was

included in Goodman's Draft Petition for Relief in 1998 (Exh 19, p. 10-under seal), was among those

Goodman has identified as having had in mind in the proposal letter, and was on a list of 10 tracers

submitted to EPA by Tracer in conjunction with the request for relief in July of 2000 (Exh 20-under

seal). ***Tracer F counts.*** Another tracer, Tracer O, may never have been used by Tracer and was not one

of the six Goodman had in mind in the original letter proposal but it was registered with EPA, which

Tracer repeatedly identified as wanting to retain (Exh 17 & Exh 18; MtyDpTr 95:1-8, letter discussed

from 91:10)) and Tracer specifically instructed Goodman to add it in his Draft Petition for Relief

(MtyDpTr 365:18-367:3, 75:12-13; Exh 19, p.11), saying that it was unlikely to be used but Tracer

wanted to have access to it for a potential situation in which it might be needed (MtyDpTr 73:18-74:2,

366:18-367:3). Goodman pointed out when so instructed that doing so would mean that the success fee

would apply to it, and Marty concurred, showing that she shared his understanding of the agreement

(MG Dec par. 16; Mty DpTr 366:15-367:20 – neither recalls nor denies). Marty fully admitted that

Tracer O was added to the petition at the request of Tracer (75:12-13, 365:18-367:3). It obviously

would not have been added without agreement as to payment unless the parties believed they shared an

understanding that made specific provision unnecessary. ***Tracer O counts***. Thus, there were at least 13 tracers available for use in leak detection in April 1998 (12 on PSI's list including Tracer F, plus Tracer O) when the agreement was executed, and another 3 added later, for 16 total.

27.     In addition, PSI provided a list of tracers in its "First Supplemental Response's and Objections to Plaintiff's First Set of Interrogatories," (Exh.21–under seal), signed and certified by Randy Golding, Tracer's chief chemist.  He and President Glenn Thompson were the top technical persons within Tracer and those most familiar with the development, introduction and use of tracers, as evidenced by his so certifying.  This list officially produced by PSI includes *15* tracers (without Tracer O) as "available for use in leak detection cumulatively from 1997 through the present …"   Golding testified in deposition that all of the tracers on that list were usable in motor fuels and ***stated four times that all of them have been used in motor fuels*** (Golding DpTr p. 56, 57:20) and that there was never any restriction on any of them being used in motor fuels (57:13-20).  Thompson also testified that all tracers could be used in motor fuel (Thompson DpTr 35:18-21).  Marty also confirmed that the additional tracers to the original six could be used in motor fuel (MtyDpTr 327:2-10).

28.     Moreover, in discussing avenues of relief with Goodman, Tracer told Goodman that Tracer was always developing new tracers and that it would be most desirable to get relief that would apply generically, thus directing his work in that direction (MG Dec par. 16).  When Goodman finally got Tracer to obtain 3rd party testimonials as to the environmental benefits of the tracer process, in October of 1998, Tracer produced form letters from five teaming partners/clients, drafted by Tracer (MtyDpTr 164:18-165:19 ), that talked of relief needed *only* for "additional tracers" (167:7-8, 18, 168:17-19). Marty (170:2-3), Golding (GdDpTr 37-39), and Thompson (ThpDpTr  26:20-27:22) all testified that Tracer was always looking for new tracers.  Goodman focused his work to obtain relief that would

include new tracers, unaware, due to Tracer's concealment, that Tracer's stable already included 13

tracers usable in motor fuels, of which 12 were then used, but fully believing that new tracers introduced

for gasoline or diesel fuel would be covered by the success fees (MG Dec par 16; Exh. 19 in entirety).

29.     In its MSJ Memorandum (p. 12), PSI quotes statements from Marty's deposition and Goodman's

deposition in which each state that they were thinking of six tracers while negotiating the agreement.

But these quotes merely reflect the mistaken factual belief that there were only six tracers to consider

(Goodman) and Marty's false self-serving statements that there were only six, not the understanding as

to what the agreement's standard for the success fees was.  Goodman was only thinking of six because

Marty had indicated to him that that was the operable number, as her deposition statements reflect.  But

Marty clearly knew of Tracer's interest in the seventh, Tracer O, as she had identified it to EA some 9-

10 months earlier (Exh 17), identified it in a marketing letter some four days after signing the agreement

(Exh 18) and had Goodman add it to the draft petition (within about six weeks).  Moreover, Marty could

not have been unaware of the additional six tracers, as documented in PSI's list with dates (Exh. 16) and

used in motor fuels (Golding depo. p. 56).  Marty testified that Tracer employees rarely sent internal

emails or memos to each other because the company was so small and offices so close that they talked to

each other constantly (392:10-394:1).  Golding and Thompson both described a multi-stage process for

testing and introducing new tracers, including listing them for licensees and other Tracer offices

(Golding 42:19-46:20, Thompson 28:20-31:1).  It is inconceivable that Marty did not know that there

were more than six tracers used.  She gave false information to Goodman that there were only six tracers

and then allowed the false number six to be shown in the agreement.  And, while Marty falsely testified

that there were only six tracers at the time of the April 1998 agreement, she could not identify which six

tracers those were – stating that she thought Tracer F was possibly not included but wasn't sure what the

six were (MtyDpTr 71:9-75:5) and admits that the agreement did not distinguish them(75:5). She refers to a "list" and is asked to supplement identifying it (72:5-7) but never does. There obviously was no meeting of the minds on a limit of six, nor on any specific group of six. Even if the additional tracers had arisen after contract execution, the parties having been originally thinking of six would not exclude others from coverage. Meeting of the minds was on covering all tracers used or usable in gasoline and in diesel, as Marty stated (above/MtyDpTr pp.78-79). And whatever the parties were thinking at that time is overridden by subsequent conduct/communication.

30.      A party that knows that the other party has made a mistake in regard to terms or language of a contract or bid cannot take advantage of that mistake. Just as a party has a duty of inquiry if he knows the other party takes a different interpretation of a contract term, and is bound by the other's interpretation, a difference resulting from a mistake must be resolved against (even reforming contract against) a party who had reason to know of the mistake of the other and did nothing to correct it. *Restatement of Contracts*, 2d, § 161. *Beacon Constr. v. U.S.*, *supra*, 314 F.2d 501, 504, noting that, in that case, as here, "*the discrepancy was in actual fact,*" and that, "*Even more the bidder in such case is under an affirmative obligation. He should call attention to an obvious omission in a specification and make certain that the omission was deliberate if he intends to take advantage of it.*" Also, *HPI/GSA, supra.* 364 F.3d 1327, 1331-1332, 1334, also involving a mistake in specification resulting in an ambiguity known to the bidder, citing *Beacon Const*r. In the instant case, however, the discrepancy is not in a material specification but merely an ancillary fact which PSI attempts to turn into a term of the contract despite both the clear structure of the phrase and the sworn understanding of Marty to the contrary. Mistake caused by misrepresentation should be reformed in favor of the mistaken party, Corbin, § 618, §537. See *Restatement of Contracts*, 2d, § 161 on "failure to correct" other party's

mistake, including nondisclosure of new information as misrepresentation. The conflict between the number "six" in the proposal, the language "each of the" tracers, and the actual number of tracers constituted, to Tracer, a patent ambiguity, which it was obliged to correct. *Triax Pacific v. West*, 130 F.3d 1469, 1474. While Marty knew of the mistake, in any event, Tracer is charged with knowledge of its own operations in negotiating a contract, hence with knowledge of Goodman's mistake.

