**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

MARC GOODMAN,

        Plaintiff/Counter-Defendant,

    v.

PRAXAIR, INC., and PRAXAIR SERVICES, INC.,

        Defendants/Counterclaimants.

Civil Action No. MJG-04-391

**DEFENDANT PRAXAIR SERVICES, INC.'S COMBINED
OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AND REPLY IN SUPPORT TO ITS MOTION FOR SUMMARY JUDGMENT[1]**

Amy L. Bess (Bar No. 14687)
Erin M. Shoudt (*pro hac vice*)
Sonnenschein Nath & Rosenthal LLP
1301 K Street, N. W.
Suite 600, East Tower
Washington, D.C.  20005
Telephone:  202-408-6400
Facsimile:  202-408-6399

*Attorneys for Defendant Praxair Services, Inc.*

---

[1]    Goodman filed a Motion for Partial Summary Judgment.  Because Praxair Services previously filed a Motion for Summary Judgment, Praxair Services will construe Goodman's submission as a combined Cross-Motion and Response to Praxair Services' Motion for Summary Judgment.

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ............................................................................... 1

II.    ARGUMENT ..................................................................................... 2

    A. Praxair Services Is Entitled to Summary Judgment on Goodman's
         Breach of Contract Claim. ........................................................... 2

        1.   Goodman Mischaracterizes the Language of the Contract and
             Praxair Services' Argument. ............................................... 2

        2.   The Contract Was Not Modified By Subsequent Agreement or
             Conduct of the Parties. ....................................................... 6

        3.   Praxair Services' Suspension of Goodman's Contact With the EPA
             Was Initiated by Goodman and Was Justified. ................... 11

        4.   Goodman Misconstrues the Language of the Contract Regarding the
             Number of Tracers to Which it Applied. ............................ 14

        5.   Goodman's Claim for Recovery Under Quantum Meruit
              Must be Rejected for a Fifth Time. .................................... 16

    B. Praxair Services is Entitled to Summary Judgment on
         Goodman's Wage Payment Act Claim. ....................................... 18

        1.   Tax Information and Resumes Are Relevant. ...................... 19

        2.   Goodman Controlled His Contributions to the Project. ....... 21

        3.   The Services Goodman Provided Were Not in Tracer's
             Usual Course of Business. .................................................. 21

         4.   Goodman Was Customarily Engaged in Independent Business. .......... 22

        5.   Goodman Used His Own Tools. .......................................... 23

    C. Goodman's Motion for Summary Judgment On Praxair Services'
         Counterclaims Should Be Denied. ............................................... 23

        1.   Breach of Contract. ............................................................ 23

        2.   Fraudulent Inducement, Fraud and Negligent Misrepresentation......... 24

           a)  Goodman's False Representation Concerning His Experience. ............ 24

           b)  False Representation Concerning Legal Consultants Goodman Retained. .... 25

III.    CONCLUSION ................................................................................. 25

I.    <u>**INTRODUCTION**</u>

None of the arguments or facts presented in Plaintiff Marc Goodman ("Goodman")'s Motion for Partial Summary Judgment create a material issue of fact that could justify denying summary judgment for Praxair Services ("Praxair Services").  The undisputed facts establish that Goodman's contract with Tracer Research Corporation ("Tracer"), which he drafted and executed, unambiguously required Goodman to be the procuring cause of the exemptions to the EPA's testing requirements that Tracer sought.  Goodman does not dispute (and in fact barely even mentions) that his draft Petition and subsequent extensive legal analysis, which he pursued for over a year and half, failed miserably.  Nor does Goodman dispute that he did not know the ultimate decisionmaker at the EPA or that the consultants Tracer retained after his attempts failed, followed a different and more effective strategy that procured the exemptions for Tracer.

Rather than disputing any of this critical evidence, Goodman argues that after his failures, Tracer changed his role in the project and the contract in such a way that he would still be entitled to a success fee even though he had not been involved in the project for 11 months and other consultants took over.  Essentially, Goodman attempts to recover over $600,000 by leeching off of the successful work performed by others.  In support of his theory, Goodman misstates facts, takes testimony out of context and where the facts do not support him, he relies on his own self-serving declaration that is hearsay.  However, none of Goodman's evidence shows that the agreement or Goodman's role was changed in any way.   Instead, it shows that Goodman's effort failed and so he was no longer involved.  If Goodman had his way, he would have had Tracer wait indefinitely, paying for multiple failed efforts, which based on the response he had received to date, would surely have resulted in EPA's denial.  The suggestion that Tracer, a for profit business, should wait around for some unspecified time at the mercy of Goodman's

unsound strategies, is wholly unreasonable, especially considering that the new consultants

procured the relief and accomplished the objective in half the time and for a tenth of the price.

 In addition, Goodman does not dispute any of the key evidence showing that he was not a

Tracer "employee" and therefore cannot recover under the Wage Payment Act.  None of

Goodman's excuses justify ignoring that his tax returns, tax withholdings, resumes and other

evidence make clear that both Tracer and Goodman considered him to be an independent

contractor.  Finally, as shown below, material issues of fact exist with respect to Praxair

Services' counterclaims for fraud, fraudulent inducement and negligent misrepresentation.

 Accordingly, Praxair Services' motion for summary judgment should be granted and

Goodman's motion for partial summary judgment be denied.

## II.    ARGUMENT

### A.    Praxair Services Is Entitled to Summary Judgment on Goodman's Breach of Contract Claim.

   1.    Goodman Mischaracterizes the Language of the Contract and Praxair Services' Argument.

 Goodman's opposition ("Opp'n")[2] demonstrates a fundamental misunderstanding and

misinterpretation of the terms of the April 14, 1998 Contract that defines both his and Tracer's

obligations.[3]  See Def's Ex. 7.  Goodman contends that his April 14, 1998 Contract governed the

---

[2]    Goodman's Motion for Partial Summary Judgment will be referred to herein as "Opp'n."
Praxair Services' Motion for Summary Judgment is referred to herein as "Def's Mem."  The
Exhibits are noted as Plf's Ex. or Def's Ex.

