IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| MARC B. GOODMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.: MJG-04-391 |
| | ) | |
| PRAXAIR SERVICES, INC. | ) | |
| | ) | |
| Defendant | ) | |

PLAINTIFF'S REPLY TO DEFENDANT'S COMBINED OPPOSITION
TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AND REPLY IN SUPPORT OF ITS
OWN MOTION FOR SUMMARY JUDGMENT

Marc Goodman, *pro se*
P.O. Box 727
North Beach, Md. 20714
(301) 855-7655
marcbgoodman@msn.com

**TABLE OF CONTENTS**

I.    GENERAL POINTS ................................................................................ p.1

II.   PSI'S BREACH OF CONTRACT ............................................................ p. 3

III.  NUMBER OF TRACERS FOR CALCULATION OF THE SUCCESS FEE ....... p. 13

IV.   WAGE PAYMENT ACT COVERAGE ..................................................... p. 17

V.    RESTITUTION AS ALTERNATE RECOVERY ON THE
      BREACH OF CONTRACT ..................................................................... p. 19

VI.   SUMMARY DENIAL OF COUNTERCLAIMS ........................................ p. 24

VII.  NO BONA FIDE REASON FOR TRACER NOT HAVING PAID GOODMAN .. p. 25

## I. GENERAL POINTS

PSI argues at various points that Goodman's declaration should be treated as hearsay because it is testimony of a party and not subject to cross examination (e.g., PSI Oppsn, p.1, p. 24). To the contrary, under FRCP 12(e), all averments in such declarations must be treated as undisputed for summary judgment unless specifically disputed by the opposing party with evidence showing there to be a genuine issue of fact: "An adverse party may not rest on mere allegations or denials in the adverse party's pleadings." PSI has not disputed, much less evidenced its dispute with, most of these averments but seeks to have them negated as hearsay without citing a scintilla of its own evidence. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "[T]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." Id. at 252. *Dale R. Marco v. Wesbanco Bank, Inc.*, No. 07-1128, 4th Cir. 2008, 2008 WL 2951354.

At the same time, PSI repeatedly makes assertions which it knows to be both false and vigorously disputed and simply misrepresents that "it is undisputed that ..." without citing any evidence. In other cases, PSI cites to some testimony or document that does not even remotely confirm its assertion. Goodman has no need to specifically dispute these misrepresentations according to the authorities cited above because the Court will see that the cited evidence does not enable a reasonable jury to reach the asserted conclusion. Goodman's assertions *infra* either have evidence cited or obviously incorporate points with evidence previously cited.

PSI argues that the informal nature of the April 14, 1998 agreement and Tracer's declining to augment it with a formal agreement are irrelevant (PSI Oppsn p. 2, fn 3). To the contrary, under Md.

law, in interpreting contracts, courts **must** consider the "character of the contract" and the circumstances

of execution. *Pacific Indemnity v. Interstate Fire & Casualty*, 488 A.2d, 486, 488 (Md. Appeals 1985),

citing cases; *First National Bank of St. Mary's v. Maryland Casualty* 121 A.2d 379, 381 (Md. App.

1923). The circumstances in this case are described in Goodman's declaration, paras. 5 and 8-14.

Goodman, a non-attorney with no experience in contracting, left his job at EA Engineering on March 13,

1998, having been contacted numerous times by Tracer in the preceding months asking him when he

could start work on bringing them into compliance, either by starting Tier 2 testing (Tracer's preference)

or by leaving EA to seek exclusion of the Tracers from testing (PSI Exh 2, 54:5-6, 55:6-10). He

forwarded the proposal on the first working day after his last day at EA. It was reviewed by Shannan

Marty, a law school graduate who took "a lot of contract courses" (Mty 16:21-17:3) consulting with

Tracer's outside General Counsel/contract attorney, Mark Lammers (Mty 22:5-16, 61:10-15). Tracer

"negotiated" the contract (Mty 60:9) requiring changes to it and had it under consideration for over a

month before signing the revised version on April 16 (compared to the one weekend Goodman had to

prepare the proposal). The proposal, particularly the March 16 draft by Goodman (PSI Exh 5), is almost

wholly an argument for seeking exclusion rather than doing testing, with only one short paragraph on

contract terms (bottom p. 2) along with one additional sentence on payment for sec. 211(f) exclusion (p.

3). Goodman expected contract terms to be defined in a formal contract, but Tracer declined to do one.

Tracer had superior knowledge of pertinent facts (e.g., the number of tracers). Tracer had previously

made representations to Goodman about recognition of the tracer process as superior that were not

accurate (Mty178:6-179:21,MtyDpTr 170:19-174:10 vs. Thpsn 36:2-37:10,) which impeded success.

For related cases but with both parties represented by counsel, see *Acme Markets v. Dawson*, 251 A.2d

2

839, 847 (Md. App. 1969); *Data General Corp v. Grumman Systems* 36 F.3d 1147, 1166, fn 33 (1st Cir,

Md. law, 1994). Deference in contract interpretation is owed to Goodman, not PSI.

## II.    PSI'S BREACH OF CONTRACT

PSI's Opposition fails to meaningfully address the key issues of liability/breach, i.e., that Tracer

kept Goodman working for many months while preventing him from meeting the condition precedent,

instead arguing that this issue is a diversion from what PSI presents as the real issue – that his draft

Petition, presented to EPA in October 1998, "failed miserably" to meet the condition precedent as PSI

now defines it – persuading EPA to grant relief on his own.[1]  PSI no longer argues that success was

achieved by a separate project but now admits that it was achieved through a single project (Oppn. p. 4),

initiated by Goodman and which he worked on actively for nearly two years (one entire year of which

was after the events PSI points to as representing the failure and after he was prevented from contacting

EPA) and was on-call on for another ten months. But, despite Tracer's management of that project and

reassigning of roles, PSI now argues Goodman was required to obtain success on his own, which it also

argues Tracer had a right to prevent him from doing.

