IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FILED ___ LODGED ___ ENTERED ___ RECEIVED ___

APR 0 2 2009

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND

DEPUTY

| | | |
|---|---|---|
| MARC B. GOODMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.: MJG-04-391 |
| | ) | |
| PRAXAIR SERVICES, INC. | ) | Referral: Judge Grimm |
| | ) | |
| Defendant | ) | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION *IN LIMINE*/TO PRECLUDE DEFENDANT'S AFFIRMATIVE DEFENSES OF FRAUD-IN-INDUCEMENT, NEGLIGENT MISREPRESENTATION, MUTUAL MISTAKE, AND EQUITABLE ESTOPPEL

I.     **PSI Renounced and Waived its Affirmative Defenses by Insisting on the Enforceability of the Contract Between Goodman and PSI in Its Opposition to Goodman's Motion for Leave to File Second Amended Complaint and Is Judicially and/or Collaterally Estopped from those Defenses.**

Affirmative defenses on contract liability of fraud in inducement, negligent misrepresentation, and mutual mistake all work through equity, rendering the contract unenforceable, i.e. rescinding the contract. *Restatement of Contracts* §7(d), §152, §163, §164; *Ryan v. Brady, et. al.*, 366 A.2d 745, 750 (Md. 1976), *Wolin v. Zenith Homes, Inc.* 146 A.2d 197, 202 (Md. 1959); *Stiegler v. Eureka Life*, 127 A.2d 397, 402, (Md. 1925). The party claiming the defenses argues that whatever performance was owed under the contract is void due to the alleged falsity or mistake. To avoid liability, the contract must be rescinded in its entirety; it may not be affirmed in part and rejected in part. *Stiegler @* 403. PSI's affirmative defense of equitable estoppel also aims to effect a rescission of the contract based on the same factual bases as its misrepresentation and mistake defenses (Exh 1, p.1).

Rescinding a contract by either party automatically triggers restitution by/to both parties and entitles them to pursue any restitution remedies.[1] *In fact, since the right of rescission is founded on equitable principles, the "injured" party must not only communicate his intent to rescind immediately upon learning that the contract is rescisionable, but must accompany the communication with an offer of restitution (of any goods or services received from the wrongdoer or their value or the value of the benefits received)* (*Stiegler* @ 402). Rescission of a contract is the abrogation or unmaking of the agreement and the placing of the parties in the status quo ante (*Ryan v. Brady* @ 750). That clearly means restitution to Goodman of either the value of his services or the value of the benefit he conferred.

Goodman previously moved this Court for leave to file an amended complaint adding a new count for restitution in the absence of a contract (Paper # 69), largely in response to PSI having noted these affirmative defenses in its Answer/Counterclaim (Paper # 55 – Exh 2). PSI responded with an Opposition arguing that the amendment was futile because such restitution could not be granted due to both parties recognizing the existence of an enforceable contract (Exh 3 - Paper # 70, p. 2, p. 8). The Court denied Goodman's Motion for Leave on that basis (Paper # 78). Obviously, having avoided Goodman's new count for restitution in the absence of a contract by affirming the contract's continuing validity, PSI cannot now avoid the contract by rendering it unenforceable with these rescissionary affirmative defenses. *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 605 (CA9 1996); *Pegram v. Herdrich*, 530 U.S. 211, 227, n.8 (2000-unanimous), citing *Rissetto*; Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Fed. Practice and Proc.* § 4477 (1981 & Supp.1995); *Russell v.*

---

[1] The Court's *sua sponte* denial of PSI's counterclaim for unjust enrichment would also be clearly erroneous unless and until these affirmative defenses are eliminated. Goodman also here notes that, although the Court's decision characterized its denial of that counterclaim as granting in part Goodman's Motion for Partial Summary Judgment, Goodman had not moved for summary denial of PSI's counterclaim of unjust enrichment. Irrespective of the outcome of this motion, Goodman has no objection to reconsideration of the Court's denial of PSI's unjust enrichment counterclaim.