31.     Moreover, as there was clearly no express written agreement explicitly excluding any tracers or explicitly distinguishing between those covered and not covered (MtyDpTr 75:5), the most that could possibly be said would be that other tracers would be outside the scope of the written agreement. This is what Marty stated about other tracers, which she falsely testified were developed after the agreement (MtyDpTr 78:12-80:11) and is PSI's position ( MSJ Mem, p.12 – "applied to six …"). If that were so, Goodman would be entitled to restitution for them either in *quantum meruit*, as the value of his services, or unjust enrichment as the value of the benefit conferred. The ***minimum*** value applicable and the natural value in *quantum meruit*, would be the same fee as that for the tracers covered by the agreement.

32.     Nor is there any reason that the tracers for which fees are paid should be restricted to those used or usable at a particular point in time. Even if, as Marty claimed, the additional six tracers on the list submitted to EPA in July 2000 had been introduced after execution of the contract and had been merely concealed from him after that (MtyDpTr, p. 327-328), they should be covered. Avenues of relief by individual tracers or groups of tracers might have otherwise been pursued. Jim Caldwell from EPA had specifically suggested use of the small business exemption for those (five) tracers previously registered with EPA but Goodman and Tracer kept that option in reserve in order to seek total exclusion (PSI Exh 18, p.12; MtyDpTr 52:3-14). Goodman's work and his project successfully resulted in a blanket exclusion for all tracers so that any additional tracers have also been excluded from testing by that result.

There is no reason that the fees should not also apply to the three tracers added after the EPA relief letter of Dec. 2000. Many commissions and bonuses are triggered by events occurring after termination of services and cannot be avoided merely because the agent is no longer engaged. *Admiral Mortgage v. Cooper*, 745 A.2d 1026, 1031 (Md. App. 2000); *Medex v. McCabe*, 811 A.2d 297, 304 (Md. App. 2002); *Magee v. Dansources*, 769 A.2d 231, 258 (Md. App. 2001). The introduction of the three additional tracers is a commissioning event for the fees. Had Tracer paid Goodman his fees at the time of the EPA relief, there might well have been closure regarding fees. But Tracer chose instead to try to cheat Goodman out of his well-earned rewards, thus deferring any closure. Tracer, but not Goodman, well knew of any potential ambiguity or omission in the agreement relating to a cut-off. It sought to avoid the question by concealment of other tracers. As a result of Tracer's deception or negligence, there is no basis for cutting off fees based on dates of introduction of tracers even after Goodman's employment or engagement ended.

33.     Whether or not the Court is prepared to rule on the number of tracers for which success fees are due, it should rule, as a matter of law, that the agreement applies to all the tracers that Tracer/PSI had available cumulatively for use in gasoline and all those available for use in diesel fuel, from April 1998 through the present, not limited to the number six, by that mistake in the agreement, as PSI argues.

**IV.     Goodman was Tracer's Agent ("Employee" Under Md.'s Wage Payment Collection Act) and the Monies Owed Goodman are Wages Under the Act**

34.     While determination of coverage under the Wage Act, like other determinations of employee status, is normally a matter for the jury, where facts are clear, as here, the Court may decide such issues. *Marroguin*, *supra*, @ 296. Nor is any "weighing" of the factors needed since ***no factor favors PSI***.

35.     PSI's argument that the Act does not cover Goodman as an employee is mainly based on the fallacious notion that there is a single, objective concept and standard for employee status applying

across different contexts.  Thus, because Goodman's resumes referred to him as an "independent consultant"[12] and because he was paid on 1099 forms as "non-employee compensation" i.e. non-wage income, PSI argues that Goodman is not an employee for purposes of Maryland's Wage Act.  Not only does this notion fly in the face of common sense and common experience, but it is soundly refuted by both applicable Maryland law and broader well settled legal principles.  That the same term may have different meaning in different contexts and different laws is well settled.  *U.S. v. American Building Maintenance Industries*, 95 S.Ct. 2150, 2155 (1975).  Few of us think of ourselves as polluting the air by breathing.  Yet, $CO_2$ is a "pollutant" within the "capacious" and "sweeping" definition of pollutant in the Clean Air Act.  *Massachusetts v. EPA*, 127 S.Ct. 1438, 1443, 1460 (2007).

36.     With regard to both PSI's general approach and to the specific concept of "***wage***" the Fifth Circuit may have put it best in *Rowan Companies v. U.S.*, 624 F.2d, 701, 705-706:

> "***The words, even if identical, are not components of an algebraic equation each side of which must inevitably yield the same result.  We are not engaged in a Socratic dialogue to determine whether all things bearing the same name are alike, but in deciding to what extent Congress purposely …***"

Thus, the court, like other circuits before it, upheld the IRS practice of over 40 years of treating meals as wages under FICA and FUTA but not under federal income tax, ***despite the statutes using not only identical terms, but identical definitions*** (within the same I.R.C.).  This was ultimately reversed by the Supreme Court, by a vote of 6-3, *Rowan Cos. v. U.S.*, 101 S.Ct. 2288, but only after a detailed examination of the legislative history led to the conclusion that Congress intended identical treatment for "simplicity and ease of administration," @ 2293.  In contrast, PSI argues to ignore the definition of "wage" within the Wage Payment Act altogether, which unquestionably includes the monies owed

---

[12] Of course, whether Goodman was providing the resumes for potential consulting work or seeking employment situations, description as a consultant was the most convenient term to use regarding that period of time.  While it was not technically false or misleading, it says nothing about his status as an employee under the Wage Act.

Goodman - assuming that he was an employee - and substitute the fact that monies paid to Goodman were treated as non-wage income for tax by Tracer and that Goodman filed tax returns accordingly. Goodman, like most 1099 receivers, was unaware of any process for challenging it; nor was it sensible for him to so confront Tracer.  Goodman to this day has no position on whether he should have been treated as an employee for tax purposes, though he certainly could have been, which is wholly irrelevant to the question of his employee status under the Wage Act.)

37.    The best arguments for rejecting PSI's conflating and confusing of the different contexts of the terms "wage" and "employee" are provided by the Wage Act and *BHC v. Ayd* themselves.  The Wage Act defines "wage" as

*(c) Wage – (1) "Wage" means all compensation that is due an employee for employment.  (2) "Wage" includes:  (i) a bonus; (ii) a commission; (iii) a fringe benefit; or (iv) any other remuneration promised for service.*

The definition is, without question, quite broad and obviously includes the success fees, as well as the non-contingent payments already made to Goodman.  The only way the definition would not apply would be if Goodman were not an employee under the Act.  Yet, in a feat of amazing circularity and disjunctive syllogism PSI argues that, since Goodman's wages were reported on a 1099 rather than a W2, he was not due "wages," hence, cannot be an employee.  In support of this bizarre circularity, PSI points to Factor #5 adopted by *BHC* for determining employee status:  "5. *Whether the individual receives wages directly from the employer or from a third party for work performed on the employer's behalf*."  *BHC* @ 318-319.  That factor quite obviously refers **_only_** to who is paying the individual; it was not intended by the Court to introduce such circularity into the determinations of "wage" and "employee," let alone to allow for substitution of tax treatment for the definition of "wage" in the Act.