[3]    Goodman's claim that this was an "informal letter" which Tracer chose not to "augment
with a formal contract" should be disregarded.  Opp'n at 5.  There is no legal distinction between
an "informal" and a "formal" contract.  Contracts can take many forms, but they all require a
meeting of the minds.  Safeway Stores, Inc. v. Altman, 463 A.2d 829, 831 (Md. 1983) (essential
element to contract formation is mutual assent).  Here, the April 14, 1998 letter from Goodman
set out the terms of a contract in which Goodman offered to provide services to Tracer in order to
obtain exemptions from the EPA testing requirements for fuel additives.  Goodman proposed to
Marty, the CEO of Tracer "if you agree to the terms as proposed herein, please countersign a

entire project of obtaining exemptions from the EPA's Tier 1 and Tier 2 testing requirements for its leak tracers.  However, the unambiguous language of the Contract shows that it only applied to *Goodman's* efforts to obtain the relief from the EPA.  The April 14, 1998 Contract, which Goodman drafted himself, provides:

> I propose that for each of the six tracers for which <u>I successfully negotiate</u> with EPA not have to perform Tier 2 testing for use with gasoline or diesel fuel, Tracer will pay a fee of $25,000.  If <u>I am also successful</u> in removing the tracers from Tier 1 coverage, another $5,000 per tracer would be paid.  (Def.'s Ex. 7 at 2) (emphasis added).

The use of the word "I" in the April 14, 1998 Contract clearly indicates that the Contract solely addressed Goodman's efforts to obtain exemptions from the Tier 1 and Tier 2 testing requirements.  Thus, according to the plain and unambiguous language of the April 14, 1998 Contract, for Goodman to be entitled to the success fee outlined in the Contract, he would have to "successfully negotiate" an exemption from Tier 2 testing and be "successful in removing" the tracers from the Tier 1 testing requirements.  Def's Ex. 7 at 2.  In other words, he was required to be the "procuring cause" of the exemptions from Tier 1 and Tier 2 testing requirements.  <u>Hampton Park Corp. v. T.P. Burgess, Co.</u>, 311 A.2d 35 (Md. 1973).  As outlined in detail in Praxair Services' opening memorandum, after over a year and a half, Goodman's efforts failed to achieve the desired relief.  Def's Mem. at 14-27.  Therefore, Praxair Services was not obligated to pay him any success fee.

---

copy and send a copy with an original signature back to me."  Def's Ex. 7 at 4.  It is undisputed that Marty signed the contract and accepted its terms on April 16, 1998.  <u>Id.</u>  Thus, there was a meeting of the minds and the April 14, 1998 letter represents a binding contract between the parties.  There was no need to augment the contract with anything else.  Moreover, notably, Goodman attached this same contract to his initial Complaint, as it forms the basis for his breach of contract claim.  Dkt. 2 at Ex. A.

In Goodman's opposition, he conveniently changes the language of the Contract to fit his purposes and argues that "the agreement indeed provided for payment of the success fees to Goodman if the project were successful…"  Opp'n at 2.  Goodman's focus on the success of "the project" misconstrues the language of the Contract.  The Contract did not provide that Goodman was entitled to a success fee if the overall "project" of obtaining exemptions from EPA testing requirements was successful in the end, regardless of who procured it.  Rather, the terms of the Contract provided that Goodman's entitlement to the success fee was based on *Goodman* being the cause of any success.  Further, National Environmental Strategies (NES), the entity that ultimately procured the relief for Tracer with the EPA, had its own contract with Tracer and was not subject to the terms of Goodman's contract.  See Marty Decl. Ex. A.

Goodman also incorrectly misunderstands Praxair Services' theory of the case. Goodman asserts that Praxair Services "invent[ed a] fiction…that there was not one project to obtain relief[,] but two separate projects, one of which failed and other of which succeeded without Goodman's involvement."  Opp'n at 2.  Praxair Services agrees that there was one project -- to obtain exemptions from the EPA's Tier 1 and Tier 2 testing requirements.  However, Praxair Services argued that there were *two dramatically different strategies* employed to accomplish this objective -- a first one that failed, and a second one that was highly effective. See Def.'s Mem. at 26-27 (providing chart of differences in strategies).  The first strategy was Goodman's, which was governed by the April 14, 1998 Contract.  His strategy involved constructing a lengthy and complex legal analysis and submitting a draft Petition to the EPA for EPA's feedback.  See Plf's Ex. 19 (filed under seal).  It is undisputed that the draft Petition was unsuccessful.  Def's Ex. 18 at 9 (recounting that the tracers were not going to receive exemptions); Goodman Dep. at 104-05.  In fact, according to Goodman himself, after Goodman

- 4 -

submitted his Draft Petition and met with EPA officials, the EPA was prepared to write a formal letter stating that Tracer's leak tracer chemicals were fuel additives and subject to the testing requirements.  Def's Ex. 18 at 10.  Notably, Goodman barely mentions this draft Petition (or its failure) in his Motion.  Goodman's subsequent efforts to provide legal support to the EPA for his positions were similarly unavailing, as Goodman concedes that Scroggin's work product was "fundamentally, thoroughly, and irreparably flawed," "a loser for Tracer" and "devastat[ing.]" Def's Exs. 23, 24.  Moreover, Goodman admitted that he did not even know Margot Oge, the official at the EPA who he concedes would be the official to sign any exemption letter. Goodman Dep. at 201; Opp'n at 43.

In stark contrast to Goodman's failed strategy was Richard Wilson and NES's strategy. Unlike Goodman, Wilson did not conduct any legal analysis or construct any legal arguments. According to Wilson, pursuing a legal strategy made no sense for him because he was not a lawyer.  Wilson Dep. at 12.  ("I wasn't trying to represent that we were presenting legal arguments to EPA.").  Rather, Wilson's strategy focused on communicating with the appropriate offices at the EPA with whom he had pre-existing relationships in an effort to convince them that Tracer's product was unique and needed for environmental safety and protection.  Id.  ("Our idea was to convince them that there must be a number of approaches and this was something they ought to want to have happen").  Goodman does not dispute that he and Wilson pursued different strategies.

Goodman further claims that Marty had some hidden intent to keep him working on the project and then deny payment because he did not participate.  This is pure conjecture that is not supported by the record.  Marty's intent in executing the Contract, as evidenced by the terms of the Contract itself, was for Goodman to actually obtain the exemptions to the Tier 1 and Tier 2

- 5 -

testing requirements that Tracer needed.  As Marty testified: "my understanding of …[the]

[C]ontract was that you would get us excluded from [the regulation] . . ."  Marty Dep. at 69.