---

[1] The evidence of Goodman's "failure" PSI describes, comments by EPA's Dave Kortum in Feb. 1999 and Goodman's reference to Oge's perspective in Feb. 1999, were before the majority of Goodman's work and the majority of the months he spent working on the project by any calculation. Marty confirmed that she did not consider that the project had failed at that point (Mty 202:10-17). If Goodman's project had failed, Tracer should have communicated that and released Goodman. PSI then makes the blatantly false assertion that Goodman failed to complete the legal research memorandum though the evidence shows clearly that it was completed, two drafts sent to Marty (*infra*), provided to Gade and Wilson, pronounced "excellent" by Gade, and attributed by Marty to have contributed to the successful conclusion (Gdmn Exh 8). All this is shown in prior briefs. Wilson's comments that he is not a lawyer and doesn't remember asking for a legal memo, though he agrees they are useful (Wil 29:8-15, 38:15-18), make sense: Gade was the lawyer then engaged; Wilson wouldn't have asked for a legal memo because one was already provided, as Marty testified (308:9-309:19; 287:10-18). Goodman succeeded in everything he was allowed to do, developing the strategic/factual/analytical bases of success, persuading the key program office heads to support relief, developing legal support for the positions, and preparing the new consultants to carry it forward, even having been the first to identify Wilson. The project was held up due to Tracer retaining the role of getting third party confirmation of the need for its process (PSI Admission # 7-Exh 14, MtyDpTr 406:1-3) and failing to do that adequately (PSI Exh 18, p. 11 top, Mty 164:2-175:14 Gdmn Exh 8). The program office heads had suggested that Tracer leave in their hands the initial approach to Oge, which Goodman and Marty concurred that they had no choice but to acquiesce in. Those office heads miscalculated but offered to set up a meeting with Oge, which Marty kept on hold until the legal research was completed, then gave Goodman's work products to new consultants and had him prepare them to carry on, rather than reauthorize Goodman, and finally got the 3rd party support needed (Gdmn Exh 8), shown in Gdmn Mem. par 12.

PSI bases this interpretation that Goodman had to succeed on his own on the agreement saying at one point, "if I succeed in negotiating with EPA ....," one of the success fees would apply. There are four problems with PSI's interpretation. *Firstly*, the word "negotiate" has various meanings. Negotiating can certainly be done through interlocutors such as Wilson, who Goodman first recommended and who followed Goodman's game plan to the T (*infra*), as Goodman had briefed him on and provided written materials on. Goodman certainly negotiated the maze of regulations, issues, and bureaucracy. The narrow concept of negotiate – bargaining quid-pro-quos – is inapplicable with EPA, as it would be illegal. Marty confirmed that the agreement referred to a "very broad" concept of negotiate, (Gdmn Mem  par. 7) and Goodman's subsequent role, following Tracer's instructions, fit this.

*Secondly*, the agreement must be read as a whole. The language on the other success fees does not refer to negotiating and the language on failure – limiting the fee to $10,000 -  is clearly predicated on the entire effort failing, which it clearly did not do. The agreement also spells out a tentative nine step process, with actual communicating with EPA orally being only a tiny amount of the effort. PSI admits in the Oppsn. (p. 4) that there was a single project, which was successful.

*Thirdly*, it is undisputed that Marty controlled the communications with EPA (MtyDpTr  p.120, 122-125, 192:12-13, 198:5-7, 211-213) and suspended Goodman's contact with EPA (MtyDpTr 124:19, 128:4, 214:11-14, 215:6-9, 353:12-14, 356-357, Answer/Counterclaim, p. 3, #12, Exh 1 - Answer #19) while keeping Goodman working (MtyDpTr.119:2-5, 132, 186:14-18, 202-203, 249:1-250:7, 252-256, 292:5-7, 364:4-7, 376:11-13, 396:13-397:16) for the success fee (256:4-6, 377:3-6) and involved additional consultants that Goodman was instructed to cooperate with and did (136:4). Predicating payment on Goodman communicating with EPA on his own is obviously incompatible with what happened. The conduct of the parties supercedes prior contract language. Tracer now argues that it had

4

a right to prevent Goodman from communicating directly with EPA but that his compensation was tied to him successfully communicating directly with EPA. That interpretation must be rejected for the reasons stated in para. 5 of Goodman's Memorandum – absurd, harsh, unconscionable and not the only one allowed by the original agreement, let alone the total contract.

PSI's facts supposedly justifying its prevention of Goodman's performing are pulled from thin air and false, saying that Marty kept Goodman from communicating with EPA due to concerns that he could damage Tracer's prospects. This is diametrically opposite deposition statements by Marty – that Tracer kept Goodman working believing she would probably authorize him to meet with Oge (Mty 379:9-13), but that after he had briefed the new consultants and provided them materials, he was excluded solely because he was "no longer needed," (Mty, p.125, p. 295-297, p. 322 – also PSI's position - PSI MSJ Mem. p. 25). Moreover, even if it were true, it would not change PSI's liability in any way. If Marty were concerned that Goodman might somehow damage Tracer's prospects, she may well have had a right to prevent him from approaching EPA. To do that, her option was clearly to buy Goodman out of his contract at the face value (unless she got him to agree to a lower settlement). Even if she had a right to stop his work, she would still be liable for payment. *Black v. Woodrow*, 39 Md. 194, 1874 WL 4715, *13 (Md. Appeals, 1874), oft-cited case to this day. Marty did not so buy him out, however. She kept him working diligently, as she testified, brought in other consultants to help, and eased Goodman out while using him to prepare the new consultants on strategy, arguments, avenues, etc. (Mty 284:19-286). She accepted and demanded his services while preventing performance of the condition precedent as PSI now defines it. The position that Marty's subjective intuition that Goodman might somehow damage Tracer's prospects is grounds to cancel his contract, to do so without telling him, to continue to use his services and then refuse to pay him, is an insult to this Court.

***Fourthly***, it is undisputed that, of the three rationales EPA gave for finding tracers not to be fuel additives, all three had been made by Goodman while only one had been made by Wilson (Mrdm para. 14). Thus, even by PSI's interpretation, Goodman was primarily responsible for negotiating the relief granted. Moreover, it is clear that when Wilson had his first meeting with the key EPA officials, they told him that they already had various avenues for finding tracers not be fuel additives (*Ibid*) which could only have been from Goodman's work, which Marty also confirmed in email (*Ibid*, Gdmn Exh 7).