*Rolfs*, 893 F.2d 1033, 1037 (9th Cir.1990), cert. denied, 501 U.S. 1260 (1991).  Further, as the Supreme

Court held in *Simmons v. Burlington, Cedar Raids & Northern Railway*, 159 U.S. 278, (1895):

> "When a party, with full knowledge, or at least with sufficient notice or means of knowledge, of
> his rights, and of all the material facts, freely does what amounts to a recognition of the
> transaction as existing, or acts in a manner inconsistent with its repudiation, or lies by for a
> considerable time, and knowingly permits the other party to deal with the subject-matter under
> the belief that the transaction has been recognized, or freely abstains for a considerable length of
> time from impeaching it, so that the other party is thereby reasonably induced to suppose that it
> is recognized, there is acquiescence; and the transaction, although originally impeachable,
> becomes unimpeachable in equity.  Even where there has been no act nor language properly
> amounting to an acquiescence, a mere delay, a suffering time to elapse unreasonably, may of
> itself be a reason why courts of equity refuse to exercise their jurisdiction in cases of actual and
> constructive fraud, as well as in other instances."

PIS's Opposition to Goodman's Motion for Leave to amend the complaint obviously recognized the

validity of the contract and was adopted by the Court.[2]  While, in other circumstances judicial estoppel

may be discretionary, in these circumstances, where PSI's previous position, adopted by the Court,

directly deprives Goodman of the remedy that is inherent to and inseparable from the affirmative

defenses, the defenses must obviously be precluded.  Moreover, to the extent that the Court has such

discretion, secs. II, III, and IV below argue unequivocally for estoppel.  Furthermore, the affirmative

defenses collaterally attack the Court's holding that the contract is enforceable, calling for collateral

estoppel.  Irrespective of the validity (or lack thereof) of the Court's denial of Goodman's Motion for

Leave to amend and its possible fate upon appeal,[3] PSI must be estopped from avoiding liability under

the contract through rescissionary defenses.

---

[2] As shown below in secs. II & III, PSI's judicial renunciation of any rescission option also confirmed its
previous rejection of rescission/restitution, expressed in Tracer's letter to Goodman of Feb. 27, 2001 (Exh 4).
[3] Goodman believes that appeal of the Court's denial of his Motion for Leave to File 2nd Amended Complaint is
unlikely because (1) PSI is likely to be found liable for breach of contract, and (2) Goodman is still entitled to
pursue restitution as alternative remedy for that breach of contract based on PSI's having prevented performance.
Restitution as alternative remedy for breach should not be confused with restitution in the absence of a contract,
i.e., in "*assumpsit*," (whatever that means).

## II.   PSI Waived its Right to Avoid the Contract by Undue Delay in Notifying Goodman of its Belief in Such Occurrences and in Electing Rescission of the Contract

In order to avoid liability on a contract (including fraud, misrepresentation, mistake, other equitable grounds) a party must notify the other party of its intention to rescind immediately upon discovering the factual basis for rescission. "***Delay and vacillation are fatal***," *Grymes v. Sanders*, 93 U.S. 55, 62, 63, 23 L.Ed. 798 (1876); *Latrobe v. Dietrich* 78 A. 983, 988 (Md. 1910); *Simmons*, supra.; *Wolin v. Zenith Homes, Inc.* 146 A.2d 197, 202 (Md. 1959); *Ryan v. Brady, et. al.* 366 A.2d 745, 750 (Md. 1976), citing cases; *Sonnenberg v. Security Management*, 599 A.2d 820, 823-825 (Md. 1992), citing cases; *Hudson v. Maryland State Housing*, 114 A.2d 421, 424-425 (1955), citing many cases; *Restatement of Contracts* §7(d), §381; 17A *Am Jur* 2d §215. "An election to rescind must become operative in the present, not in the future." *Stiegler @* 403. The rescinding party has the burden of showing that it rescinded in a timely manner and with an offer of restitution. *Ibid.*

The trigger for immediately rescinding the contract dates from whenever the party has knowledge of "circumstances which ought to have put a person of prudence on inquiry," (*Ryan @* 752; *Simmons* -quoted *supra*). Nor is the opportunity to rescind renewed if the party subsequently discovers additional circumstances associated with the same misrepresentations (*Wolin @* 202-203).