38.     If Tracer had obtained a ruling from the IRS saying that Goodman was an employee and that his compensation should be reported as wages, the IRS ruling would clearly be inadmissible in this proceeding as more prejudicial than probative.  It would be a ruling by a separate branch of government based on a separate standard and set of definitions.  But Tracer obtained no such ruling.  Its payroll and tax treatment of Goodman was unilateral.  Shannan Marty, who described tax law as one of her main qualifications to be CEO of Tracer (MtyDpTr 16:21, 18:2-4), repeatedly refused to say whether she had believed it would have been contrary to IRS regulations to have treated him as an employee for tax/payroll purposes (112:5-113:12).  The court in *BHC* addressed a closely related issue, ruling that payroll treatment (pay periods *__can not__* be used as a factor in determining employee status, precisely because it is unilaterally determined by the employer.  *BHC* @319-320.  Moreover, in discussing the plurality of concepts of employee status, the court identified dozens of employment related laws (@314-318) applying to "employees."  Tax law is so far afield from these employment laws that it warrants not the slightest mention.  Nor does it relate to any of the six factors adopted by the court (@318-319), hence, PSI attempts to distort Factor 5.  A common sense argument might be made that, while a firm's treating paying an individual as "non-employee" is self-serving and irrelevant, paying him as an employee on a W2 acts as an admission of his employee status.  But even in that case, the *BHC* court, noting that Ayd was paid on a W2, does not include that as a factor to be even considered on remand.

39.     The *BHC* court identifies 21 Md. statutes that include definitions of "employee" @ 314, but does not find any particularly applicable to the Wage Act.  It holds that, because the Wage Act does not include such a definition, the Court should look to the purpose of the Act (@311) and then look to similar laws/jurisprudence in other jurisdictions rather than to Md. laws adopted for other purposes (@314.)  It holds that the purposes of the Wage Act call for a broad definition of employee, ("*nor did it*

*limit the potential scope of the term*"), pointing out that many similar statutes have extremely broad definitions, such as "*any person suffered or permitted to work by an employer,*" @315.  And it points to the definition from Webster's New World College Dictionary (4th Ed. 1997): "*a person hired by another, or by a business firm, etc. to work for wages or salary,*" @315, n. 11.  There is no question that Goodman would have been an employee under these definitions, which are very consonant with the Wage Act's definition of "employer":  " '*Employer' includes any person who employs an individual in the State or a successor of the person.*"  The word "employ" is clearly "employed" here in the broad sense – "to make use of …"

40.     The *BHC* Court held that the broad concept of "master-servant" is the applicable one for determining employee status under the Wage Act, and thereby explicitly went beyond formal employees to include "agents" under the Act's coverage (@315);  Goodman unquestionably was Tracer's agent (Exh. 19, cover page).  The *BHC* Court considers various standards with sets of factors, including the Md. Workman Comp. Act with five factors, Calif.'s wage act with eight, and Restatement of Agency with ten, arriving at its own list of six exclusive factors.  What these factors all have in common is that they point to the overall level of independence of operation.  In the words of *BHC*, the most important factor is "***the right to control the manner and means of accomplishing the result desired***" @ 317.  Stated differently, where the work performed is completely separate from the normal business of the company and within the normal business of the individual such that the company specifies only what its requirements are and then cuts the person loose to meet the company's specifications in any way he sees fit, the person is probably not an employee.  If the company orders construction or facility repairs according to a pre-determined design, sends equipment for repair, contracts for an event venue, etc. the person engaged is probably not an employee.  Where the company goes beyond providing its required

specifications and becomes involved in ongoing instruction, deciding methods of operation, involving

the individual with regular employees, where the individual is dependent on the company for ongoing

support, decision-making, etc., he is an employee under the Wage Act.  Under this general distinction, as

well as the six *BHC* factors, understood this way, Goodman was an employee or agent.

41.      ***Factor 1, control and dependence***:  The "right to exercise control," is by far the most important

of the factors (*BHC*, @ 319, 317, 318, distinguishing it from whether the company actually exercised

such control), specifically "***the right to control the manner and means of accomplishing the result***

***desired***."  Tracer's way of seeing this and way of managing Goodman is summed up best in PSI's own

characterization of them in its Reply in Opposition to Plaintiff Marc Goodman's Motion for Leave to

Amend the Complaint (Docket Paper # 70), p. 1, 1st para.  Far from seeing Goodman as independent, it

shows, "*Pursuant to the contract, Goodman agreed to perform certain services in order **to assist Tracer***

***in obtaining exemptions** for …*"  That was precisely how Tracer treated Goodman's role throughout the

project – as subservient and assisting.  Marty characterized the other consultants as "helping" Tracer

with the project (MtyDpTr 247:2, 283:7-9).  Tracer exercised near absolute control over the work of the

project, far tighter control than Goodman has experienced in any job he has had, at least since he was at

entry-level (MG Dec par. 27).  Although Marty did give Goodman credit for having done an outstanding

job of developing the avenues and arguments presented to EPA (MtyDpTr p. 262-265), on which relief

was granted, asked specifically if Goodman had first made them, Marty insisted that "we made them,"

(MtyDpTr 334:2,16) indicating that Goodman worked in conjunction with, not independent of, Tracer.

This project was, according to its own words, run by Tracer.

42.      Marty correctly testified that Goodman was ***dependent*** on Tracer for, among other things,

information and documents, consultations with Tracer staff, Tracer staff to speak with EPA, comments

31

and approvals, and additional consultants (MtyDpTr. 133-136).  She testified that Tracer maintained

control over Goodman's communications with EPA (p.120, 122-125, 192:12-13, 198:5-7, 211-213),

which obviously was the key to success in persuading EPA, and over the positions and avenues of relief

to be pursued (p. 121).  *BHC* quotes the California Supreme Court regarding the control factor as

specifying that "*strong evidence of an employment relationship is the right to discharge at will*" @ 317.

Marty testified not only that she had that right but that she had so discharged Goodman (p.123, p.124),

simply because he was no longer needed (PSI Mem p. 25, MtyDpTr p. 125, 295-297, 322).[13]  (That

Marty had such a right does not mean that exercising it would not breach the contract.  *Black v.

Woodrow*, 39 Md. 194, 1874 WL 4715, *12, *13.)  She testified that she had the authority to hire other

consultants (p. 126), reassign roles including Goodman's (pp. 265-266, p. 371:2-17), and to prevent him

from interfering with other consultants working on the project, which she did do (126:8-127:8).  As she

put it, "… *I had to take control*" (371:16-17).  Although Goodman had described testimonials from tank

regulators as to the environmental role of Tracer as key to success from the outset, (MtyDpTr pp. 150-

153), Tracer reserved the role of getting such testimonials to itself (Exh 14 # 7, MtyDpTr pp. 405-406).

She instructed Goodman to refrain from various activities, as she dictated roles (pp. 405-408).