When nearly two years has passed and the core objective had not been obtained, Marty

considered Goodman's efforts to have failed.  Thus, according to the terms of the April 14, 1998

Contract, Tracer only owed Goodman $10,000, and not a success fee.[4]

The bottom line is that Goodman drafted a success based contract which required him to

be the procuring cause of the exemptions to EPA testing requirements in order to receive any

success fee.  In the alternative, if his efforts were not successful, he was to be paid a $10,000 fee

if he performed certain services.  One of the risks Goodman assumed in executing this Contract

was that he would not be successful and not receive the success fee.  Ignoring this inherent risk,

Goodman claims that there was no possibility that he would not succeed.  However, the evidence

shows that Goodman's strategy and efforts to obtain the exemptions from the EPA were a

complete failure.  Nor was he involved in the strategy that ultimately was successful.  Thus, he

did not broker the success and Tracer accordingly did not breach the agreement in refusing to

pay him the success fee.  The fact that Goodman no longer likes the terms of the Contract he

drafted and agreed to is no reason to avoid enforcing the express contractual terms.

        2.        The Contract Was Not Modified By Subsequent Agreement or Conduct of the Parties.

Goodman attempts to deflect the Court's attention from the plain language of the

Contract and the fact that his efforts failed by claiming that, based on the conduct of the parties

and communications subsequent to the execution of the Contract, the Contract was "clarified"

---

[4]      Although Goodman is correct that the Contract did not limit the method by which the exemptions were obtained (Opp'n at 5-6), the Contract did require that whatever method was used to obtain success had to be pursued by *Goodman*.  It is undisputed that Goodman's chosen method -- submitting a detailed legal memorandum and argument -- did not work.

and his role changed so that he would receive the success fee even though different consultants ultimately procured the relief.  Opp'n at 10, 15 (expecting payment even though new consultants played a lead role).  Essentially, he claims that he is entitled to over $600,000 in success fees despite the fact that he only attended <u>one</u> meeting and was not consulted for the next 11 months.  Whatever term he uses -- clarify, modify, waiver or substitute -- the conclusion is the same, the Contract was not changed and Goodman was <u>not</u> the procuring cause of the ultimate success.  In any event, Goodman's reliance on the conduct of the parties is belied by his own deposition testimony in which he testified that the only "modification" to the Contract that occurred was an advance of $20,000 that he requested because he was in need of funds.  Goodman Dep. at 384-85 ("Yeah, it was a modification in order to pay me some interim payments.").

At the outset, Goodman claims that because "the contract did not provide clearly for the situation that developed," the interpretation of the contract must be determined from additional communications and the conduct of the parties.  Opp'n at 7.  However, the April 14, 1998 Contract <u>did</u> provide for the situation that developed -- that is, if Goodman was unsuccessful in negotiating the EPA exemptions, he would be entitled to the $10,000 payment, but not the success fee.  Goodman's initial submission of the draft Petition to the EPA and his almost two years of effort were a total failure in obtaining the exemptions.  He thus received a $10,000 payment pursuant to the terms of the Contract.

Goodman's claim of a subsequent contract modification is unsupported in the record.  First, Goodman argues that the contract was modified in November 1999 when Marty informed Goodman that Mary Gade may be primarily responsible, but she could "live with our original agreement."  Opp'n at 10.  Clearly the original agreement was still intact at this point in the

chronology of events.  This email was sent when Goodman's initial strategy had failed and

neither Goodman nor Tracer knew which direction to go in.  Later in the email, Marty states:

> "I'll be honest, the Don Scroggin thing really made me concerned
> that you didn't know where to go or how to get there. I paid Don
> over $40,000 - that I don't have anything to show for nor do I have
> much ability to make a claim against."

Def's Ex. 8 at 1.  At this time, Tracer did not know whether Goodman would be part of the effort

to obtain success or not.[5]  All Tracer did know was that over one and a half years had passed and

no progress was made.

Second, Goodman claims that the contract was modified and that his role changed to that

of a "provider of strategy and analysis" while other consultants communicated with the EPA.

Opp'n at 13.  In support of this assertion, Goodman claims he did substantial work after the new

consultants were engaged.  However, he points to work he performed before it was certain that

his strategy was not going to succeed.  Opp'n at 11.  Specifically, he points to documents, such

as a chronology of his communications with EPA and a legal argument memorandum, that he

drafted at his own suggestion, not at the request of Tracer.  Id.

It was only after the initial meeting with NES in January 2000 (and the only meeting

Goodman attended), that Tracer realized that Goodman had provided no value to the "project,"

that his strategy had produced no results over two years and that he would no longer be

"needed."  Marty Dep. at 322.  In fact, Marty thought he may be harmful to the project at this

point since the response to his efforts from the EPA had been negative.  Plf's Ex. 15 (Req. for

---

[5]       In further support of his notion that he thought he would still be paid at this point,
Goodman relies on his own Declaration that Gade "pronounced Goodman's [ideas] to be
'excellent' saying they would be the strategy going forward."  Opp'n at 10; Decl. ¶ 29.  There is
no credible support for this hearsay statement in the record and thus Goodman's own hearsay
testimony must be discounted a self-serving.  Moreover, Marty testified that she did not recall
the details of this conversation, yet Goodman even cites her deposition as additional support for
Gade's alleged statement.  Opp'n at 10.

Adm. No. 4).  In terms of anything Goodman may have drafted after this point, Goodman testified that Tracer had no knowledge that he was continuing to do any work.  Goodman Dep. at 375 (stating that he continued to work but Marty never saw edits he made to documents).  It is undisputed that after January 2000, Goodman was not involved in any meetings, strategy sessions or communications with the EPA.  Marty Dep. at 297-98 (stating she did not ask for any subsequent work on the project); Goodman Dep. at 403 (agreeing that he was not involved in any meeting with NES or EPA after January, 2000).  Any "advice" he may have given was unsolicited.  Thus, his role did not change to that of "strategic advisor" – he was simply not involved anymore and provided no advice or strategy.