PSI argues that the exchange of emails in late November of 1999 (Gdmn Exh 4) did not promise Goodman payment with the participation of the new consultants because Marty's email said "... I can more comfortably live with our original agreement" (p. 1 top), which PSI says cannot have been a change. The context of Marty's statement was clearly about whether the success fees would apply with the new consultants taking the lead at EPA; that dialog had begun by Marty saying, "We may actually need to rework the agreement if Mary is the one primarily responsible for achieving success with EPA" (p. 3 bottom), followed by Goodman's arguments for his still being due the fees (p. 2 middle). If Marty intended it to mean that Goodman would not be paid because the original agreement tied payment to his achieving success on his own, then it clearly was intended to deceive. Goodman obviously understood it to say he would be paid, as he was intended to understand it. It makes PSI liable for all the reasons stated in Goodman's Memorandum paras. 10, 11, 17, and 18.

PSI also attempts to dodge liability based on having prevented performance by arguing that it was Goodman who revoked his own authority to communicate with EPA, despite PSI having admitted numerous times that Tracer suspended it in April 1999. PSI argues that Goodman did so by pointing out (correctly) that Dave Kortum of EPA had offered Goodman to set up a meeting with Margo Oge, to which Goodman replied that he would have to check with Marty and get back (PSI Exh 18 middle par.,

Exh 31- GdmnDpTr 237-238). But Goodman continued to communicate with other EPA officials after this, particularly trying to address what Kortum said was the main impediment, Tracer's having failed to convince EPA that its work was needed (PSI Exh 18, p. 11 top; Mty 164:2-175:14; Gdmn Exh 8). Goodman sent Kortum a fax within a day of the conversation in which the offer of the Oge meeting was made (Exh 32) and repeatedly implored Marty to get evidence of regulatory action in California and Florida that Marty told Goodman about. When Marty never produced such evidence, Goodman drafted a second email to Kortum on the issue and submitted it to Marty for approval (Exh 33), stressing that he was proposing to send it "*In light of the obvious importance the program office attached to whether Tracer Tight really makes unique environmental contribution ...*" (p.1 top). Not hearing any response, Goodman again emailed Marty requesting approval (Exh 34, p.1 middle). Still not hearing anything, Goodman asked Marty about it in their next telephone conversation, during the week of April 19-23. It was in response to this that Marty suspended all Goodman's contacts with EPA, pending completion of the legal research, unilaterally and contrary to Goodman's advice, (MG Dec par. 24, Mty Dep 353:12-14 – saying April 98 but meaning 99).[2] It was this continuing failure by Tracer to adequately address the 3rd party confirmation of the need for the process that held up success (PSI Exh p. 11 top, p. 12 top, Gdmn Exh 7 top, Exh 8 top and as shown in PSI's position about Wilson's "strategy"). PSI's silly argument that Goodman revoked his own authority to represent Tracer to EPA by holding off on setting

---

[2] PSI argues that Marty did so because Goodman was pursuing ideas for a reduced program of testing that Tracer was not interested in. This is pure fiction and there is not a scintilla of evidence presented of it beyond Marty's deposition testimony, which showed she was confused (129:6-131:21,214:15-215:5). Goodman's only discussion of reduced testing with EPA was in February 1999 on Marty's instruction in response to Caldwell's offer, which was Caldwell's misunderstanding of Oge. He never discussed it again with EPA or Marty except as a reserve option (Mty355:18-356:9). Goodman and Marty considered engaging The Sapphire Group, a toxicology firm, to consider a scientific statement of a *de min/*mis standard, at Kortum's request. Tardiff of Sapphire proposed instead a program of testing, which Marty indicated consent to but Goodman advised would not be of value. Goodman did investigate some testing ideas deriving from Tardiff's proposal as part of the ongoing conversation with Tardiff, but only to hold in reserve and to show Tardiff why his proposal was not of interest. The option of pursuing reduced testing was held in reserve by Goodman ***BUT was proposed in the options paper Wilson subsequently presented to EPA (PSI Exh 31, p.2), approved by Tracer***.

the meeting offered with Oge in order to check with Marty is also a reversal of its previous repeated deliberate misrepresentations that "Goodman was never able to arrange a meeting" with Oge (PSI MSJ Mem, p. 6 top, p. 16).

PSI also argues that it had a right to suspend Goodman's contacts with EPA because it had arranged other representatives at a lower price (Oppsn, p. 2). That is obviously what really happened – after Goodman had developed the strategy, avenues, arguments etc, prepared Wilson and Gade on them, made it all look easy, Tracer was able to engage interlocutors at a lower cost than the Goodman contract, which had been made in completely different circumstances – so it played its options while keeping Goodman on-call if needed. That is obviously not grounds for not paying Goodman. Those consultants had not left jobs and sacrificed for three years with little income and done so for compensation on a risk basis, with an unknown risk, as Goodman had. They had not performed the high volume of work needed to develop the avenues, arguments and strategy, probably 2000 hours of work. They did not save Tracer the millions of dollars by persuading it to undertake the project rather than doing the testing (which Goodman would have been employed to do). And there is no way that they can be considered to have been as important to the project overall as Goodman, as shown in Goodman's Memorandum. *And even if these things were not true, PSI cannot escape liability on the contract because it came to believe that it had made a bad deal with Goodman, as it argues here*. *Hartford County v. Town of Bel Air*, 704 A.2d 421, 431 (Md App. 1998) citing cases; *Equitable Trust Co. v. Towson Manor Association*, 340 A.2d 759, 765, 766 (Md App. 1975); *Acme Markets, supra*, @ 839.

PSI also argues that all of Tracer's contacts with Goodman after Feb. of 2000 were at Goodman's initiative (p. 9) and that *some* of the work he had done in late 1999 was at his initiative (p. 8). What relevance PSI believes this has is anyone's guess. Marty confirmed in her deposition that she

sent at least one fax to Goodman in March 2000 at her initiative (Mty 323:7-18). Her email of June 13, 2000 also began with "I was going to get ahold of you as soon as we got a little further with EPA but I will give you an update ..." (Gdmn Exh 3), clearly reflecting that Marty still considered Goodman part of the team as of that date and Goodman could only understand it as so. Goodman was clearly on-call at that point and PSI has made no meaningful argument to the contrary. The drafting of the chronology memo was in response to inquiries from Marty/Gade; Marty confirmed that, upon Goodman's mentioning the ideas of the chronology and the legal memo, both of which PSI now calls "unsolicited," she instructed him to prepare them (Mty 252:2-253-15). Marty had made clear that she wanted the legal research done before any further steps (Mty 357:9-18, 356:16-17, 377:19) and Goodman's drafting of the legal memo was what made that research meaningful. In any event, legally, whether Marty requested Goodman's services and availability after a certain point or merely "accepted them in silence" is immaterial, as the latter equally makes PSI liable (cases cited in Gdmn Mrdm fn 8). Goodman had a contract in place with Tracer. He continued to operate under it by providing advice as best he could in the circumstances. Marty never said anything to indicate that he was no longer engaged or to stop him from working or maintaining availability. To the contrary, her many communications after Goodman was sidelined continue to reflect that Goodman was still engaged. And the outset of the time frame PSI points to was already after Goodman had put in nearly two years work, including 10 months work after his communication with EPA had been suspended. PSI's retroactive position that he had actually failed in Feb. 99 seven months before these tasks (Nov. 99) and a year before his last assigned task (the updated environmental role memo in Feb. 2000) is wholly irrelevant. After his having so worked, PSI was not free to discard Goodman without compensating him under the contract, even if it had released him, which it didn't. PSI says that work done by Goodman after the new consultants were brought in