Tracer/PSI could not have been put "on inquiry" of any falsity or mistake due to any circumstances arising after December 2000 since there was no further contact with Goodman nor work on the project after that. Neither Tracer nor PSI ever gave Goodman any indication that it believed that misrepresentation or mutual mistake had occurred with regard to the contract until the filing of PSI's Answer and Counterclaim on Nov. 30, 2007 (MGAffirmDec par. 7). Tracer explicitly rejected the rescission/restitution option in its letter to Goodman of Feb. 27, 2001 (Exh 4). PSI's interrogatory

answers stating the factual basis for its affirmative defenses give no hint of any election by Tracer/PSI to rescind nor of any notice given of rescission/restitution, an essential element of these affirmative defenses (Exh 1 p. 1-6; Exh 5 p. 17; Exh 6 p. 6-11). Thus, even before it insisted on the enforceability of the contract in its Opposition to Goodman's Motion for Leave to amend, PSI ratified the contract and precluded these defenses. While PSI has not identified when it claims to have learned of these occurrences, it obviously would have had to have learned of them before December 2000, the conclusion of the project. Even after Dec. 2000 and Feb. 27, 2001, Goodman spent considerable time and effort, at cost to his livelihood, ascertaining counsel, bringing this lawsuit, appealing its dismissal, etc., before ever being so notified by PSI. This delay of over seven years is obviously undue.

Of course, Tracer would have had to have learned of such occurrences substantially prior to the end of the project. Tracer's last opportunities to rescind can be seen by examination of the individual incidences claimed by PSI as the bases for these counter claims. PSI previously claimed three such incidences (Exh 1 – PSI's 3rd Supplemental Response to Plaintiff's Interrogatories facts #4, #11, #14, #16, #25-#33; Exh 2 – Answer and Counterclaims, Paper #55, pp. 8-11; Exh 5 – PSI's 1st Response to Plaintiff's Interrogatories, #13, pp. 11-13;)

1) Goodman's statement in his contract proposals (spring 1998) that "I have ten years experience dealing with the key decision makers for the fuel registration program." PSI claims that this statement was false because it turned out that the officials Goodman had worked with referred the decision to Margo Oge, Director of the Office of Mobile Sources (subsequently Office of Transportation and Air Quality). It claims that Goodman could not have had any prior experience with Oge because he was unable to set up a meeting with her

over some period of time (Exh 2 – p.10 – fact #28, p. 11–#40; Exh 1 – fact #35) and that

Tracer was damaged by this failure to set up such a meeting.

2) Goodman's having "***recommended***" Don Scroggin as an attorney to be possibly used in

finding legal support for the positions laid out in Goodman's draft petition supporting

exclusion of Tracer from EPA testing (Exh 2– p.10, facts 29-33; Exh 1–fact 25; Exh 8 p. 25)

3) Goodman's having represented in November 1999 that Richard Bechtold had done work on

the project and should be compensated, which Goodman would have to do out of the success

fee (obviously meaning unless Tracer paid him directly) (Exh 2- p. 11 – facts 37-39).

PSI has, however, subsequently conceded that it had no basis for asserting that Tracer had relied

on the representation in (3) above, did not respond to it in its Reply to Goodman's Motion for Summary

Judgment and asserted that it would not pursue it as a counterclaim (Exh 7 - PSI Sur-Reply, p. 3). Its

admitted lack of reliance also precludes raising this incident within its affirmative defenses.

With regard to (1) above, although PSI has not indicated when it became aware of the falsity or

mistake of this statement, it has stated that its basis for believing it false is that Goodman was unable to

arrange a meeting with Margo Oge by early 2000 (Exh 1 – fact #35; Exh 2 – p.10 - #28, p. 11 - #40).[4]

At the same time, PSI admits that it suspended Goodman's authority to communicate with EPA on its

behalf by April 1999 (Exh 5 - Answer #19; Exh 2, p. 3, #12; MtyDpTr 124:19, 128:4, 214:11-14, 215:6-

9, 353:12-14, 356-357) and that it had previously (Feb. 1999) instructed him to hold off on setting up

such a meeting, as had been offered by EPA (Mty 357:9-18), and that it never reauthorized Goodman to

---

[4] Marty admitted in deposition that Goodman's EPA contacts had offered to arrange a meeting with Oge and that Marty had instructed Goodman to hold off on setting up such a meeting (Mty 357:9-18) and PSI has admitted that in its Combined Reply to Goodman's MSJ (Exh 8, pp. 12-13). Nonetheless, PSI has identified Goodman's supposed inability to arrange such a meeting as its sole bases for asserting that the statement in Goodman's proposals was false or mistaken, that it relied on that statement, and that it was damaged by its reliance on that statement. Yet, PSI has not to date withdrawn this affirmative defense (or counterclaim).

communicate with EPA (Exh 2–p. 4, #18; Mty 215:6-9). Since Goodman had no authority to set up a

meeting with Oge after April 1999 at the latest, the basis for PSI's allegation obviously dates before

April 1999. Therefore, given PSI's basis for alleging the falsity or mistake of Goodman' statement,

Tracer had to have been aware of the alleged falsity by not later than April 1999. There were no

circumstances associated with the misrepresentation or mistake that could have occurred or been

discovered after April 1999 since Goodman was precluded by Tracer from contacting EPA.