43.     *BHC* describes the genesis of the doctrine of *respondeat superior* by the Md. Court of Appeals

from 1869, *Defort v. State, to use of Keyser*, 30 Md. 179, 203, as distinguishing an independent

contractor as one "*free to exercise his own judgment and discretion as to the means and assistants that

he may think proper about the work, exclusive of the control and direction, in this respect, of the

party for whom the work is being performed*."  As shown above, Goodman's role with Tracer could not

be further from this.  Tracer approved, and in some cases, declined to approve, all significant papers to

---

[13] Marty' characterization of having discharged Goodman at that time is not accurate because she had kept him on notice to remain available, which is a form of employment. See fn. 5 *supra*.

be submitted to EPA, controlled when and if, Goodman was authorized to communicate with it (*supra*), and what he could say.  Goodman was hired by Tracer as an individual (MtyDpTr p. 140), based on his own experience and skills; he had no freedom to substitute anyone else to perform his work.  He was completely dependent on Tracer to provide other human resources, which Tracer did through six of its own employees with whom Goodman interacted (MtyDpTr p. 134; MG Dec par. 27) and others working for those, and five outside consulting groups hired by Tracer (Scroggin's firm, NLRG, which worked through Tracer's law firm, Gade/Sonnenschein, and NES), not counting the Sapphire Group, with which Tracer put a contract in place but never used (MtyDpTr pp. 135-136).  Tracer and Marty exchanged hundreds of emails, many faxes and had dozens, if not hundreds, of phone conversations over the course of the project (MtyDpTr 134:9-14; Goodman Dec par. 27).  Explaining her retaining control over Goodman's activities, Marty exclaimed, "***You worked for us***."  (MtyDpTr 122:18-19).  This was not some independent operation by Goodman but was inextricably intertwined with Tracer's operations, personnel, resources and control through specific directives given to Goodman.

44.    PSI tries to argue that Goodman controlled the outside help by having chosen them but that is sophistry.  Goodman was ***tasked by Tracer to identify and/or investigate firms*** to do legal research, which Marty insisted on having done, (MtyDpTr 356:16-17, 357:16-18) and toxicology (MtyDpTr 135-136, 278:15-17) and was "instructed to cooperate with" them (136:4).  Goodman identified attorney Scroggin to Tracer and put him in touch with Marty, after having had him read Goodman's arguments and confirm that he could find support for them (Exh 28; 206:6-20).  Marty spoke with Scroggin and had him send her an engagement letter, to which Goodman was not privy, and told Scroggin to coordinate with Goodman but report to her (216:16-217:5).  Scroggin got Marty to agree to an engagement that allowed him to pursue his own ideas free from any control by Goodman and did so

(157:12-13, 217:16-224:13).  When Goodman tried to guide Scroggin's work, Marty instructed

Goodman to refrain from doing so (127:3-8, 226:1-15).  Subsequently Goodman asked whether Marty

wanted to make another attempt at finding legal support or to proceed without it (Exh 22).  Marty

replied "LD [sic – I'd] LIKE TO FIND LEGAL AUTHORITY" and "Proceed with the legal research"

instructing Goodman to arrange that and to oversee it (Exh 21).  NLRG was contracted by Tracer

through its regular law firm, again without Goodman seeing any agreement (Exh 23).  (Goodman had

drafted a description of the tasks desired to avoid misdirection as Marty had provided Don Scroggin,

which Marty approved and provided to NLRG through Tracer's lawyers - in PSI Exh 29)  Marty also

interviewed the Sapphire Group by telephone and invited them to submit a proposal, (PSI Exh 28).  She

hired Mary Gade on her own, despite Goodman suggesting Richard Wilson as an alternative and she

hired NES on her own without any control by Goodman (125:13-18, 272:8-12, 293:13-295:11).  She

reassigned the roles, using Goodman to brief and educate Gade and NES on the issues, avenues of relief,

arguments, and prior communications with EPA, then kept him sidelined while NES, Gade and Marty

communicated directly with EPA despite Goodman's protest at not being included (see above, sec. II.A).

Far from Goodman being able to "*exercise his own judgment and discretion as to the means and

assistants that he may think proper about the work, exclusive of the control and direction, in this

respect, of the party for whom the work is being performed*," Tracer had absolute control over it, to the

point of limiting Goodman's role and denying him the ability to participate in key phases.  PSI now tries

to escape this obvious verity by inventing the fiction that there were two separate projects – that the

phase in which Tracer went so far as to sideline Goodman does not count as part of the project.

45.     PSI also argues that Tracer had no control over Goodman because it did not control or monitor

his hours of work.  But that is meaningless in the circumstances of the relationship and nature of the

work. The same is true of virtually all executives, all salesmen and commissioned agents (which are covered), a great part of information workers today, and essentially all employees who "work-from-home" (Exh 24), as Goodman did (in a location two time zones and in summer three hours away). This factor is not about schedule but about control of the "...*means of accomplishing the desired result*."

46. ***Factor 2, Whether the services provided were within the usual course of business of the enterprise.*** Shannan Marty said this best in her deposition on pp. 120-121; when asked why she had to exercise such control over Goodman's communications with EPA, positions to be taken, etc.:

> **Marty**:"I would always – *this was communication with a governmental entity that was very key to what Tracer Research did. I mean EPA regulations drove our business, and our relationship with EPA was of paramount importance to the company*. And as a manager, as a CEO of that, I would have to maintain what I thought was a good relationship with EPA irregardless of what happened with that."
> **Q**: *"Tracer was in the business of EPA compliance?"*
> **Marty**:"*Yes."*

Also, 380:9-12: "***We were basically a regulatory company*** *that had to maintain a good relationship with EPA*." Moreover, leak detection was the mainstay of Tracer's business. While motor fuel tanks themselves were a minority of Tracer's leak detection, a great many of the facilities where Tracer did testing, including military bases, refineries, and terminals, included motor fuels with other products (MtyDpTr 31:3-32:12,). Inability to test motor fuels could have resulted in loss of the entire contracts for Tracer (109:15-111:10). And the news that Tracer could not be legally used to test motor fuel tanks could spread throughout the industry, with major impact on Tracer's business. This was not some extraneous activity but was at the very heart of Tracer's business as Tracer had made clear (*supra*).

47. PSI argues that this work was not in Tracer's regular course of business because Marty testified that she "didn't know the players ..." (Mem p. 36). But no executive has the entire skill set for every problem that might come up for a business, nor does the existing professional staff necessarily have the

requisite skills.  That does not mean the work was outside of Tracer's regular business.  The very nature

of executives is to deal with various problems, each of which is unique in some way.  Tracer had

previously had various employees working on this (Exh 25 –under seal).  At least six Tracer employees

interacted with Goodman (MG Dec par. 27), various employees commented on and edited his drafts, and

the CEO communicated with Goodman hundreds of times on it (134:9-135:10).  This project was well

within the course of Tracer's business.