Third, Goodman claims he is entitled to the success fee based on two short emails sent in March and June 2000, months after anyone had consulted him about any aspect of the "project." Opp'n at 11, 13.  Comparing himself to a doctor, professional athlete and a "Mafia hit man," Goodman now contends that he is entitled to recover over $600,000 because the two emails put him on "stand by" status.  Opp'n at 11 & n.5.  However, it is clear from the language of the emails that Marty never instructed Goodman to remain on "stand by."  At most, she states that "we may need to get you involved."  Plf's Exs. 7, 14.  The emails were merely a response to Goodman's unsolicited inquiry as to the status of the project.  Marty never initiated communication with Goodman after February 2000.  In fact, Marty testified that any emails she sent were only in response to Goodman's and were just "to be nice."  Marty Dep. at 312.[6] Moreover, the emails also put Goodman on notice that he no longer had a role.  Plf's Exs. 7, 14 (Marty stating "at this point I am comfortable" and "everyone seemed to indicate they had what

---

[6]     Goodman asserts that Marty's lack of responsiveness should be considered silence that shows acquiescence.  Opp'n at 14.  To the contrary, it only further proves that Marty was not consulting Goodman any longer.

they needed.").  Goodman could not seriously interpret a three sentence email as an instruction to

him that he drop everything and remain on stand by.  As Marty testified:

> I think most anyone else would have already realized they weren't
> on the team.  I mean, you hadn't been at meetings.  You hadn't
> been consulted.  You hadn't been in the loop.  You hadn't been
> getting e-mails.  You were pretty much frozen out of
> communication.  You didn't even know meetings were happening.

Marty Dep. at 312.  Nor is it reasonable for him to assume he would be entitled to a $600,000

payment based on a few email exchanges telling him his services were <u>not</u> needed.[7]

Fourth, in an effort to prove that he contributed to the successful result, Goodman takes

the remarkably bold step of attempting to take credit for the success Wilson, a former high-

ranking EPA official and leading Washington lobbyist, achieved.  He claims that "Wilson's work

… [was] an extension of his" and that "Wilson followed the same path started and advocated by

Goodman."  Opp'n at 11-12.  Goodman assumes that because there may be similarity of

language used in Goodman's work product and the final letter received from the EPA, Wilson

<u>must</u> have relied on Goodman's prior work.  Opp'n at 13.  However, Wilson had no recollection

of relying on any of Goodman's materials or that Goodman's work "opened any doors" for NES.

Wilson Dep. at 116.

Moreover, Goodman ignores the reality that arguing that the leak tracers were not "fuel

additives" was a blatantly obvious way to attack the testing requirements that applied to "fuel

additives," regardless as who made the argument.  There was nothing novel or particularly

creative in this theory.  Rather, it was the <u>approach</u> to the EPA that mattered.  With respect to the

---

[7]      Goodman also argues that allegedly being put on stand by status prevented him from
obtaining other work.  To the contrary, there was nothing <u>ever</u> prohibiting Goodman from
obtaining work from other clients, especially after he was no longer involved in the Tracer
project.  Notably, however, Goodman did have other clients throughout the entire time he
worked for Tracer.  <u>See</u> Def's Ex. 11 (1099s Form QSS Corp., Atro Associates and Pure
Energy).

approach, Goodman does not dispute that Wilson employed a different strategy than Goodman had that focused on oral communications with various relevant offices at the EPA and did not involve extensive legal analysis.  Nor does Goodman dispute that Wilson's relationship with Oge (as her former boss) was critical to Tracer's ultimate success.  In fact, Goodman declares that a meeting with Oge was necessary and concedes that he did not know her.  Opp'n at 44.  Nevertheless, Goodman assumes without any factual basis, that Wilson did not need to perform legal analysis because he just relied on the analysis already done by Goodman.  Opp'n at 12.  This assertion flies in the face of Wilson's testimony that he saw no need for legal analysis and never would have performed it because he was not a lawyer.  Wilson Dep. at 12.  Unlike Goodman, Wilson simply did not view Tracer's issue as a legal problem.  Id.  Thus, Wilson's approach, work product and results were all very different from Goodman's and cannot be seen as a mere extension of it.

In addition, Goodman rewrites history by baldly asserting that by the time Wilson was involved, the EPA was "largely accepting of the idea of tracers not being fuel additives" and that "Goodman had already persuaded EPA" of the avenue of relief it adopted and that his "role had been accomplished."  Opp'n at 12-13.  The undisputed records proves this to be false.  If it were, then there would have been no need engage NES and employ a different strategy over the next 11 months.  By January 2000, Goodman had worked on the project for over a year and a half.  Yet, all Tracer had obtained was a negative response from the EPA and huge bills from lawyers that worked with Goodman and produced nothing useful.  See Def's Ex. 18.

3.    Praxair Services' Suspension of Goodman's Contact With the EPA Was Initiated by Goodman and Was Justified.

Goodman places much emphasis in his opposition on his contention that Tracer interfered with his ability to obtain his success fee by suspending and never reauthorizing his ability to

contact the EPA after March or April 1999.  Opp'n at 17-18.  However, Goodman 1) disregards

the undisputed fact that *he* initially suggested suspending contact with the EPA; 2) ignores that

EPA representatives determined that any meeting at that point would have been futile; and 3)

conveniently never describes *why* Tracer agreed to hold off on contacting the EPA.

It is undisputed that by March 1999, Goodman had spent one year researching and

preparing a draft Petition to be submitted to the EPA.  It is also undisputed that after the draft

Petition was submitted, Goodman met with EPA representatives and provided follow up

memoranda, all of which received a negative response from the EPA that was going to be

memorialized in a letter formally rejecting the relief.  Def's Ex. 18 at 9.  Thus, all of

Goodman's communications with the EPA over the one year period from April 1998 to March

1999 had led Tracer to a markedly negative outcome.

According to Goodman, after the EPA informed Goodman of its negative position,

Goodman asked David Kortum of the EPA if he could meet with Oge.  Def's Ex. 18 at 10.

Kortum informed Goodman that he could arrange for a meeting with Oge, but "counsels

Goodman 'as a friend' that he doesn't think it will change her mind."  Id. at 10.  As Goodman

described the situation to others:

> Kortum, who is in better position than anyone to know, said he
> would be more than willing to set up a meeting for me with Margo
> Oge, but that he seriously doubted it would be any difference - her
> mind was made up.  His real suggestion to me, as a friend, was not
> to bother…as far as Margot Oge is concerned, right now the issue
> has been decided and is dead.