was "before it was certain that his strategy was not going to succeed." What that refers to is anyone's guess but whatever it refers to is sheer fiction since Wilson followed Goodman strategy to a T (Mrdm paras. 13-16, discussion *infra*) and Marty's emails show that she continued to want him available in case "anyone hits a bump," etc. (Gdmn Exh 3), obviously valuing Goodman's strategic advice throughout.

PSI also argues that all of the communications and conduct subsequent to the execution of the agreement should be disregarded because it argues the contract was never modified, whatever it means by that – citing a comment by Goodman in his deposition in which Shoudt referred to its modification and Goodman indicated that he was unclear what she was referring to (Oppsn p.7). Whether the contract was modified is not factual but a legal conclusion, not subject to admission by witness in deposition. Moreover, Goodman's position is that, apart from Tracer's agreement to make additional payments, the contract was merely *clarified* by the conduct and communications. Only if the language of the April 14 agreement is seen as unsusceptible to PSI being liable would it be a modification.

PSI also misrepresents Goodman's position regarding his stand-by status in its fn 7 by saying that Goodman could do some other work and misrepresents the fact that he had other work during "the entire time he worked for Tracer." The evidence cited by PSI, however, shows that he did no other work after he left EA for the first year he was working for Tracer. Goodman's position was clearly stated that *he could not seek other full-time employment*, which he obviously would have done since, in 2000, for example, he had only $2850 in income other than the interim payments from Tracer. The standard for on-call employment is whether the person was constrained in any way from acting in "the ways the men would have chosen had they been free to do so." *Skidmore v. Swift* 323 US 134, 139.

*Goodman's strategy was followed:* PSI now admits that success was achieved through a single project initiated by Goodman but claims that it was through a strategy radically different from

Goodman's. Pure fiction. It claims that Goodman's strategy was based on detailed legal arguments while Wilson's avoided those completely, based on Wilson's statements that he was not a lawyer and didn't remember asking for or using legal arguments (Wil 29:8-15, 38:15-18). Wilson made clear that he remembered very little without his file, which had been destroyed because he was never asked to save it by Tracer (Wil 94:8-95:6). Wilson/NES's engagement letter (PSI Exh 1A) specifically says, "*It ... will require communications with both staff and political level senior officials in the ... **and general counsel's office**.*" Marty's reports show that Keith Mathews from EPA OGC was very involved and was given Goodman's legal memo (Gdmn Exhs 7-p.2 top, 8-p.1 top). PSI presents no evidence that Goodman's strategy was based on detailed legal arguments, just that Goodman drafted a memorandum of such arguments to reflect the legal research which Marty had insisted on prior to the next round of communications with EPA (Mty 357:9-18, 356:16-17, 377:19) after EPA had involved Mathews from OGC (Mty 203:20-205-2). Goodman actually argued against focusing on OGC (Gdmn Exh 6 middle).

PSI also argues that Wilson's strategy differed from Goodman's in that it involved Marty speaking with EPA while Goodman had wanted to keep Marty out of touch with EPA based on Marty's self-serving statements of her impressions of this, which she could have no personal knowledge of (what Goodman wanted). The record shows that Goodman invited Marty to participate in his very first meeting with EPA and she chose to participate by phone rather than attending (Mty 325:8-326:8). In contrast, Wilson testified that he made sure to have his first meeting without her (Wil 36:15-38:1), and had at least two other meetings without her before the single meeting she attended (Gdmn Exhs 7, 8).

Goodman's strategy was based not on legalisms but on two prongs: convincing EPA that it was in EPA's interest to facilitate Tracer staying active in leak detection because of the benefits of its work and finding avenues to exclude it from testing that would not open the door for other products to do so

(PSI Exh18, p. 2 top, Mty 149:8-150:11 and to 153:8), the latter having been specifically identified by Kortum as key to relief (PSI Exh 18, p. 1 top, p.4 bottom). While Wilson only *remembered* focusing on the first of these, that reflects that it had been identified to him by Goodman as the main impediment (Wil 18:3-20:20), which he confirmed it was (41:15-18, GDm Exh 7 top, Exh 8 top). The record shows, however, that he actually pursued both prongs as his handouts to EPA (PSI Exh 31) featured proposed avenues substantially more than discussion of environmental need; and they were even included in the October 30 letter to OSWER (PSI Exh 36 pp. 2-3), though OSWER would not be involved in actually providing relief. Moreover, although the program office heads and OGC indicated in Wilson's first meeting that they had avenues in mind from Goodman's communications, Margo Oge eventually had to dictate that she wanted her staff to stop spending time working on such avenues until she was convinced of the environmental need (Gdmn Exh 8 top).

Regarding avenues, Goodman's strategy involved a "carrot and stick" approach. Finding tracers not to be fuel additives was the most desirable avenue and the one EPA was most interested in. But finding Tracer not to be a manufacturer not introducing fuel additives into commerce, which EPA indicated interest in but some reservations about (PSI Exh 18, p. 5 top, p. 6 fn 2), had stronger legal support, hence, would raise concerns to EPA that it might be stuck with it if it didn't find tracers not to be fuel additives. The carrot/stick was incorporated into the same four bullets of both Wilson's handouts and the Shapiro letter.[5]

---

[5] PSI now claims that Goodman's avenues and arguments were "obvious" based on reading of the regulations. But Marty admitted that Goodman was the first to have proposed them (Mty 155:21-4, 157:3-18). Randy Golding of Tracer had engaged in a thorough review of the regulations and had failed to find them, except for one part of one argument (Exh 37-GldgDpTr 25:2-25, 26:20-27:21, 23:9-17. None of the other consultants, either Envirolytical, Energy and Environmental Analysis, Sapphire or Gade came up with those avenues or arguments on their own, while Scoggin and NLRG had to be pushed to focus on them properly, as shown in other briefs, including PSI's own arguments. The EPA registration requirements specifically cover "bulk additives that are used intermittently for … treating or maintaining the storage, pipeline, and/or other components of the fuel distribution system …" 40 CFR 79.51(2)(h)(1)(vi).