Shannan Marty, Tracer's then CEO, has also confirmed that Goodman informed her immediately

after his meeting with EPA in October 1998 that his EPA contacts had told him that they would be

referring the final decision to their superior (Mty 185:10-19; 186:6-8; 197:4-16; 209:20-210:3; 306:5-

10). While Marty did not remember if October 1998 was when Goodman first identified Margo Oge by

name, she confirmed that it was by soon thereafter (Mty 185:14-16). Marty was clearly aware that Oge

was the official to which the decision would be referred by March 25, 1999, as she herself refers to Oge

in an email of that date (Exh 9). Moreover, on September 29, 1999, Marty refers to the possible

desirability of going over Oge's head to her boss, based on advice from Mary Gade (Exh 10). PSI does

not claim that Goodman ever indicated that he had direct experience with Oge, let alone with her new

superior. Marty testified that she does not remember Goodman ever claiming to have known Oge (Mty

185:17-20). Obviously, by spring 1999 or fall 1999 at the very latest Tracer was on inquiry of any

circumstances relating to Goodman's relationships with key EPA staff.

PSI's Answer/Counterclaim alleges that Tracer had given up on Goodman by "in or around early

2000" since he had been unable to set up a meeting with Oge and that that realization led to its hiring of

NES (Exh 1, pp. 5-6 – #35-38; Exh 2 – p. 11 – fact #40). The decision to seek NES's help was made in

November 1999 (Exh 11; MGAffirmDec par. 8-11) and a meeting to brief NES held on Jan. 7, 2000

(Exh 12, Exh 13- WilDpTr 13:8-9) essentially eight years before any indication of rescission and well before the conclusion of Goodman's active work or engagement (Exh 14). Thus, PSI's own position asserts that Tracer's hiring of NES was a result of its discovering the circumstances giving rise to the defenses of misrepresentation and mistake (Exh 1 – fact #35; Exh 2 – p. 11 – facts #40-41) in/around early 2000, almost eight years before rescission. Further, that PSI kept Goodman engaged after engaging NES is undisputed (Exh 14).

With regard to incidence of falsity (2) above, Goodman's having "*recommended*" Don Scroggin, Tracer had abandoned using Donald Scroggin for legal research by June 9, 1999, instructing Goodman to proceed with legal research through the National Legal Research Group instead (Exh 15). But despite months of Scroggin failing to find the support Goodman sought, having pursued his own ideas instead (while reporting to Marty, not Goodman – Mty 218:1-15), Marty emailed Goodman that she had "a preference for keeping Don in the loop" as late as July 6, 1999 (Exh 16). Thus, not only had Marty kept Goodman engaged after Scroggin had failed to find the legal support, but she had also proposed to keep Scroggin available after that. *Yet, despite Marty having maintained that "preference," by November 24, 1999, out of thin air without any change in circumstances relating to Scroggin's work, Marty was blaming Goodman for Scroggin's failures* (while explicitly keeping his contract in place) (Exh 17, 1st para.). Since the decision to engage NLRG was made by June 9, 1999 (Exh 15), Tracer had to have been aware of any falsity or mistake of Goodman's having "*recommended*" Scroggin by June 1999 or by November 1999 at the very latest, eight years before its attempt to rescind the contract based on misrepresentation, mistake, and equitable estoppel.

Of course, it is somewhat problematic to identify a date for the when the circumstances showing falsity or mistake about Scroggin became known and rescindable since it is unclear how to

"*recommend*" someone, if Goodman had done that, could become a basis for falsity or mistake (both of which must be of material fact, not opinion, to be actionable). Recommending and opinions are not actionable as "false representations," (*Parker v. Columbia National Bank*, 604 A.2d 521, 528, (Md. 1992), citing cases). The same logic obviously applies to such opinions as basis for "mistake."