48.     ***Factor 3, Whether the individual is customarily engaged in an independently established***

***trade, occupation, profession or business***.  There is no question of Goodman having been so

"customarily engaged."  It is undisputed that he was a full time (30 hour/week) employee of EA

Engineering until he left that job to undertake this project for Tracer (MG Dec par. 11-13; PSI Exh 11,

13 ).  He was allowed to do work on the side while at EA, and did some earlier, but during 1997, the

year before he left to work for Tracer, he had no income other than his salary from EA (PSI Exhs 11,

13).  During the first year of the project, 1998, after leaving EA, he had no income other than that from

Tracer (*Ibid*).  During the other two years he was working on the project, 1999 and 2000, he had

$13,350 and $2850 respectively in income from work on the side of the Tracer work (*Ibid*), obviously

not enough to constitute an independent business, nor to live on, hence, the need for the interim

payments he obtained from Tracer (MtyDpTr 258:12-19).  Shannan Marty testified that she well knew

that the Tracer work was Goodman main vocation during this period (258:12-13).  And the Act also

covers part time employees.  *Magee v. Dansources*, 769 A.2d 231, 235-236.

49.     PSI bases its argument that Goodman was so established almost wholly on his proposal letter to

Tracer, sent the first working day after his last day of work at EA (MG Dec. par.13), being on letterhead

that includes the descriptor "International Consulting Services."  But that is obviously circumstantial and

is completely misleading.  When Goodman had previously been between jobs, around 1992-93, he was approached by various companies to do some consulting work and he did obtain some such work, including ongoing work for EA before becoming a formal employee.  He had letterhead printed at that time for those purposes (MG Dec par. 15).  It was only natural that he would use it again upon leaving EA to write to Tracer.  That Goodman's resumes show him as having been an "independent consultant" during this period says nothing about the Wage Act.  There is obviously a sense in which he was an independent consultant but not regarding the Tracer project and not in terms of the Wage Act.  He was not established but merely worked from his home using home computer, his home phone number etc., as PSI states (Mem, p. 39), and had almost no work or income outside of Tracer.  Resumes and letterhead do not outweigh the actual facts that he was working almost solely for Tracer and had been a full time employee of EA until he left it to work for Tracer.  He was not established in business.

50.     ***Factor 4, whether it is the employer or the employee who supplies the instrumentalities, tools, and location of the work performed.***  While Goodman worked from home and used his home computer, single home phone line with dial-up modem, and HP 350 combination fax/printer, it was Tracer who supplied the real instrumentalities of the work:  the documents, information, additional human resources, a sample vial of a tracer in gasoline, etc.  This factor is clearly somewhat asymmetrical in that, if Tracer had supplied the office, computer, printer, supplies, etc., it would say more about Goodman being an employee than Goodman using his home does.  Alternatively, if Goodman had an established office outside the home, networks with servers, specialized or even commercial grade equipment, that would be a factor toward him not being an employee.  But that Goodman worked from home using ordinary home equipment says nothing one way or the other.  Tens of millions of regular employees of American organizations worked from home during the period, virtually all of which used their own equipment and

supplies identically to how Goodman did.  (Report of expert witness Charles Wilsker, Exh  24).  Indeed, almost all information workers do some work from home using their own equipment, whether on some week days or merely evenings, weekends, or when sick.  Goodman was stationed 2000 miles from Tracer's headquarters; it is only natural that he would work from home.  Just as employees traditionally supply their own hand tools in the building trades, much facility maintenance, and most car repair shops, among others, "work-from-home" employees essentially all do.  Moreover, PSI itself has pleaded that, "*the fact that he [Goodman] worked out of his home and so do some employees is irrelevant to this claim*."  PSI Memorandum in Support of Motion to Exclude Expert Witnesses, Docket Paper # 79 Attachment 1,  p. 11.  PSI is correct that work from home is not a valid factor.

51.     ***Factor 5, whether the individual receives wages directly from the employer or from a third party for work performed on the employer's behalf.***  Goodman received his compensation directly from Tracer.  There was no third party, nor even nominal entity such as any company of his own.  He worked and was paid directly by Tracer as an individual (MtyDpTr 140:11-18; PSI Exh 10,11).

52.     ***Factor 6, whether the individual had an ownership interest in the business such that he had the ability and discretion to affect the general policies and procedures of the business.***  On this factor, PSI correctly states that Goodman had no such ownership interest, nor ability to affect the general policies or procedures.  Remarkably, however, PSI attempts to apply this factor in reverse, to say that his lack of such ownership or control is a factor against his being an employee rather than for it.  That obvious makes no sense, as the great majority of employees, including those most in need of the protection of the Act, blue collar workers, clearly have no such ability (see *BHC* @ 320).  *BHC* is very clear on this, describing, @318, *Cook v. Burke*, the Mo. case in which the "*plaintiff was an employee*

*where, although she served in a management capacity, she had no ownership in the business and no*

*share in profits and no 'discretion to affect ...' "* The court points out that in *BHC,*

> "*The primary argument raised by BHC is that the trial court properly dismissed Ayd's claim under the Wage act because Ayd was not an employee of BHC but rather an officer, and did not qualify under the Act's protections. ... BHC notes that Ayd served as the President and Treasurer of the corporation acted in an executive capacity, ... controlled the checkbook of the company. ... In essence, Ayd could have and should have paid himself,*" @313.

> "*BHC contends that Ayd is not entitled to the salary ... because Ayd controlled the accounting books and refrained from paying himself a regular salary,*" @320, where it further discusses the facts and holding of *Cook v. Burke.*

Obviously, the court did not want the Wage Act to be used as a weapon in disputes between business

partners nor to reward top executives with treble damages for not receiving prompt payment under

policies they had themselves put into place.

53.     **All** of the **pertinent** factors point to Goodman being a covered agent/employee of Tracer under

the Wage Act.  The evidence is clear and summary judgment is appropriate.


**V. PSI's Counterclaims For Breach of Contract and Misrepresentation Should Be Denied**

54.     **Breach of Contract by Goodman:**  PSI's counterclaim based on Goodman's breach of contract

should be summarily denied.  As shown above, Goodman did not breach the contract but worked

diligently (*supra*, p. 2) throughout.  He did not fulfill the condition precedent of persuading EPA to grant

relief on his own because Tracer breached the agreement by instructing him to refrain from contacting

EPA, preventing his performance and excusing performance.  But he fulfilled that condition precedent in

conjunction with the new team and new roles assigned by Tracer.  PSI's arguments that he failed are

hollow.  Its arguments essentially justifying replacing him due to delay in performance are void both

because he was only partially replaced (PSI continued to demand his services) and because the delay

was caused by Tracer.  Goodman did not delay in setting up a meeting with the key decision maker

because he was never authorized to set up such meeting (MtyDpTr 357:9-18).  Where contracts do not

stipulate time to be of the essence, delay is not grounds for cancelling.  *Phillips Roofing Co. v. Maryland*

*Broadcasting* 40 A.2d 298, 301 303.  PSI admits Goodman was not authorized to resume contact with

EPA simply because, after he had done his analysis (which was provided to new consultants (MtyDpTr

p. 287:10-18), and new consultants were well suited to complete the project, he was "*no longer needed*"

(PSI Mem. 25; MtyDpTr, p. 125, 295-297, 322).  Breach was not his.