Def's Ex. 22 at 1.  After receiving this information, *Goodman himself* suggested that Tracer not

pursue a meeting with Oge.  As Goodman later recounted, "*Goodman* suggests Kortum hold off

on setting up a meeting with Oge until further consultations with Tracer have determined its next

- 12 -

steps." Def's Ex. 18 at 10 (emphasis added). Thus, in his own words, *Goodman* suggested that

he not contact Oge until a new strategy had been developed -- not Tracer.

      Goodman reported the EPA's negative response back to Marty at Tracer and suggested a

new strategy that focused not on obtaining the exemptions as originally contracted, but instead

performing a limited form of the testing that Tracer had been trying to avoid. Def's Ex. 18 at 10;

Marty Dep. at 127-29. But such an alternative approach was untenable for Tracer because even a

limited form of testing was too expensive and an unrealistic option. Id. Given that the EPA

representatives had recommended against a meeting with Oge and Goodman was now suggesting

a testing strategy that Tracer had been adamantly trying to avoid, Marty grew increasingly

alarmed with Goodman's effectiveness and demanded that Goodman refrain communicating

with the EPA at that time because she thought it could only further damage Tracer's position at

the EPA. RFA No. 4. As Marty testified:

> Well, the avenue that you were wanting to propose next for EPA
> was to do limited testing, and that was where I was not
> comfortable going to that . . . I think that's the point when I said
> no, don't give that to EPA, stop contact with EPA because I don't
> want to go down that path . . . we have to stop because this is going
> to cost too much and we have to pursue, we have to look at other
> options.

Marty Dep. at 127-29. Goodman conceded that if he had presented a strategy that was realistic,

he would have been reauthorized to contact the EPA:

> A:    We certainly talked about the fact that we had to have a
> complete strategy to go back to EPA. You knew that from
> the time I told you no more contact with EPA. We talked
> about that.
>
> Q:    I agree we talked about having a strategy. I do agree with
> that.

Marty Dep. at 381. In fact, at the time, Marty thought Goodman's authority would be restored:

A:      I was assuming that I probably was going to authorize you
to go back to communicate with the EPA once we had
something to move forward with . . .

Marty Dep. at 379.  However, it is undisputed that Goodman <u>never</u> came up with a better

strategy.  After his failed Fall 1998 - Winter 1999 effort, Goodman suggested that Tracer work

with a lawyer to develop additional legal arguments.  Def's Ex. 18 at 11; Goodman Dep. at 279-

81.  For the next six months, Goodman worked with Don Scroggin, whose efforts in the end

Goodman himself believed would "doom our case."  Def's Ex. 23.  Thus, Goodman would have

been allowed to communicate with the EPA again if he had come up with a new strategy that

was worth presenting to the EPA.  Despite having worked on the project for 16 months, he never

came up with a new plan.  Thus, Goodman's suspension of contact with the EPA was completely

of his own doing.

4.      Goodman Misconstrues the Language of the Contract Regarding the
Number of Tracers to Which it Applied.

Goodman claims that the total success fee that he is owed, *assuming he is owed any*,

should be calculated based "on how many tracers have been cumulatively available for use in

gasoline and diesel fuel."  Opp'n at 20 (emphasis omitted).  However, this argument is refuted by

the plain language of the Contract and the intent of the parties when the contract was executed.

The Contract provides that Goodman is owed the success fee "<u>for each of the six tracers</u> for

which [he] successfully negotiate[s] with EPA not to have to perform Tier 2 testing."  Def's Ex.

7 at 2 (emphasis added).  Goodman tortures the language of the Contract, claiming that the key

term -- the word "six" -- should be disregarded entirely because it was a mistake.  Opp'n at 19.

However, Goodman cannot just delete a term of the Contract because it does not suit him.

<u>Goodman v. Resolution Trust Corp.</u>, 7 F.3d 1123, 1127 (4th Cir. 1993) ("contract terms must be

construed to give meaning and effect to every part of the contract, rather than leave a portion of

- 14 -

the contract meaningless or reduced to mere surplusage").  In addition, Goodman does not

dispute that at the time the Contract was executed, both parties believed it applied to six tracers

(tracers A, C, D, F, R and W).   See Goodman Dep. at 148 & Marty Dep. at 71-72, 85.

The use of the word "six" was not a mistake.  As explained above, the parties expressly

intended the Contract to only apply to six tracers.  Goodman points to interrogatory answers in

which Praxair Services provided information that showed that more than six tracers were

"available for use" in 1998.  Opp'n at 20-22.  However, the fact that more tracers may have been

"available for use" does not change an express contract term limiting the number of tracers to

six.  Limiting the Contract to only six tracers made sense.  Tracer was in the business of using

tracer chemicals for leak detection in a variety of applications.  The EPA exemptions that

Goodman was working towards applied only to tracer chemicals used in motor fuels, which was

a small portion of Tracer's business.  Six were identified for possible exemption because four of

them (A, C, D, F) had been registered as "fuel additives" with the EPA (Def's Ex. 18 at 1) and

were eligible for an exemption and only two others (R & W) were intended to be used at the

time.  Any others that may have existed at the time were not in use (and thus no exemptions were

required for them).  See Plf's Ex. 15 (Praxair Services Req. for Adm. No. 1).

Regardless of how many tracers were ever available, in the end, Tracer only obtained

exemptions from the EPA for six leak tracers.  The October 30, 2000 "operating agreement" with

the EPA lists six tracers which the EPA's Office of Research and Development had determined

did not have negative health effects and would be eligible for the exemption.  See Def's Ex. 36

(filed under seal); Marty Dep. at 331 (explaining that the letter was the operating agreement).

Thus, regardless of how many leak tracers were ever "available for use," only six leak tracers

received the EPA exemption.  Therefore, any potential success fee would be limited to six tracers.[8]

> 5. Goodman's Claim for Recovery Under Quantum Meruit Must be Rejected for a Fifth Time.