Regarding what approach and level of detail to use with both the program office heads and the

higher-ups, Goodman's strategy as distinct from Gade's proposals, is shown in Exh 4, p. 2 top:

*"I think we need to get Oge or Persciape to indicate an interest in finding a solution and make her or him aware that there are various options. This will give the staff more incentive to work out one or more favorable recommendations."* Goodman email to Marty, 11-19-99 (misdated due to Y2K test).

Wilson followed the same path started and advocated by Goodman. (PSI's SOF, p. 1,2; WilDpTr, pp.

24-25), meeting with Kortum and Caldwell, confirming that they were already on board, then

proceeding to meet with Oge. Of course, he did not have to prepare a detailed petition explaining

Tracer's operations and why they fit proposed avenues of relief because that had already been done (Wil

26:2-7), Marty continuing today to call Goodman's petition "outstanding" (118:9-10, 19-20) and the

foundation for al that followed (Mty 155:6-156:4). EPA had wanted more detail, not less (Mty 185:6-9,

181:3-9). Wilson picked up where Goodman had been cut-off and followed the path he advocated.

## III.   NUMBER OF TRACERS FOR CALCULATION OF THE SUCCESS FEE

As shown in Gooodman's Memorandum (sec. III), the success fees PSI owes Goodman are

based on the number of tracers cumulatively available for use in gasoline plus the number of tracers

cumulatively available for use in diesel fuel that have been excluded from the EPA testing.

PSI's arguments to the contrary in its opposition are meritless. It argues that there was no

mistake in putting the word "six" in the proposal and that the proposal intended to only cover certain

tracers, irrespective of whether other tracers are available, are used in gasoline and diesel, and are

excluded from testing by the project undertaken by Goodman. It bases this on arguing that the number

"six" that appears in the agreement is sacrosanct, irrespective of the other language of the agreement, of

subsequent agreement and conduct, and irrespective of Tracer having concealed the existence and use of

other tracers from Goodman at the time of execution. See Gdmn Mem, paras. 26-29. It is undisputed

that Tracer instructed Goodman to add an additional tracer to the list Goodman had been aware of and that Marty and Goodman expressly shared an understanding at that time that it would be paid for (para 26). The addition of that tracer alone wipes the number six out of the agreement. Marty confirmed explicitly in deposition that the agreement applied to all tracers used in gasoline and diesel and PSI's official document and deposition by its author confirm that there were twelve used at that time, contrary to Marty's testimony that there were only six. *Some of the tracers included in the very Draft Petition submitted to EPA were intended to be not used but held available for emergency use, as the Petition shows (Gdmn Exh 19, p. 9-10, tracers C and O) so it is clear that availability, not use, is the standard as Marty confirmed (Mty 81:1-8).* And Marty, Thompson and Golding all testified that all of the tracers could be used in gasoline and diesel (Gdmn Mem para. 27). Moreover, PSI resisted providing documents that would show the use of the tracers for each period in question, arguing that use of the tracers is irrelevant (Exh 35, #4). Ultimately, Judge Grimm ordered PSI to answer Goodman's interrogatory about tracers available for use and to provide something showing dates of use. PSI's answer to interrogatory no. 11, (Gdmn Exh 21) provides no basis for eliminating any tracers as not used (or not used in motor fuel) and its official answer regarding dates of use (Gdmn Exh 16) shows 11-12 tracers used as of contract execution with most of those still in use today. Golding testified that all have been used in motor fuel. He and Thompson both testified that there has *never* been any restriction or distinction between tracers used in motor fuel vs. other tanks (Gldg 57:16-20; Thpsn 35:13-21) and Marty's testimony also stated that there has been no reason not to use other tracers in motor fuel (Mrdm par. 27). Having refused to provide documents as requested that would show when and where the tracers were used, PSI cannot now argue that any tracers were not used in relevant ways then or now.

14

PSI argues that the number six was no mistake because the agreement focused on those tracers already registered with EPA. But it is undisputed that Goodman had been told that these were the only tracers used in motor fuels (Mty 78:21-79:10)[4], which was undisputedly not true (Gdmn Exh 16). Whatever Tracer's rationale was then or is now to justify the number six, Goodman's basis for the number six was erroneous. Tracer could have avoided any potential misunderstanding. It failed to do so. And, contrary to PSI's position, Marty also testified that the agreement was to cover all tracers used (Mty 78:21-79:10) or usable (Mty 81:1-8) in motor fuel. When persons executing a contract agree on the meanings of the words, a party cannot escape liability based on a different reading. Corbin §538.

PSI is, however, correct that the original focus on six tracers derived from the tracers previously registered in 1990. That is because Tracer had hired EA Engineering to perform Tier 1 and Tier 2 testing to "maintain the registrations" (Gdmn Exh 17, first line). For previously registered additives, the EPA regulations gave three years to submit a Tier 1 and another three years to submit a Tier 2 (40 *CFR* 79.51(c)(1) ). In contrast, new additives could not be used in commerce until the Tier 1 and Tier 2 had been submitted (40 *CFR* 79.51(c)(3) ). But no such distinction between previously registered and not-registered additives has any relevance to getting the tracers classified as not being fuel additives, which does not "*maintain the registration*" but makes it unnecessary. Goodman's proposal letters strongly hinted that an avenue to be explored was classification as not-additives PSI Exh 5, p.2, 3rd par., as Goodman had already discussed with Marty (Mty 51:4-52:14). Tracer was using other tracers in motor fuel, notwithstanding that they were not registered (Mrdm par. 27). Goodman clearly thought that agreement was covering all additives usable in motor fuel, which is what he had been told by Tracer the

---

[4] Later, in preparing the Draft Petition, Goodman was informed by Tracer of the existence of Tracer O, which was added to the petition, and Tracer B, which Tracer said could not be used in motor fuels. This was stated about Tracer B in the Draft Petition, Gdmn Exh 19, p. 6, fn 2. This was not true, as shown by Golding's testimony and Tracer's subsequent lists of tracers to be used in motor fuels given to EPA (Gdmn Exh 20 and PSI Exh 36 p. 2).