III.     **Tracer Waived Its Right to Avoid the Contract Based on Misrepresentation or Mistake by Affirming the Contract Rather than Electing Rescission After It Must Have Been Aware of Any Issues of Misrepresentation or Mistake**

This principle is a variation of II above and overlaps with it considerably but is based on actual acts of affirmation subsequent to when the party had reason to know of any alleged falsity or mistake, irrespective of how much times has passed. Yet, "even silence may indicate ratification," (*Latrobe, supra* @ 983; *Wolin, supra* @ 202). Continuing to act in accordance with the contract, communicate as if it were in effect, or receive performance from the other party, constitutes ratification. "Acts ... which constitute acquiescence, ratification or estoppel will preclude him from rescinding the contract," (*Ryan* @ 751; *Wolin* @ 202-203; *Hudson* @ 423-425).

Tracer affirmed its contract with Goodman in many ways. The majority of the work Goodman did on the contract was after his authority to communicate with EPA was suspended and after Marty says she no longer considered him a point person with EPA (without telling him that) in spring 1999 (Mty Mty 371:2-8 - referring back to 369:10-14, 370:13-16). After this he undertook the legal research with Scroggin and NLRG. After Scroggin had failed in his research, Marty instructed Goodman to proceed with the legal research with NLRG (Exh 15). She instructed him to cooperate with Gade and Wilson after they were engaged, having Goodman prepare both a memorandum of the legal research and a lengthy description of his contacts with EPA for the new consultants (Exh 18). She had him brief NES at the meeting on Jan. 7, 2000 (Mty 284:18-286:11). She had him prepare a memorandum on the

environmental role of the Tracer process in Jan. – Feb. 2000 (Exh 14). She sent him various emails

stating that he was still on the team through Feb. 2000 and that he still had to be available in case needed

again through June of 2000 (Exh 14). And on Nov. 24, 1999, after Gade had already been involved and

the decision had been made to engage Wilson in a conference call earlier on the same day (Exh 17;

MGAffirmDec par 8-11),[5] Marty emailed Goodman, "I can more comfortably live with our original

agreement" (Exh 17, 1st para.). This was the same email in which Marty also blamed Goodman for

Scroggin's failures, while affirming the agreement (*Ibid.*). Subsequent to success, On Feb. 27, 2001

Tracer again rejected rescission/restitution in favor of its interpretation of the agreement and its version

of facts (Exh 4). Tracer clearly elected to ratify rather than rescind the agreement and is estopped from

doing so now.

IV.   **PSI's Affirmative Defenses of Fraud, Misrepresentation and Equitable Estoppel
      Should be Precluded Based on PSI's Spoliation and Other Discovery Abuses.**

For starters, any lack of clarity or precision in the facts relating to the issues raised in sections II

and III above could reasonably result from Tracer/PSI's spoliation of evidence and other discovery

abuses. Tracer's internal communications relating to its discovery of the falsity of Goodman's

statements, the extent to which it had relied on them, and the extent to which it was damaged by them

would shed more light on these questions as well as on the applicable dates when Tracer discovered the

circumstances and any alleged notice of rescission/restitution. But no such documents have been

produced due to Tracer's wholesale, wanton, multi-stage and deliberate destruction of documents and

ESI, as is the subject of a separate motion. The standard for applying adverse inferences or striking

defenses is whether there is reasonable possibility that discoverable relevant evidence was destroyed.

---

[5] Exh 11 also shows that the effort to set up a meeting with Wilson was already in process by Nov. 29, confirming
that the decision had been made in the Nov. 24 conference call.

And the burden of proof on PSI to show fraud or misrepresentation is "clear and convincing," which obviously cannot be met in light of the spoliation. Striking defenses is an appropriate sanction for such spoliation.

Pinpointing the point at time in which PSI claims that Tracer became aware of the alleged falsity or mistake of the various statements is also problematic due to PSI's other discovery abuses. Goodman requested in his Interrogatory 22 that PSI identify the factual bases for its affirmative defenses and counterclaims. PSI refused to give answers at all through multiple rounds of requests and responses (Exh 5, p. 17-#22; Exh 19- PSI June 11, 2008 letter, p. 4- Int. #22 ). Thus, Goodman's deposition of Shannan Marty took place (June 18) without the benefit of the identified factual basis of each. When Magistrate Grimm threatened that he would preclude PSI from offering any evidence on them, PSI agreed to do so but subsequently served Goodman a mere modification of the statement of facts in its Answer and Counterclaim, with a list of 47 facts shown to represent Tracer's response on all affirmative defenses and counterclaims collectively without identifying any facts with specific defenses (Exh 6- 2nd Supplemental Response ..., pp. 6-11). When Magistrate Grimm then suggested that Goodman move for sanctions, PSI served Goodman a revised interrogatory answer but which still lumped the factual bases of four affirmative defenses and three counterclaims together in 43 facts (Exh 1, pp. 1-6), without any identification of what facts show which defense or which elements. Despite Goodman's repeated best efforts at discovery, none of PSI's answers give Goodman any basis for identifying when PSI alleges that circumstances suggested any falsity or mistake. ("**By pleading everything, the defendant informed the plaintiff of nothing. ...** That is, appropriate notice must be given to the opposing party so as to comply with the requirements of due process." *Liberty Mutual v. Ben Lewis Plumbing and Heating*, _ A.3d __ , 121 Md. App. 467, 479 ( 1998) ). As the rescinding party, PSI has the burden of