55.     ***Fraud and Negligent Misrepresentation:***  PSI's allegations of fraud in the inducement and

negligent misrepresentation are patently contrived and sham.  It should be noted that Shannan Marty,

who was the person who dealt with Goodman on these matters and was responsible on Tracer's part, and

is a party in interest, has testified that she does not believe that Goodman deceived her in any way

(288:16-292:7, 119:5, 395:9-396:5).  PSI has given no explanation of damages, nor presented evidence

of damages or reliance.  The allegations noted in PSI's counterclaims are addressed below.

56.     PSI alleges that Goodman misrepresented to Tracer that he had the capabilities to succeed in

obtaining relief from EPA, which he knew not to be true.  This is obviously nonsensical.  Goodman left

a secure job at EA Engineering to undertake the project for Tracer (MG Dec par. 11-13), almost

completely for a success fee, with only a consolation fee of $10,000 payable if the project failed.  It was

obvious that the project would take months and quite readily foreseeable that it might take a year.  (It

took nearly three.)  Goodman began the project with research on the legislative history and drafting of a

Draft Petition to submit to EPA, which took three months even before receiving needed information and

comments/approval from Tracer, which took over two months (MtyDpTr 160:20-162:6).  He turned

down Tracer's offer to pay him $200/hour in lieu of the $10,000 failure fee, stating that the many hours

he expected to work might cause Tracer to limit his effort, which would jeopardize the success

(MtyDpTR 58:1-8, 60:11-20, 117:9-118:6; PSI Exh 6).  Obviously, if he did not expect to succeed, he

would have made much more with the $200/hour than the $10,000, and the success fee wouldn't have

been a major consideration for him.  Shannan Marty, who worked with Goodman for 3.5 years, counting

the EA work, testified that she is fully convinced that he believed he could succeed (114:15-115:6).

(Note:  Regarding negligent misrepresentation, Goodman's duty of care attached from Tracer's

execution of the agreement, not to the proposal.  *Champion Billiards Cafe*, 685 A.2d @905.)

57.    Specifically, in relation to the above paragraph, PSI claims that Goodman's proposal falsely

represented that he had over 10 years experience working with the "key decision makers *for the fuel*

*registration regulations*" in order to induce Tracer into hiring him, knowing that he could not succeed –

and that it was damaged by the misrepresentation.  *Firstly*, there is no way that sentence in the March 16

and April 14 letter proposals (PSI Exh 5 & 7) can be interpreted as claiming any special influence, nor

as an inducement to hire Goodman.  It was quite clearly part of Goodman's argument that Trace should

attempt to have the tracers excluded from testing rather than initiating the testing program, which Tracer

had wanted Goodman to manage (PSI Answer and Counterclaim, Docket paper 55, p. 8, #7).  The letter

proposals begin by summarizing the test requirements, leading up to estimates of their costs.  They

follow this with a paragraph (p. 2, 1st para.) beginning:

> "*Prior to embarking on such a costly course*, however, I believe that some alternatives should
> be investigated and pursued that could obviate the need for some or all of this considerable effort
> and expense. ..."

The next paragraph explains that there is no exemption explicitly covering Tracer's activities and that

EPA was then treating them as fuel additives before reaching the passage PSI claims to be fraudulent:

> "Nonetheless, I believe that at least some arguable ambiguities exist regarding Tracer's coverage
> by the regulations and that *the possibility of using the ambiguities to avoid the Tier 2*

*requirements should be fully explored. I have ten years experience dealing with the key decision makers on the fuel registration regulations within EPA. I believe that these officials will be sympathetic to providing relief to Tracer and will work with me to attempt to find a mechanism for such relief*. They will, of course, be concerned with … One of the challenges will be to fashion interpretations or solutions to avoid these problems."

There can be no mistaking that the statement in question ("ten years experience …") was intended to argue for the path of excluding the tracers rather than initiating the testing – to enhance the credibility of Goodman's suggestion of the potential viability of pursuing relief rather than testing, while at the same time the passage prepares Tracer for the reality that success should not be assumed.

58.     *Secondly*, the point of the statement – that Goodman's experience led him to believe that those officials would be sympathetic, turned out to be correct. It was a predictive statement, which cannot be actionable as misrepresentation, even if it hadn't been later validated. *Edell and Associates,* 264 F.3d, 424, 447 (4th Cir. 2001). Goodman met with the officials referred to, Dave Kortum and Jim Caldwell and they indeed were sympathetic and worked to exclude the tracers (MtyDpTr 158:4-15, 184:4-185:4, 194:20-196:9). Although they referred the decision, based on the avenues to be proposed, to their superior, who initially rejected their proposal, she (Margo Oge) ultimately also was willing to consider and grant such relief (Exhs 3, 8, 9; PSI Exh 34).

59.     *Thirdly*, Goodman convincing Tracer to undertake the project did not damage Tracer but saved it $ millions, as the agreement states and Tracer acknowledged by signing it. See MtyDpTr 42:7-43:4.

60.     *Fourthly*, the statement that Goodman had over ten years experience working with the decision makers "*for the fuel registration regulations*" was true technically, true as intended and as understood by Tracer. The official who directly handled fuel additive registration was Joseph Fernandes, who Goodman had known for many years. Goodman had told Tracer that he would be approaching Fernandes's boss (Caldwell) and his boss's boss (Kortum) who Goodman had known even longer (MG

42

Dec par. 6).  Goodman had also worked with their superiors, the Directors of the Office of Energy and

Fuels, successively Richard Kozlowski, Mary Smith and the then current one, Chuck Freed, and had

obtained relief for other clients signed by various of these officials and higher-ups, including by the EPA

Administrator (Exh 26).  PSI claims that Goodman misrepresented because he had no experience

working with Margo Oge, Director of the Office of Mobile Sources (OMS), responsible for all air

pollution from transportation sources, to whom the decision was referred.  Ms Oge is *four* levels above

the fuel registration program and would not normally be referred to as "key decision makers for the fuel

registration regulations …" in this context.  Richard Wilson, who held that job for over a decade

testified that Kortum and Caldwell were the persons to deal with, that getting them on board was the key

to success (WilDpTr 16:2-17, 22:21-25:19) and that normally the OMS Director would merely be

briefed on the issue and sign-off on it (99:5-17).  Tracer clearly understood that there is no way of

predicting with assurance where a decision in a large organization would be ultimately considered,

evaluated, decided, or even hindered, mired or struck.  As Goodman did not predict that his EPA

contacts would approve the exclusions, he could not have predicted that they would do so on their own.

Even if Tracer read Goodman's statement as a representation about a future event – that the officials he

referred to what have the last word - and relied on it, it would be at most an opinion or a prediction

which by law cannot be actionable.  *Edell and Associates, supra* @ 447.  In any event, Tracer did not

understand the statement that way, as Marty testified that she does not today believe that Goodman

made any false or deceptive statements (*supra*).  Had Goodman exaggerated his experience and

capabilities, which he did not (MtyDpTr 291:1), that would be a mere "indefinite generality of

exaggeration," not misrepresentation.  *Wolin v. Zenith Homes* 146 A.2d 197, 200 (Md. App. 1959).