Despite the Court's clear and repeated rejection of Goodman's restitution theory on *four prior occasions*, Goodman argues for yet a *fifth* time that he is entitled to restitution, quantum meruit and unjust enrichment.[9]  This time, Goodman argues that Maryland law allows parties to recover under alternative theories, such as restitution, despite the fact it was not pled in the complaint and an express contract exists that would preclude such recovery.  This is contrary to Maryland law and therefore the restitution claim must be rejected *again*.

In the instant motion, Goodman claims that "it is well-established that alternative theories or means of recovery can be pursued, whether or not pleaded in the Complaint."  Opp'n at 46.  However, the cases Goodman relies on are inapposite.  Goodman's primary support for this novel idea comes from cases brought under the Miller Act, 40 U.S.C. § 3131 et seq.  See Opp'n at 46 (citing United States v. Algernon Blair, 479 F.2d 638 (4th Cir. 1973); Narragansett Improvement Co. v. United States, 290 F.2d 577 (1st Cir. 1961); W.F. Magann Corp. v. Diamond Mfg. Co., Inc., 775 F.2d 1202 (4th Cir. 1985)).  The Miller Act provides a private right of action to individuals who have furnished labor or materials under a contract secured by a payment bond but who have not been paid.  40 U.S.C. § 3133(b).  Thus, the Miller Act expressly

---

[8]     Notably, only three of the six tracers that the April 14, 1998 Contract intended to cover were listed in the October 30, 2000 letter with the EPA.  Thus, it could be argued that Goodman, at best, could only recover the success fee for three tracers.  In addition, until this lawsuit began, Goodman was not even aware of the existence of three of the tracers listed in the October 30, 2000 letter, since their use and application were developed after January 2000, when Goodman was no longer involved in the EPA approval process.

[9]     The Court has rejected Goodman's attempt to pursue quantum meruit numerous times. See Dkt. 78 (Mot. for Leave to File a 2d Am. Compl.); Dkt. 80 (Mot. to Extend Time); Dkt. 85 (Mot. for Recons.); Dkt. 93 (Mot. for Clarification of Disc. Issues).

permits subcontractors to bring civil actions for the value of their services.  In <u>Algernon Blair</u>,

<u>Narragansett</u> and <u>W.F. Magann</u> (cases cited by Goodman), the plaintiffs sought recovery for

quantum meruit under the cause of action expressly provided in the Miller Act.  In contrast, this

is <u>not</u> a Miller Act case and the causes of action expressly permitted by that statute do not apply.

     Moreover, no cause of action for quantum meruit was alleged in Goodman's Complaint,

nor has the Court allowed Goodman to add one.  In virtually all of the other cases that Goodman

cites as "black letter law" that restitution can be an alternative remedy for breach of contract

(Opp'n at 47), the plaintiffs alleged specific claims for restitution, *quantum meruit* or unjust

enrichment in their complaints.  <u>See</u> <u>e.g.</u>, <u>Sanders v. Mueller</u>, 2005 WL 517975, No. 03-2505 at

*40 (4th Cir. Mar. 4, 2005) (listing causes of action as breach of contract, unjust enrichment and

*quantum meruit*).[10]  The bottom line here is that Goodman did not allege a claim for restitution,

*quantum meruit* or unjust enrichment.

     Regardless of whether Goodman alleged a claim for restitution, as Praxair Services

argued before, any such claim is precluded because the parties had an express contract.  The

Court of Appeals of Maryland, in <u>Comm'rs of Caroline County</u>, 747 A.2d at 610, a case that

Goodman cites, makes clear that "quasi-contract claims such as *quantum meruit* and unjust

enrichment cannot be asserted when an express contract defining the right and remedies of the

parties exists."  The Court explained that the rationale for this rule is not difficult to discern:

> When the parties enter into a contract they assume certain risks
> with an expectation of a return.  Sometimes, their expectations are
> not realized, but they discover that under the contract they have
> assumed the risk of having those expectations defeated.  As a
> result, they have no remedy under the contract for restoring their

---

[10]    <u>See also</u> <u>Comm'rs of Caroline County v. J. Roland Dashiell & Sons, Inc.</u>, 747 A.2d 600
(Md. 2000) (unjust enrichment alleged); <u>Mogavero v. Silverstein</u>, 790 A.2d 43, 45 (Md. App.
2002) (Count II for *quantum meruit*); <u>Petropoulos v. Lubienski</u>, 152 A.2d 801 (Md. 1959) (cause
of action for *quantum meruit* alleged).

- 17 -

> expectations.  In desperation, they turn to quasi-contract for
> recovery.  This the law will not allow.

747 A.2d at 607.  This is precisely what Goodman attempts to do here.  In rejecting a theory

similar to Goodman's, the court in <u>Comm'rs of Caroline County</u> explained that:

> [e]ven if the [defendant] . . . was enriched, the enrichment was not
> unjust because it was in strict compliance with the terms of their
> contract.  To hold otherwise would turn the basic foundation of
> contract law on its ear.  This rule holds the contract parties to their
> agreement and prevents a party who made a bad business decision
> from asking the court to restore his expectations.  <u>Id.</u> at 610.

Likewise, here, Goodman and Tracer's CEO executed a contract that defined the parties'

relationship and upon which Goodman bases his breach of contract claim.  As a result, Goodman

is entitled to pursue damages pursuant to the contractual terms, but nothing more.

## B.     Praxair Services is Entitled to Summary Judgment on Goodman's Wage Payment Act Claim.

Goodman does not refute the overwhelming volume of evidence that Praxair Services

proferred to show that Goodman was not Tracer's "employee" under the Wage Payment Act.

Specifically, Goodman does not dispute that he:

- referred to himself as a "self-employed consultant," on his resumes (Def's Exs.14, 15);

- received compensation from Tracer reported on 1099 Forms as non-employee compensation (Def's Ex. 10);

- submitted to the IRS a Schedule C-EZ describing his principal business as "consultant" or "consultant entrepreneur" (Def's Ex. 17);

- provided similar consulting services for other clients at the same time he performed services for Tracer (Def's Ex. 11);

- drafted a contract that explicitly gave him discretion and flexibility to modify the progress of the project (Def's Ex. 6); and

- worked from home in Maryland, using his own computer, phone and fax and office supplies (Def's Ex. 9 at 5-6).