"six" represented. That was clearly a mistake caused by Tracer's misrepresentation, whether willful or not. And while relevant to the overall work program Tracer approached EA about, neither the number six nor the group of six referred to has any functional or practical relationship to Goodman's work after April 1998, based on the avenues pursued and the actual use of tracers. It was mistake pure and simple.

PSI now also argues that the October 30, 2000 letter submitted by Marty to Michael Shapiro of EPA's Office of Solid Waste and Emergency Response (OSWER) (PSI Oppsn. Exh 36) is the "operating agreement" between Tracer and EPA and that it only includes six tracers, albeit a different group than the original six. That this letter is an "operating agreement" is preposterous. **Firstly**, it has been testified and is undisputed that Tracer and PSI have used other tracers in addition to those six continuously since the letter was submitted and the relief granted (*supra*). In fact, it has added three or four new tracers since the relief was granted without any additional approval from EPA, as shown in Gdmn Exh 16. Golding testified that some tracers have been discontinued due to going out of production (under the Montreal Protocol on ozone depletion). But none were discontinued at or around the time of the EPA relief or of the letter to Shapiro (late 2000) or for four years after that, as shown in PSI's official list of the tracers' dates of first and last use (Gdmn Exh 16). Golding and Thompson both testified that there has **_never_** been any limitation on using any of the tracers in motor fuel and Marty also testified that all could be used in motor fuel (*supra*). **Secondly,** the office to which the letter was addressed, OSWER (which includes the office for leaking tanks) does not distinguish in any way between motor fuel tanks and non-motor fuel tanks. Its responsibility relates to releases from tanks, toxicities, groundwater, etc. It has no interest in whether the tanks contain motor fuel vs. any other fuel. It has no authority over fuels, fuel additives, their registration, or Tier1 and 2 testing. Its advice and support were sought just to assure the air pollution offices (Office of Transportation and Air Quality

16

[OTAQ], formerly Office of Mobile Sources), that the tracer process was important. **Thirdly**, the exclusion from testing was based on a finding that the tracers are not fuel additives, hence, EPA has no jurisdiction over them as fuel additives. This was granted in the letter from Oge/OTAQ of Dec. 18, 2000. **That is the operable document.** It does not limit the use of any group of tracers and, importantly, does not reference the October 20 letter to Shapiro in any way. It is a blanket exclusion for all tracers as not being fuel additives, as Goodman pushed for and Tracer wanted, to give it flexibility. At most, the Shapiro letter can be seen as an offer by Tracer to limit its regular use to the six tracers listed there, which offer EPA did not adopt in its relief letter. Moreover, Marty reported to Wilson that she had had a number of conversations with Jim Caldwell, who drafted that letter, explicitly to arrange for the relief letter to provide needed flexibility (Exh 36). While Tracer/PSI undoubtedly uses some tracers more than others, patterns that undoubtedly change over time, and probably holds some tracers in reserve for use in special unforeseen circumstances, **such tracers were explicitly included in the original group which the agreement originally referred to (Mty 81:1-8)**.

*There is no question but that the agreement provides success fees for each tracer usable in gasoline plus each tracer usable in diesel that have been excluded from testing (i.e. all sixteen tracers in each motor fuel).*

## IV.   WAGE PAYMENT ACT COVERAGE

PSI's Opposition partly rehashes its prior arguments, which remain without merit. There are only three points that warrant responses.

**Firstly**, PSI argues that the project to exclude the tracers and Goodman's work in it were not in Tracer's usual line of business because Tracer is in the business of leak detection and Goodman's work was not in detecting leaks but in EPA regulatory compliance. This would mean that none of Tracer's

executives were involved in its normal business, nor were its clerical and administrative staff, accounting, accounts payable and receivable, marketing and sales staff, nor even its R&D staff, to say nothing of in-house attorneys, if it had had any (apparently didn't, though Marty had a law degree), let alone Tracer's "Special Projects" staff (Exh 37- GldgDpTr 17:20-22). Many of these activities are, in fact, capable of out-sourcing (and its General Counsel is outside); but that doesn't mean they are not part of Tracer's regular business. According to PSI, since Tracer's business was leak detection, only those whose work is detecting leaks are employees or working in Tracer's normal business. The argument is obviously frivolous. As Marty stated, Tracer was in the business of environmental compliance, including EPA compliance (Gdmn Mrdm, par. 46). If its leak detection operations violated EPA regulations, it could not have been in the business of providing clients compliance with other EPA/state regulations. This was not some extraneous activity but as at the core of Tracer's business - enabling the leak detection operations. It meets that factor of *Baltimore Harbor Charters v. Ayd*, Md. Ct. Appeals, 780 A.2d, 373 for all the reasons in Goodman's Memorandum.

*Secondly*, PSI argues that if Goodman is considered an employee under the Wage Act, every contractor would be. Nonsense. As *BHC v. Ayd* lays out the factors, there are lots of contractors who would not be employees. Among them – those working for other companies or even through their own companies, those established in business with significant other customer base, those with specialized or commercial equipment or even their own offices (outside of the home), and those whose work can be and is done independently of the company in question (not, as Marty put it – "when you first came to work for me," - Mty 290:8). These are precisely the differences intended by *BHC v. Ayd* and presumably by the statute itself.

18

**Thirdly**, PSI argues that Goodman being paid on W2 forms is a relevant factor although it clearly does not fit into any of the six factors of *BHC v. Ayd* and in spite of the conclusive analysis to the contrary presented in Goodman's Memorandum (paras. 34-40). It cites as its authority for this, an offhand *dictum* by this Court in its prior ruling on PSI's 12(b) Motion to Dismiss. PSI misstated to the Court in that motion that Goodman was operating through his own company, pointing to his letterhead with the descriptor "International Consulting Services," though any real examination of the letterhead shows that there is no company involved at all (as is now undisputed). Goodman had no need to engage in factual statements or arguments at that time because the 12(b) motion so obviously failed on its own. Thus, the Court was presented with erroneous facts and mentioned in *dicta* that tax/payroll treatment might be relevant to secure summary judgment. The Court obviously never intended that idea to be used without undergoing critical analysis by PSI, let alone to be quoted or accepted as an authority, as PSI attempts to do. As the Court held in its Memorandum and Order (on clarification) of April 24, 2008, "Plaintiff does not suggest a basis on which he is entitled to have this Court provide an advisory opinion …." The same is true of the *dicta* cited by PSI. It has no force as an authority nor as an advisory opinion and has no bearing on the legal issues and analysis regarding Goodman's status under the Wage Act. Apparently, PSI believes that, while the Court cannot clarify its own orders to a non-lawyer, its offhand suggestions to lawyers are binding on the Court. Goodman's analysis applying *BHC v. Ayd* in his Memorandum shows conclusively that tax/payroll treatment are not factors to be considered.