showing that it rescinded in a timely manner and with an offer of restitution. *Stiegler @* 403. Thus, through discovery abuses, PSI has failed to provide an adequate factual basis for its affirmative defenses in its interrogatory answers.

Deposing Marty on June 18, 2008, without the benefit of the factual bases he was entitled to have been provided well in advance of the deposition (i.e., May 7, 2008 – Exh 5, p. 18) but which PSI had then refused to provide, Goodman asked Marty about any false or misleading statements he had made; Marty did not identify any falsity about his relationships with EPA officials but said "you were setting yourself up as an expert" (Mty 291:16-17) and "you led me to believe that you had a lot of experience in this area and you did have experience but the rules had changed since you had done it," (Mty 290:19-291:2), obviously giving Goodman no basis to divine any basis of the allegations of falsity of the statements, hence none of when Tracer discovered any falsity; Goodman's allegedly false statement dealt with his knowing EPA officials for ten prior years, not with any assurance that EPA orientations did not change or had not changed, nor with his being an "expert." When Goodman asked Marty if she believed he had deceived her in any way, she tried to dodge the question but then answered in the negative (Mty 291:4-292:7). While Marty's testimony undermines PSI's assertions that Goodman misrepresented facts to Tracer at all, it also shows that Goodman was denied the opportunity to discover the key factual bases for PSI's affirmative defenses and counterclaims as result of PSI's failure to give timely meaningful answers to the standard contention interrogatories, prior to the key deposition or even afterward, as well as by its spoliation.[6] Moreover, while the only factual basis for both falsity of Goodman's statement and for damages resulting from it that can be even surmised from PSI's

---

[6] That Goodman questioned Marty regarding things that relate to or were included in PSI's subsequent interrogatory answers does not excuse PSI's failure to provide the factual bases of the affirmative defenses prior to the deposition. Obviously, knowing more about those factual bases could have led Goodman to emphasize such questioning more, ask more follow-up questions, more specific questions, etc.

interrogatory answer is that Goodman was unable to set up a meeting with Margo Oge (Exh 1, pp. 5-6, facts 35-38), Marty contradicted this (Mty 357:9-18) and PSI subsequently reversed its position and also contradicted it (Exh 8, pp. 12-13). This is another instance of PSI's failure to reveal any adequate factual basis for the misrepresentation defenses and counterclaims, let alone do so prior to Marty's deposition, caused either by PSI's resisting discovery or by the complete absence of any adequate factual bases. This alone warrants striking the defenses **and** counterclaims (*Thompson v. HUD*, 219 FRD 93, 102 D.Md. 2003), notwithstanding the absence of a prior court order compelling the evidence (*Thompson* @ 100; *Trigon v. U.S.*, 204 FRD 277, 285, citing *Vodusek v. Bayliner*, 71 F.3d148, 156, 4th Cir. 1995, *Chambers v. Nasco* 501 US 32, 43-45, 111 S.Ct. 2123 – 1991, and other cases).

Respectfully submitted,

Marc Goodman
P.O. Box 727
North Beach, Md.  20714
(301) 855-7655
marcbgoodman@msn.com

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Plaintiff's Memorandum in Support of Motion *In Limine*/to Preclude Defendant's Affirmative Defenses of Fraud-in-Inducement, Negligent Misrepresentation and Equitable Estoppel was mailed, postage prepaid, to Erin Shoudt, Sonnenschein Nath & Rosenthal LLP, 1301 K St. N.W., Ste. 600, East Tower, Washington, D.C. 20005, this 1st day of April
2009.