43

61.   *Fifthly*, Goodman reported immediately after his October 21, 1998 meeting with the EPA office heads that they would be looking to Margo Oge to approve the decision (MtyDpTr 185:10-20, 306:5-10) and informed Tracer at that time that he had never had any direct contact with Ms. Oge (MG Dec par. 20).  Tracer breathed not a whisper about this constituting fraud or misrepresentation (MtyDpTr 185:10-187:12) or about having relied on assertions of his relationships, and continued to instruct Goodman to carry out the project.  PSI has presented no scintilla of evidence of reliance, an element of fraud and misrepresentation claims.  PSI's only basis for misrepresentation is that Goodman's failure to arrange a meeting with Oge shows that his original statement of experience with EPA to be misrepresentation. But there was never a time when Goodman was authorized to set up such a meeting, although Dave Kortum had offered to arrange one (MtyDpTr 357:12-18).  Nor would that failure evidence misrepresentation.

62.   PSI also claims that Goodman misrepresented that Don Scroggin had the capabilities to help succeed, knowing that he did not – or simply that Goodman had "recommended" Scroggin (Exh 1, Answer #13.2.).  PSI has not described or identified any specific statements representing that either in its Answer and Counterclaim (Docket Paper #55) or in answering Goodman's Interrogatory #22 about the factual basis for the counterclaim (Exh 27, p.4, #25).  Fraud must be pleaded with specificity per FRCP 9(b); it hasn't been.  *Kwang Dong Pharmaceutical Co. v. Han*, 205 F. Supp. 2d 489, 495 (D. Md. 2002). Nor has PSI offered a scintilla of evidence of such misrepresentation, so that its claim does not survive summary judgment.  *Edell*, *supra* @ 447.  Again, the allegation makes no sense since Goodman's only incentive at that point was to obtain the success fee, Tracer having already agreed that he had met the minimum effort requirement and paid him the $10,000 minimum payment (PSI Mem p.10; MtyDpTr 187:16-188:11) in Feb. 1999.  Goodman could presumably have found a person with the capability to

44

help succeed. Why would he, as PSI claims, deliberately recommend someone who could not help

succeed, which would doom Goodman to months of additional work with no compensation nor help in

earning the success fee? Marty testified that Goodman had not represented Scroggin as having any

special contacts or influence with EPA and that he had been engaged to find supporting legal authorities

for Goodman's arguments (MtyDpTr 206:6-207:1). It is undisputed that Scroggin was an environmental

attorney, had been a partner in Beveridge and Diamond, one of D.C.'s leading, if not the leading,

environmental law firm and subsequently a partner at Jenner & Block. He also had a Phd. in chemistry.

Goodman's only representations to Tracer about Scroggin were these credentials plus that he had

worked with John Cannon, then General Counsel of EPA, and had experience dealing with EPA (*Ibid*;

Exh 28), all of which were true. Neither Marty nor PSI apparently argues otherwise. Had Goodman

"recommended" Scroggin or represented that Scroggin's capabilities would make the project succeed,

which he didn't, that would have been an anticipatory statement, not a basis for fraud, *Wolin v. Zenith*,

*supra*. PSI's claims of misrepresentation are obviously without merit.

63.     PSI's third and final claim of fraud is that Goodman represented to Tracer that he had to pay

Rich Bechtold "something" as an inducement for Tracer to make interim payments to Goodman, and he

never paid Bechtold anything. The statement in question (Exh 4, p. 2 top) says clearly that Goodman

would have to give Bechtold something "out of the success fee," which, of course, was never paid. Any

debt he might have to Bechtold, as his statement said, was contingent on the receipt of the success fees,

thus never became due. *Ewell v. Landing* 85 A.2d 475, 477. The statement was made ***after*** Tracer had

already agreed to the interim payments and was given as a reason for Tracer not restructuring (reducing

or eliminating) the overall success fee, as is clear from the document, as well as a hint that Tracer should

make arrangements to pay Bechtold directly. Marty clearly and directly testified that the statement had

no relation to the interim payments, was made after she had agreed to the interim payments, and that it in no way induced her to make the interim payments (MtyDpTr 277:6-280:8, esp. 278:2-6). She testified, as is also clear from Goodman's email (Exh 4, p. 2, top), that the interim payments were made because Goodman was financially squeezed due to the delay in the project (279:10-14), which obviously contradicts PSI's allegation that the payment was induced to pay Bechtold. Having so testified under oath, however, she then turned around and swore an answer to Goodman's interrogatory no. 22 (Exh 27, p. 5, #30-33) which stated the exact opposite as the factual basis for the counterclaim, an obvious act of perjury, obviously induced by attorney Shoudt. Had Goodman promised PSI that he would compensate Bechtold from the interim payments, which he didn't, that would have been anticipatory statement, not misrepresentation. *Wolin v. Zenith*, *supra*.

64.    Marty testified that she does not believe Goodman deceived her in any way (*supra*). PSI's allegations of misrepresentation are obviously contrived and sham and should be summarily denied.

## VI.    Goodman is Entitled to Restitution in *Quantum Meruit* and/or Unjust Enrichment as Alternative Means of Recovery on the Breach of Contract

65.    Although Goodman's 1st Amended Complaint does not identify restitution as a means of recovery being sought, it is well established that alternative theories or means of recovery can be pursued, whether or not pleaded in the complaint. "*Further, that the complaint is not clear in regard to the theory of a plaintiff's recovery does not preclude recovery under quantum meruit.*" *U.S. v. Algernon Blair* 479 F.2d 638, 641 (4th Cir. 1973), citing *Narragansett Improvement Co. v. United States* 290 F.2d 577 (1st Cir. 1961). In *Algernon Blair*, although no restitution was mentioned in the complaint, *quantum meruit* was allowed, along with contract damages. Adding alternative theory of recovery is essentially a form of amending the complaint to conform to the evidence, which can be done at any time under Rule 15(b). See also, *Independent Insurance Agents of America v. Clarke*, 955 F.2d 731, 733 on substitution

of legal theories in general.  This Court has previously denied an amendment to the complaint that would have included restitution as a means of recovery on the breach but its rejection was based on other grounds – rejecting a new claim for restitution in the absence of a contract, citing PSI's stipulation to the enforceability of the contract.  It described the addition of restitution on the existing breach of contract claim (Count I) as "inconsequential," which it was, in the sense that restitution could be pursued on that claim without need for formal amendment.

66.     It is black letter law in Maryland, as elsewhere, that restitution can be an alternative remedy for breach of contract in various circumstances.  As this Court held in *Sanders v. Mueller*, 2003 WL 25719930, (J. Garbis, 2003), "***The Court concluded at trial and confirms its conclusion, that Plaintiff was entitled to recover from the Firm on a <u>contract and/or quantum meruit basis</u>.  To prevail on a claim for unjust enrichment …*" <u>affirmed</u>, 4th Cir., *Sanders v. Mueller*, 2005 WL 597975, pp. 5-6 (reversing other holding).  Such conditions include material breach, repudiation, fraud, and/or bad faith, including breach of the implied covenant of fair dealing/prevention of performance.  *County Commissioners of Caroline Co. v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d @ 608-09 (2000); *Mogavero v. Silverstein*, 790 A.2d 43 (Md. 2002) @ 53-56; *Petropoulos v. Lubienski*, 152 A.2d 801 (Md. 1959); *Hirsch v. Yaker*, 174 A.2d 728 (Md. 1961); *Hoffman v. Gluck*, 315 A.2d 551, 556 (Md. 1974).  "*A contractor who has been wrongfully prevented by the owner from rendering substantial performance, and thus creating a right to the contract price has, in addition to his remedy in damages as stated above, an alternative restitution remedy.*" *Ibid.*  The instant case meets not one but many of the requisite conditions, as shown above in II.A.  Moreover, the situation that Tracer created by reassigning roles was not expressly covered in the terms of the written contract, also making restitution applicable.