- 18 -

Instead of disputing any of the myriad evidence to the contrary, Goodman urges the Court to disregard it and find that because he was Tracer's "agent," he was Tracer's employee. Opp'n at 26. In an effort to find support for his tortured argument, Goodman misrepresents facts, misconstrues the relevant law and twists deposition testimony out of context.[11]  None of Goodman's excuses or explanations justify ignoring the undisputed evidence showing that he was an independent contractor. If Goodman's interpretation of the Wage Payment Act were correct, then essentially every independent contractor or consultant in Maryland would be considered an "employee" for purposes of the Wage Payment Act. That result is simply not what the Maryland legislature intended when it enacted this law.

> 1.     Tax Information and Resumes Are Relevant.

Goodman asks the Court to completely ignore the evidence that he considered himself to be a "self-employed consultant." Opp'n at 27.   As Praxair Services pointed out in its initial memorandum, Goodman produced at least three resumes which he admitted were prepared while he performed services for Tracer, and describing the work he did for Tracer as a "self-employed consultant." Exs. 14, 15 and 16.  Now, he conveniently claims that his resumes should be overlooked because the phrase "self-employed consultant" did not really mean that. Opp'n at 27 (arguing that the same terms may have different meaning in different contexts).  However, Goodman himself notes that his "description as a consultant was the most convenient term to use regarding that period of time." Opp'n at 27, n.12. Quite simply, that was because the term "consultant" was accurate.

---

[11]     Goodman argues that Tracer's nonpayment of the success fee was not the result of a bona fide dispute and therefore the Court should treble his damages. Opp'n at 49; Md. Code Ann., Lab. & Empl. § 3-507.1.  To the contrary, as stated above, Goodman was not employee for which this provision could apply.  In addition, there is no evidence of bad faith on the part of Tracer.  Rather, Tracer contends that Goodman breached its contract and therefore, pursuant to the contractual terms, Goodman was not entitled to a success fee.

Goodman asks the Court to disregard that he was paid as an independent contractor and received IRS 1099 forms rather a W-2 Form or that he described his own compensation as a "fee" rather than "wage." Despite Goodman's unsupported conclusion that "tax law is far afield" from employment law, an individual's tax information is very relevant to his or her employment status. In fact, in a prior order, this Court explicitly listed tax filings as relevant to the question of whether an employment or independent contractor relationship existed here. In denying Praxair Services' early motion to dismiss the Wage Payment claims, this Court held:

> The Court must note that the contract between Goodman and [Tracer], on its face, appears to establish an independent contractor relationship. However, it is possible that there could be objective evidence sufficient to establish an employment relationship. Thus, <u>if [Tracer] withheld federal and state income taxes from its payments to Goodman, and Goodman reported the payments as "wages" on his tax returns, there would be evidence of an employment relationship. If on the other hand, Goodman and [Tracer] treated the payments as being made to an independent contractor so that there was no withholding, Goodman reported the income as other than wages, etc., it is possible that, together with other evidence, the defendants would be entitled to partial summary judgment on the employment relationship issue.</u>

Dkt. 24. The evidence is undisputed that Tracer did not withhold federal or state taxes from its payments to Goodman and Goodman did not report those payments to the IRS as "wages." It is of no import that Tracer chose to issue the 1099 Forms. Nor is it relevant that Goodman was unaware of any process for challenging the receipt of the 1099 Form. If Goodman thought his receipt of a 1099 Form was incorrect, he should have corrected the representation to the IRS. Ignorance or failure to read the instructions is no defense. Moreover, he received <u>three</u> 1099 forms in three different years, none of which he took issue with in any way until this lawsuit was filed.

Finally, it is not only Praxair Services who considered Goodman to be an independent contractor. This is also how Goodman characterized himself. Goodman totally disregards (and

- 20 -

does not dispute) that he characterized himself as an independent contractor on his own tax forms. Def's Ex. 17 (stating that his principal business was "consultant" or "consultant-entrepreneur").

> 2.   Goodman Controlled His Contributions to the Project.

In a failed attempt to argue that Tracer controlled the project, Goodman misstates the facts and takes testimony out of context in an attempt to show that Tracer was in control of the project. Opp'n at 31. Yet, Goodman fails to address that he explicitly requested that his contract provide him with discretion and flexibility in how the project was executed. Def's Ex. 7. He also ignores the evidence that Tracer sought and relied on Goodman's recommendations and suggestions for every aspect of the project (Marty Dep. at 106-08), that Goodman himself described himself as the "point man" and "[Scroggin] was simply another consultant working with him" (Ex. 18 at 11) and that Marty never had any contact with NLRG. Goodman Dep. at 362-63.

Instead, Goodman takes Marty's deposition testimony, including where she stated, "I had to take control," out of context. Opp'n at 32. It is clear from the remainder of the testimony that is conveniently omitted, that Marty was referring to the period of time when the relationships between Goodman, Scroggin and NLRG had deteriorated. Marty Dep. at 371-72. Thus, Marty had to step in to monitor the number of communications in an effort to reduce expenses. Marty never controlled the substance of what Goodman or the other lawyers did.

> 3.   The Services Goodman Provided Were Not in Tracer's Usual Course of Business.

As discussed in Praxair Services opening brief, this factor looks at whether the services provided by the alleged employee were within the usual course of business of the employer. Goodman confuses this inquiry and argues that Tracer was in the business of leak detection,

- 21 -

rather than properly focusing on whether Tracer was in the business of obtaining exemptions

from the EPA testing requirements.   The relevant inquiry here is whether Tracer needed to

obtain these services from an independent contractor or could have performed them itself, in the

course of its business.

There is no dispute that Tracer's primary business was the marketing and sale of leak

detection chemicals to clients.  Opp'n at 35.  There is no dispute that Tracer was not in the

business of negotiating exemptions from EPA regulations.  Indeed, if Tracer was in the business

of getting EPA exemptions, there would have been no need to engage Goodman at all.