## V.    RESTITUTION AS ALTERNATE RECOVERY ON THE BREACH OF CONTRACT

PSI begins its response on this issue with the extreme presumption of instructing this Court on its own prior rulings in the case, i.e., that the Court has four times already ruled out this means of recovery. As the Court well knows, it has done no such thing. The Court rejected Goodman's proposed

amendment to his complaint because it added a new claim for restitution in the absence of a contract, which the Court believed was rendered moot by PSI's Opposition to that motion, in which PSI insisted on the existence of an enforceable agreement, effectively abandoning its affirmative defenses. With regard to Goodman's proposed addition of restitution as alternate means of recovery on his existing breach of contract claim, however, the Court said that the change was "inconsequential," which it is in the sense that it is not needed. Goodman moved for clarification of the court's order, specifically requesting clarification as to whether the alternative means of recovery had been ruled out. The Court refused, saying that it would not "speculate" on what could be done on the existing claims or counterclaims. Of course, there would have been nothing to speculate on had restitution been ruled out. The Court also temporarily excluded some expert witnesses, which argued were only relevant to the unjust enrichment recovery (cost of Tier 1 and 2 testing as the value of the benefit conferred on PSI) but explicitly said they could give fact testimony. Moreover, the Court strongly suggested that they would be readmitted as experts, which they were. PSI argued to Judge Grimm that they should not be readmitted because unjust enrichment had been ruled out. Judge Grimm rejected PSI's arguments and readmitted them. PSI has been under notice since winter 2000 that unjust enrichment is an issue.

PSI also argues that restitution (or, presumably, other alternative means of recovery) cannot be awarded unless pled in the original complaint, contrary to the authorities cited by Goodman, *U.S. v. Algeron Blair* 479 F.2d 638, 641 (CA 4 1973) and *Naragansett Improvement v. US* 290 F.2d 577, 580. PSI argues that *quantum meruit* in those Williams Act cases was effectively authorized by that Act, which doesn't apply to the instant case. This is also without merit. All the Williams Act does is to authorize subcontractors on federal projects to sue the U.S. to recover otherwise valid claims against contractors, paid by the U.S. out of the performance bond posted by the contractor. It does not change

the substantive principles of contract or restitution law in any way. *Quantum meruit* has become common in Williams Act cases through decisions of courts based on general principles of restitution, not on the Act. *St. Paul Mercury Indemnity v. U.S.* 238 F.2d 917, 922 (CA 10); See *Evans Products v. West American Ins.* 736 F.2d 920, 923, (CA 3 1984), which is not under Williams Act, citing Wright, Miller & Kane, *Federal Practice and Procedure*, §2664 @ 163169 (1983). Neither *Algernon Blair* nor *Naragansett* ties the allowance of *quantum meruit* without having been pled to the Williams Act. In fact, *Naragansett*, which is cited by *Algernon Blair*, only mentions the Williams Act in its first and second paragraphs introducing the case. Its holding that *quantum meurit* can be used without having been pled is much later in the decision (paragraph 14 out of 23).

It is well settled that neither parties nor the Courts are bound to specific theories of recovery as pled in complaints and that complaints need not identify the theories of recovery. This is based on the liberal "notice pleading" system of the Federal Court system. "However, the complaint must contain either direct allegations on every material point necessary to sustain a recovery on ***any recognizable legal theory even though the theory may not be the one suggested or intended by the pleader*** or the pleading must contain allegations from which an inference fairly may be drawn by the district court ..." Wright & Miller, *Federal Practice and Procedure*, 3rd Ed., 2004, Sec. 1216, pp. 220-227, citing many cases, esp. at p. 229. *Boykin v. KeyCorp* 521 F.3d 202, 215 (CA2 2008). Rule 8(a) requires a "*short and plain statement of the claim showing that the pleader is entitled to relief.*" "(m)odern rules for pleading in the federal courts do not require that any particular form be used so long as the defendant is adequately apprised of the nature of the claim being asserted," *Dart Drug v. Corning Glass Works*, 480 F. Supp 1091, 1098 (D.Md 1979), ***allowing*** a theory of recovery where it was neither explicit nor suggested by the factual allegations of the complaint but where "such a theory of recovery can be found

only by the most sympathetic reading" of the facts of the complaint. "The Federal Rules favor simplicity in pleadings … as well as the administration of cases to secure their just determination." *Goodman v. Praxair*, 494 F.3d 458, 467. *Conley v. Gibson*, 355 US 41, 45-46, 78 S.Ct. 99 (1957).

FRCP 54(c) provides "… Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." Even applying Rule 54(c) alternative relief to a new claim, rather than an alternative recovery on an existing claim, is allowed when it would not be unfairly prejudicial. *Pinkley Inc., t/a Bradley v. City of Frederick,Md.* 191 F.3d 394, 400 (e.g., in *Pinkley*, conversion of a state law claim). See, esp., *Gilbane Building v. Fed. Reserve Bank of Richmond*, 80 F.3d 895, 901. While changes in the legal theory forming a cause of action are prejudicial when, shortly before or during trial, they require the gathering of facts not otherwise considered, adding an alternative theory of recovery on an existing claim is not prejudicial to the adverse party. *Laber v. Harvey*, 38 F.3d 404, 427 (4th Cir.) citing *Foman v. Davis*, 371 US 178, 182, 83 S.Ct. 227. Unlike Rule 15(b), which requires that the facts at issue (not being relevant to the originally pled claim) had been litigated with the consent of the adverse party, Rule 54(c), which applies where the facts of the alternative claim were pertinent to the claim originally pled, requires no such consent but merely *"that the theory was squarely presented and litigated by the parties at some stage or other of the proceedings.'" Pinkley @ 400, citing Gilbane.*

In the instant case, the claim at issue, breach of contract, is not being changed, only an alternative theory of recovery on the existing claim is being added; thus, *Algernon Blair* controls, along with the many cases cited *supra* and in Wright & Miller. But, even if that were not true, the litigated facts relevant to whether Goodman is entitled to unjust enrichment are the same as those for the breach

of contract claim and for Tracer's counterclaims of misrepresentation, as shown by Goodman's

Memorandum, where his unjust enrichment argument merely refers back to the section on breach of

contract. Even the value of the benefit Goodman conferred on Tracer, which would not arise until the

damages phase of the proceedings, is also relevant to Tracer's bad faith and its fraud counterclaim.