67.     See also, *W.F. Magann Corporation  v. Diamond Manufacturing*, 775 F.2d 1202, 1206 (4th Cir.

1985);  *U.S. v. Algernon Blair*, *supra* @ 641, citing Williston, *Contracts* § 1469 @210 and other

authority.  Both cases allow the joint remedies due to prevention of performance.  All of the major texts

on contracts and restitution also agree that restitution is an available as alternative remedy for material

breach of contract.  *Corbin on Contracts*, §1102-1121.  Farnsworth, *Contracts*, pp. 709-719, pp. 488-89.

Laurence Simpson, *Contracts*, 1965, pp. 406-413.  Restatement Contracts 2d, § 370-378.

68.     Md. cases where restitution has been applied with breach of employment contracts run from

*Keedy v. Long*, 71 Md. 385, 18 A. 704 (1889) and include cases that also include claims under the Wage

Payment Act.  *Battaglia v. Clinical Pefusionists, Inc.*  658 A.2d, 680, 683, HN 7, (1995) citing cases;

*Baltimore Harbor Charters v. Ayd*, 759 A.2d 1091, 1094-1097, Md. Ct. of Special Appeals, (also

discussed in *Baltimore Harbor Charters v. Ayd*, Md. Ct. Appeals, 780 A.2d, 373).

69.     The criteria for unjust enrichment were recited by this Court in *Sanders v. Mueller*, *supra*., on p.

2, citing *Klein v. Signet Bank* 751 A.2d 442, 444 and other cases, as (1) a benefit conferred upon the

defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the

acceptance or retention by the defendant of the benefit under such circumstances as to make it

inequitable for the defendant to retain the benefit without payment of its value.  The analysis laid out

*supra*, e.g., paragraphs 14-16, showing Tracer's use and acceptance of Goodman's work also shows

clearly that these three criteria are met  See, particularly, Tracer's email of May 5, 2000 (Exh 8), in

which Marty attributes to Goodman's work that EPA OGC had confirmed that there were various

options not to cover Tracer (also MtyDpTr  308:3-309:13) and its email of June 13, 2000 (Exh 3), when

it informed Goodman that his role had apparently been accomplished saying that "everyone … had what

they needed," yet keeping Goodman on notice of potential future need.   The exhibit cited in para. 14-16

show that the strategy, avenues, and arguments leading to success were drawn essentially completely from Goodman's work, which Marty had also confirmed in those emails.  Moreover, PSI has admitted that Tracer had essentially hired EA Engineering to perform Tier 1 and Tier 2 testing - Answer and Counterclaim (Docket #55), p. 8, Fact # 7:  "… *to assist Tracer with the Tier 1 registration and, if necessary, Tier 2 testing of certain tracer chemicals*".  Marty admits that the testing would have costs millions of dollars (42:7-43:4).  The April 14 letter agreement shows clearly that Goodman persuaded Tracer to pursue exclusion through this project rather than proceed directly to the testing (first five paragraphs, beginning para. 4 with "*Prior to embarking on such a costly course, however, I believe …*").  Thus, it is clear that Goodman's actions and the project he persuaded Tracer to undertake conferred on Tracer a saving of millions of dollars, actual amount to be determined in trial.  Tracer was well aware that it had received this benefit.  Goodman left his job, worked diligently while sacrificing with very little income for three years, and has had his life disrupted for another eight years trying to collect.  It is obviously inequitable that PSI retain the benefits Goodman conferred without restoring him their value.

70.     If, however, this Court is not completely prepared to rule outright on Goodman's entitlement to restitution as unjust enrichment, it should rule, nonetheless, based on this motion, that he is entitled to pursue restitution.  In that case, it should further consider judgment on whether the standard for unjust enrichment is met in conjunction with Goodman's Spoliation Motion, which will be filed shortly.

### VII. Tracer's Refusal to Pay Goodman Was Not for a Bona Fide Reason

71.     Under the Wage Payment Act, a plaintiff can be awarded up to treble damages plus interest and attorneys fees if the employer's failure to pay was not a result of a bona fide dispute.  Normally a question for the trier of fact, summary judgment is appropriate where sufficient evidence as to the bona fide reason does not exist. *Marroquin*, *supra* @296, citing cases.  For a dispute to be bona fide, the employer must have a good faith belief in the validity of its position and must also "act in good faith and without deceit or fraud in pursuing that dispute."

*Admiral Mortgage* 745 A.2d, 1026, 1035; *Marroquin*, *supra*; *BHC* @ 321.  Obviously, since the Act requires payment within two weeks of the wages being due, the good faith effort must be made in a similar time frame.

72.     In the instant case there clearly is not a glimmer of a bona fide dispute, as shown above in II.A, nor any evidence of good faith by Tracer.  While breach of implied warranty of fair dealing and cooperation always constitutes bad faith, in most cases such breach terminates work.  In contrast, Tracer kept Goodman working diligently with essentially no income for 10 months while preventing him from performing so as to earn his success fee, then kept him on hold for another 10 months, while also concealing the number of tracers covered by the agreement.  Then, the day after it was comfortable that it was in the clear with EPA, it called him refusing payment.  While Marty's version of this conversation is largely inaccurate (also claiming she has no specific recollection of the call), both her version (MtyDpTr 358:6-360:9) and Goodman's (Exh 2, p. 10) show a complete absence of good faith.  *PSI states that it refused to make any payment at all to Goodman upon success* (PSI MSJ Mem. p. 7).  Marty's professed foggy recollection that she didn't think Goodman would believe he was entitled to any payment is completely refuted by the many communications to the contrary shown above in II.A.  In any event, Goodman wrote 2 letters pointing out sound reasons for entitlement (Exhs 2, 29), which Tracer never responded to until Feb. 27, 2001, six weeks after Goodman's first letter, when it responded through counsel threatening to demand return of the payments already made and giving preposterous reasons for not paying (Exh 30).  It subsequently contrived and brought blatantly false allegations of fraud to intimidate him.  Tracer's bad faith is overwhelming.  Any questions over the details of how much has been owed are irrelevant since such questions are clearly not the reasons for Tracer's non-payment.  *Tracer refused to pay because it could*.  Or so it thought.

73.     For the reasons identified above, there are no material facts in dispute and summary judgment should be granted to plaintiff on the issues identified above.

Respectfully submitted,

*Marc Goodman*

Marc Goodman
P.O. Box 727
North Beach, Md.  20714
(301) 855-7655
marcbgoodman@msn.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Memorandum in Support of Plaintiff Marc Goodman's Motion for Partial Summary Judgment was mailed, postage prepaid, to Erin Shoudt, Sonnenschein Nath & Rosenthal LLP, 1301 K St. N.W., Ste. 600, East Tower, Washington, D.C. 20005, this 13th day of September 2008.

*Marc Goodman*

Marc Goodman