> 4. <u>Goodman Was Customarily Engaged in Independent Business.</u>

Goodman claims that he was not engaged in an independent business because working

for Tracer was his "main vocation" at the time.  Opp'n at 36.  He concedes that he may have

"been an independent consultant during this period," but he was "not regarding the Tracer

project and not in terms of the Wage Act."  <u>Id.</u> at 37.  Goodman asks the court to overlook all of

the evidence because it is "circumstantial and misleading" and "do[es] not outweigh the actual

facts" that he worked primarily for Tracer at this time  <u>Id.</u>  Whatever his excuses are, these are

the undisputed facts:

- Goodman used letterhead at the time that referred to his business as "International Consulting Services" (Def's Ex. 7 at 1);
- Nothing prohibited Goodman from working for other companies (and indeed he did so) while performing services for Tracer (Def's Ex. 11);
- Goodman described his own business on tax forms as "consultant-entrepreneur" (Def's Ex. 17);
- Goodman's resumes describe his work for Tracer as done as a "self employed consultant" (Def's Exs. 14-16).

Essentially, Goodman wants to have it both ways -- he wants to represent to the world

(including the IRS) that he was an independent contractor, but wants the Court to ignore all of

that evidence so that he can be an "employee" for purposes of this lawsuit and claim entitlement to treble damages and attorneys' fees.

            5.       <u>Goodman Used His Own Tools.</u>

With respect to the instrumentalities, tools and location of work performed, Goodman does not dispute that he used his own computer, phone, fax and modem or that he performed the work from his home in Maryland.   Instead, Goodman tries to argue that because Tracer supplied the information necessary for him to do his consulting work, he was really an employee.  This argument is completely divorced from reality.  It is inherent in every independent contractor relationship that the contractor is going to need some information from the company in order to perform its work.  If the contractor did not need any information from its client, then there would be no reason for the contractor in the first place.  These are not the "tools" the <u>Baltimore Harbor</u> court was referring to.  Moreover, as an independent contractor, Goodman's approach was to research and draft a petition and legal memoranda to submit to the EPA.  Clearly, his computer, phone and fax were essential to his ability to carry out his consulting strategy.

Accordingly, the weight of the evidence establishes that Goodman was not an employee.

    **C.**    **Goodman's Motion for Summary Judgment On Praxair Services'
Counterclaims Should Be Denied.**

            1.       <u>Breach of Contract.</u>

As explained above and in Praxair Services' initial motion, the evidence demonstrates that Goodman and Tracer executed a success based contract in which Goodman agreed to (and represented that he could) "successfully negotiate" exemptions from EPA's testing requirements. Goodman did not succeed because he was not the procuring cause of the exemptions.  Rather, another consultant, who pursued a different and more effective strategy procured the desired relief.  In addition, Tracer paid Goodman an advance of $20,000 to be deducted from any

- 23 -

success fee.  Since he was not successful, that $20,000 should be remitted to Tracer.  As a result, Goodman breached his contract with Tracer.

       2.      <u>Fraudulent Inducement, Fraud and Negligent Misrepresentation.</u>

       a)      <u>Goodman's False Representation Concerning His Experience.</u>

Goodman takes the unsupportable position that in "no way" could the statement that he "has ten years of experience dealing with the key decisionmakers on the fuel registration regulations within the EPA" be interpreted as "claiming any special influence, nor as an inducement to hire Goodman."  Opp'n at 41.  He claims that this sentence was intended to encourage Tracer to pursue obtaining exemptions rather than pursuing a testing program.  <u>Id.</u> at 42.  However, in the very same sentence, he notes that it was meant "to enhance the credibility" of Goodman's proposal.  <u>Id.</u>  Thus, the logical interpretation of this sentence is that it was intended to convince Tracer that Goodman had the right contacts to obtain the EPA exemptions.

Regardless of what this sentence was intended to be, it is undisputed that it was a representation made by Goodman and that it was false.  It is entirely reasonable that Marty, who "did not know the players," would conclude from this sentence that Goodman had relationships with the appropriate people within the EPA who would make the decision regarding Tracer's exemptions.  It is undisputed that Goodman knew that Oge would make the decision, but he had no prior experience with her.  Opp'n at 43; Def's Ex. 18 at 10; Goodman Dep. at 201.[12]  Tracer suffered damage from Goodman's misrepresentations when it continued to spend money on Goodman's failed strategies for over a year and a half.  <u>See</u> Def's Ex. 8.

---

[12]      Goodman's citation to his own declaration for the proposition that he had informed Tracer that "he had never had any direct contact with Ms. Oge" (Opp'n 44; Decl.¶20) should be discounted entirely.  It is completely self-serving hearsay.  Goodman was not subject to cross examination and the statement is not supported by any other evidence in the record.

       b)      False Representation Concerning Legal Consultants Goodman Retained.

Goodman contends that Praxair Services has not identified any specific representations that Goodman made recommending Scroggin or concerning his capabilities.  Yet on May 4, 1999 (Def's Ex. 23), Goodman sent Marty an email specifically stating that he "recommended" Scroggin.   It is also undisputed that retaining Scroggin was Goodman's idea.  Goodman Dep. at 273, 284, 318.  In addition, Goodman cited elsewhere that other people (i.e., Jon Cannon) had a lot of respect for Scroggin's work.  <u>See</u> Def's Ex. 30.  It was reasonable for Tracer to rely on these representations, considering that Goodman knew and was familiar with Scroggin's work and Tracer was not.  Moreover, it is undisputed that Goodman's belief in Scroggin's capabilities was false and the recommendation was a bad one that cost Tracer up to $50,000.  <u>See</u> Def's Exs. 22 & 23 (admitting that Scroggin's work product was "fundamentally flawed" and "devastating.").

## III.   <u>CONCLUSION</u>

For the foregoing reasons, Defendant Praxair Services' motion for summary judgment should be granted and Goodman's Partial Motion for Summary Judgment should be denied.


October 20, 2008                      Respectfully submitted,


                                /s/ Amy L. Bess
                                Amy L. Bess (Bar No. 14687)
                                Erin M. Shoudt (*pro hac vice*)
                                Sonnenschein Nath & Rosenthal LLP
                                1301 K Street, N. W.
                                Suite 600, East Tower
                                Washington, D.C.  20005
                                Tel:  202-408-9217
                                Fax: 202-408-6399

                                *Attorneys for Defendant Praxair Services, Inc.*

- 25 -

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Combined Opposition to Plaintiff's Motion for Partial

Summary Judgment and Reply In Support of its Motion for Summary Judgment was served on

October 20, 2008, by first class mail upon the following:

        Mr. Marc Goodman
        P.O. Box 727
        North Beach, MD 20714


                                /s/ Erin M. Shoudt
                              Erin M. Shoudt