Moreover, PSI has been on notice since before discovery even started that unjust enrichment is being

pursued and PSI has conducted discovery on that question. It asked Goodman interrogatory no. 4, about

his basis for calculating his estimates of the costs of Tier 2 testing. Goodman answered that

interrogatory fully (Exh 38), including Tier 1 costs as well as Tier 2. Goodman also disclosed his expert

witnesses on that subject, which PSI sought to have excluded based on its argument that unjust

enrichment was ruled-out, Magistrate Grimm rejecting PSI's argument and admitting the witnesses.

Goodman fully answered both PSI's interrogatory about his expert witnesses and their testimony and

standard interrogatories #8 & #9 on that question. Goodman not only identified the documents on which

he and his experts would base their testimony on testing costs, but also provided PSI electronic copies of

the most direct and important of these – EPA's own estimates of those costs based on reports from

entities having made Tier 1 and 2 submissions. Thus, unjust enrichment is not foreclosed by not having

been initially pled both due to being an alternative theory of recovery on an existing claim and because

the pertinent facts have been litigated and/or subject to discovery.

   PSI also argues that Goodman would not otherwise be entitled to unjust enrichment, citing

*Commissioners of Caroline County v. J. Roland Dashiell*, 747 A.2d 600. That holding is completely

inapposite, as *Comm'rs of Carline County* explicitly also held that unjust enrichment is allowed with an

explicit contract in cases of bad faith, material breach, and/or prevention of performance, all of which

are present in the instant case. Its holding that enrichment was not unjust if the terms were expressly

provided for in the contract is inapposite because it is undisputed that Tracer changed the roles and prevented Goodman from performing in the way PSI argues he was required to do to meet the condition precedent. Thus, if Goodman were not entitled to the fees based on the contract, it would have been because the contract did not cover the situation that Tracer created and the services Goodman provided in that situation. But, moreover, PSI's argument presumes that PSI is not liable for breach, while the issue presented by Goodman for summary judgment is for unjust enrichment as alternative recovery on that breach. PSI is merely confusing the issue. Beyond that argument, PSI does not challenge that the standard for unjust enrichment is met. Therefore, the Court should rule that Goodman is entitled to restitution of unjust enrichment.

## VI.    SUMMARY DENIAL OF COUNTERCLAIMS

**Breach of contract**: PSI's argues that Goodman's requesting and accepting $20,000 that was not part of the original agreement is breach of contract and he should repay the $20,000. PSI does not suggest and cannot suggest that the $20,000 was not paid voluntarily nor that it was a repayable loan. Voluntary payments are not subject to claims for refund, let alone for breach of contract. Tracer's agreement to pay the $20,000, i.e. the very act of paying the $20,000, constitutes a modification of the agreement manifested in the conduct of the parties. *Cole v. Wilbank*, 171 A.2d @713. Alternatively, it would be a gift, which is also not a breach by Goodman and not subject to refund.

**Fraud and negligent misrepresentation**: Like its breach of contract counterclaim, PSI's counterclaims for misrepresentation bring new meaning to the word "frivolous." PSI now argues that "recommending" someone is a basis for fraud and also that "Goodman's belief in Scroggin's ability was false" (Oppn. p. 25), as if holding a mistaken belief is misrepresentation. All the evidence shows is that Marty's mismanagement of Scroggin (Mty 216:16-217:5, 217:16-224:13, 157:12-13) and her instructing

Goodman not to interfere with Scroggin (Mty 127:3-6), resulted in no usable work product at a cost of $50,000 – whereas, when Goodman avoided Marty's micromanagement with NLRG, the desired result was achieved for a cost of $3000. PSI pulls from thin air that it is "undisputed" that Goodman's reference to experience with the EPA fuel regulation officials was "false" (Oppn. p. 24) when it is completely undisputed that it was true (Mty 291:1; Gdmn Exh 26). PSI pulls from thin air that it is "undisputed" that Goodman knew that Oge would make the decision, whereas, again, the opposite is undisputed (Mty 290:4-292:7, 198:13-18; Gdmn Exh 26) and perfectly obvious – Goodman could not have known that. Even Jim Caldwell initially thought that Kortum would be making the decision (Exh 40). Fraud includes five elements: misrepresentation, actual malice, purpose to defraud, reliance, and damage. To survive summary judgment, credible evidence must be shown on each element. PSI has shown no evidence on most of the elements and no credible evidence on any of them. For negligent misrepresentation, the claimant must show evidence of misrepresentation, reliance, damages, and that a duty of care was owed by the defendant to the claimant at the time of the alleged misrepresentation. None of these elements are present and not a scintilla of evidence is presented.

For all of the reasons in Goodman's Memorandum, none of which have been addressed by PSI, PSI's counterclaims for breach of contract, fraud and negligent misrepresentation must be denied.

## VII.  NO BONA FIDE REASON FOR TRACER NOT HAVING PAID GOODMAN

PSI has not responded, opposed, or disputed Goodman's Motion for judgment on this issue apart from saying that the issue is moot if the Wage Payment Act does not apply. Therefore, unless summary judgment is granted to PSI denying Goodman's Wage Payment Act claim, the Court must grant summary judgment to Goodman on this issue, for the reasons shown in Goodman's Memorandum.

Respectfully submitted,

Marc Goodman
P.O. Box 727
North Beach, Md.  20714
(301) 855-7655
marcbgoodman@msn.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Plaintiff's Reply to Defendant's Combined
Opposition to Plaintiff's Motion for Partial Summary Judgment and Reply in Support of Its Own
Motion for Summary Judgment was mailed, postage prepaid, to Erin Shoudt, Sonnenschein Nath &
Rosenthal LLP, 1301 K St. N.W., Ste. 600, East Tower, Washington, D.C. 20005, this 3rd day of
November 2008.

Marc Goodman